1  Stephen G. Larson (SBN 145225)
2  *slarson@larsonobrienlaw.com*
   Jonathan E. Phillips (SBN 233965)
3  *jphillips@larsonobrienlaw.com*
4  **LARSON O'BRIEN LLP**
   555 South Flower Street, Suite 4400
5  Los Angeles, CA  90071
   Telephone:  213.436.4888
6  Facsimile:  213.623.2000
7
   Attorneys for Plaintiff
8  COLONIES PARTNERS, L.P.

9           UNITED STATES DISTRICT COURT

10         CENTRAL DISTRICT OF CALIFORNIA

11                EASTERN DIVISION

12

| | |
|---|---|
| COLONIES PARTNERS, L.P. | **CASE NO.  5:18-cv-00420** |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | |
| COUNTY OF SAN BERNARDINO; SAN BERNARDINO COUNTY FLOOD CONTROL DISTRICT; MICHAEL A. RAMOS, in his individual capacity; R. LEWIS COPE, in his individual capacity; JAMES HACKLEMAN, in his individual capacity; HOLLIS "BUD" RANDLES, in his individual capacity; ROBERT SCHREIBER, in his individual capacity; JOSIE GONZALES, in her individual capacity; RUTH STRINGER, in her individual capacity; ADAM ALEMAN, in his individual capacity; EDMUND G. BROWN, JR., in his individual capacity; KAMALA D. HARRIS, in her individual capacity; MELISSA MANDEL, in her individual capacity; and GARY SCHONS, in his individual capacity | **(1) RETALIATION (42 U.S.C. § 1983);** <br> **(2) *MONELL* CLAIM (42 U.S.C. § 1983);** <br> **(3) SUPERVISORIAL LIABILITY (42 U.S.C. § 1983);** <br> **(4) CONSPIRACY (42 U.S.C. § 1983);** <br> **(5) BREACH OF CONTRACT;** <br> **(6) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.** <br><br> **DEMAND FOR JURY TRIAL** |
| Defendants. | |

1.      Plaintiff Colonies Partners, L.P. ("Plaintiff" or "Colonies") brings this action seeking compensatory and punitive damages against Defendants COUNTY OF SAN BERNARDINO ("County"), SAN BERNARDINO COUNTY FLOOD CONTROL DISTRICT ("District"), MICHAEL A. RAMOS, R. LEWIS COPE, JAMES HACKLEMAN, HOLLIS "BUD" RANDLES, ROBERT SCHREIBER, JOSIE GONZALES, RUTH STRINGER, ADAM ALEMAN, EDMUND G. BROWN, JR., KAMALA D. HARRIS, MELISSA MANDEL, and GARY SCHONS for violations of Plaintiff's civil and other rights under the U.S. Constitution and under California law.

2.      Colonies' claims are based on an illegal campaign of retaliation, intimidation, and harassment by the County and the State of California through their employees.  This unlawful campaign was undertaken in retaliation for Colonies' exercise of its First and Fifth Amendment constitutional rights.  First, Colonies exercised its Fifth Amendment right to receive just compensation in connection with the uncompensated "taking" of 72 acres of its land by Defendants County and District for a regional flood control facility.  The campaign intensified after Colonies secured a $102 million civil settlement in 2006 from Defendants County and District (the "Settlement Agreement").  Second, in connection with the civil litigation and settlement Colonies exercised its First Amendment free speech rights to petition the government and advocate for settlement.  Following the settlement Colonies continued to exercise its free speech rights by making political contributions to general purpose political action committees ("PACs") affiliated with pro-development politicians, including members of the San Bernardino County Board of Supervisors and others who had supported the settlement.

3.      The Defendants' retaliatory campaign developed and manifested in several ways, but no more so than in a coordinated effort to target Colonies through an unfounded criminal investigation of its general partner's two co-managing members without justification or probable cause.  This retaliatory investigation

ultimately resulted in felony charges being brought against one of those co-managing members, Jeffrey Burum, more than six years of criminal litigation, and a ten-month criminal trial in San Bernardino Superior Court in the case entitled *People v. Biane, et al*., Case No. FSB 1102102 (the "Criminal Action"). Because the investigation's motivating and ultimate goal was to punish Colonies and its management, and not to conduct a legitimate and fair examination of the facts, it was no surprise that the prosecution's case was marred by repeated use of fabricated evidence and perjured testimony; indeed, it was so weak that Mr. Burum did not need to call a single witness in his defense. On August 28, 2017, the next court day after the jury deliberations began, the jury acquitted Mr. Burum on all remaining charges, with the Court having already dismissed several charges for numerous legal and/or factual deficiencies. Mr. Burum—and by extension, Colonies—was vindicated.

4. This thorough repudiation of the prosecution's case, and the lengths to which prosecutors, investigators, and certain County-affiliated witnesses went to manufacture some semblance of a case against Mr. Burum, is itself evidence of the unjustified and retaliatory motives that drove the criminal investigation from the outset. There was never any credible evidence of criminal conduct involving the Settlement Agreement or subsequent PAC contributions—just a relentless drive by the Defendants to punish Colonies for having exercised its constitutional rights, and to chill Colonies from daring to exercise its constitutional rights in the future.

5. Moreover, in their zeal to exact this punishment, Defendants County and District ignored their contractual obligations under the Settlement Agreement, as fulfilling them would have undermined the multi-pronged strategy of retaliation. The County and District were undoubtedly thrilled that Colonies was being forced to spend millions of dollars defending itself from the bogus investigation and prosecution, which various County and District employees vigorously encouraged and assisted. It is no surprise, then, that the County and District would stonewall

Colonies' repeated requests for the indemnity and defense Colonies had bargained for in the Settlement Agreement.  By doing so, they ensured that Colonies' resources would be tied up defending itself instead of expanding its business or, even worse in their view, influencing elections through First Amendment protected political contributions.

6.     Defendants County and District thus breached the Settlement Agreement and violated the covenant of good faith and fair dealing by failing to defend and indemnify Colonies in two subsequent legal actions, failing to defend the validity of the Settlement Agreement, and assisting the San Bernardino County District Attorney's Office and California Attorney General's Office in their efforts to invalidate the Settlement Agreement through the criminal prosecution of Mr. Burum.

7.     Defendants' wanton disregard of Colonies' constitutional and contractual rights violates 42 U.S.C. § 1983 and California law.  As a direct and proximate result of Defendants' actions, Colonies has suffered and will continue to suffer damages.  For these reasons, and as set forth below, Colonies is entitled to compensatory damages, punitive damages, attorneys' fees and costs, pre-judgment interest, and all other relief provided by law.

**JURISDICTION AND VENUE**

8.     This case arises under 42 U.S.C. § 1983 and California law.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a).

9.     Pursuant to California Government Code §§ 810 et seq., Plaintiff filed its state law claims with the County and District on December 14, 2017.  On January 26, 2018, the County and District rejected these claims, stating they were taking no action because Colonies' claims were supposedly untimely.  Because Colonies' claims were filed timely pursuant to California law, the County and

//

District's response is appropriately interpreted as a denial of all claims.  Pursuant to Government Code § 945.6, Colonies is now filing these claims with this Court.

10.    Venue is proper in the Central District of California under 28 U.S.C. § 1391 (b)(1) and (2) because the majority of Defendants reside in this District and substantial acts and omissions giving rise to Colonies' claims occurred in this District.

### THE PARTIES

11.    Plaintiff Colonies Partners, L.P. is a California limited partnership with its principal place of business in Rancho Cucamonga, California.

12.    Defendant County of San Bernardino is a municipal corporation organized and existing under the laws of the State of California.  Defendant County was at all relevant times mentioned herein responsible for its own actions and/or omissions as well as the actions and/or omissions and the policies, procedures, customs, and practices of the San Bernardino County District Attorney's Office.

13.    Defendant San Bernardino County Flood Control District is a public agency organized and existing under the laws of the State of California and is the government agency responsible for constructing, maintaining, and operating regional flood control facilities in the County of San Bernardino.

14.    At all relevant times, Defendant Michael Ramos was the District Attorney of the County of San Bernardino.  In that capacity, he is the official responsible for setting and enforcing the policies, customs, and practices of the District Attorney's Office.  Defendant Ramos at all relevant times directed, supervised, authorized, and/or ratified the actions of his office's employees, agents, and officials as alleged herein.

15.    At all relevant times, Defendant R. Lewis Cope was a Deputy District Attorney for the County of San Bernardino in the District Attorney's "Public Integrity Unit" and was a supervisor in that unit.  Defendant Cope is employed by and is an agent of Defendant County and the District Attorney's Office.  Defendant

Cope was one of the lead prosecutors from the District Attorney's Office assigned to prosecute Mr. Burum, and as such he directed and participated in the retaliatory criminal investigation into Colonies and Mr. Burum, including directing, supervising, authorizing, and/or ratifying the actions of the Public Integrity Unit's other employees, agents, and officials working on the Criminal Action.

16.    At all relevant times until October 2011, Defendant James B. Hackleman was a Deputy District Attorney for the County of San Bernardino, and the lead prosecutor in the "Public Integrity Unit." Defendant Hackleman directed and participated in the retaliatory criminal investigation into Colonies and Mr. Burum, including directing, supervising, authorizing, and/or ratifying the actions of the Public Integrity Unit's other employees, agents, and officials working on the Criminal Action.

17.    At all relevant times, Defendant Hollis "Bud" Randles was an Investigator in the San Bernardino County District Attorney's office. Defendant Randles was a lead District Attorney investigator in the retaliatory criminal investigation into Colonies and Mr. Burum.

18.    At all relevant times, Defendant Robert Schreiber was an Investigator in the San Bernardino County District Attorney's office. Defendant Schreiber was a lead District Attorney investigator in the retaliatory criminal investigation into Colonies and Mr. Burum.

19.    At all relevant times, Defendant Josie Gonzales was the Supervisor for the Fifth District of San Bernardino County. Defendant Gonzales initiated and participated in the retaliatory criminal investigation into Colonies and Mr. Burum.

20.    At all relevant times until October 2010, Defendant Ruth Stringer was an attorney with the County Counsel's Office for the County of San Bernardino. Defendant Stringer participated in and encouraged the retaliatory criminal investigation into Colonies and Mr. Burum.

21.    At all relevant times until December 2006, Defendant Adam Aleman

was a Field Representative and assistant to then-Supervisor Bill Postmus.  Then, until July 2008, Defendant Aleman was Assistant Assessor for the County of San Bernardino.  Thereafter, Defendant Aleman was a cooperating witness who initiated and participated in the retaliatory criminal investigation into Colonies and Mr. Burum.

22.   At all relevant times until January 2011, Defendant Edmund G. Brown, Jr., was the Attorney General for the State of California.  Defendant Brown at all relevant times directed, supervised, authorized, and/or ratified the actions of his office's employees, agents, and officials as alleged herein.

23.   At all relevant times from January 2011 through January 2017, Defendant Kamala D. Harris was the Attorney General for the State of California. Defendant Harris at all relevant times directed, supervised, authorized, and/or ratified the actions of her office's employees, agents, and officials as alleged herein.

24.   At all relevant times, Defendant Melissa Mandel was a Supervising Deputy Attorney General for the State of California.  Defendant Mandel is employed by and is an agent of the State of California and the Attorney General's Office.  Defendant Mandel was one of the lead prosecutors assigned to prosecute Mr. Burum, and as such she directed and participated in the retaliatory criminal investigation into Colonies and Mr. Burum, including directing, supervising, authorizing, and/or ratifying the actions of the Attorney General's Office's other employees, agents, and officials, as well as the District Attorney investigators, working on the Criminal Action.

25.   At all relevant times until October 2011, Defendant Gary Schons was a Deputy Attorney General for the State of California.  He was employed by and was an agent of the State of California and the Attorney General's Office.  Defendant Schons was one of the prosecutors assigned to prosecute Mr. Burum, and as such he directed and participated in the retaliatory criminal investigation into Colonies and Mr. Burum, including directing, supervising, authorizing, and/or ratifying the

actions of the Attorney General's Office's other employees, agents, and officials, as well as the District Attorney investigators, working on the Criminal Action.

26.     In taking the actions alleged herein, Defendants acted under color of law, with the exception of the County and District's actions in connection with the Colonies civil litigation and settlement (as alleged in Paragraphs 28-41 below) and their breach of the Settlement Agreement and the covenant of good faith and fair dealing (as alleged in Paragraphs 91-109 below).

27.     As set forth below, Defendants conspired with each other and others to illegally retaliate against, intimidate, and harass Colonies for having successfully exercised its First and Fifth Amendment Rights.

## **FACTUAL ALLEGATIONS**

### **Civil Litigation Over the Uncompensated Taking of Colonies' Land, the Settlement, and Colonies' Post-Settlement Political Contributions**

28.     The County's long campaign to deprive Colonies of its rights began in 1999 when Colonies refused to be victimized by the County and District's efforts to unlawfully take 72 acres of prime developable land, without just compensation, to build a regional flood control facility.  In 1997, Colonies purchased 434 acres of land in Upland, California for development.  When the County and other entities built the 210 freeway extension through Colonies' property, they needed a large area in which to contain the massive water runoff caused by that project and the related 20th Street Storm Drain.  The 20th Street Storm Drain was a regional flood-control facility built in Upland to provide 100-year flood protection for the below-grade portion of the 210 freeway west of Colonies' property.  The 20th Street Storm Drain ended in a 12-foot-by-14-foot concrete outlet located on the western edge of Colonies' property.  Instead of appropriately exercising their power of eminent domain over Colonies' land, or even simply offering to fund the necessarily huge flood control basin, the County and District set out to force

//

1  Colonies to build the flood control facility itself, on Colonies' own land, and at its

2  own expense.

3      29.    In 1999, the District's executive director, Ken Miller—knowing that

4  water runoff from the 210 freeway project would be torrential and would require

5  construction of a new, vast, expensive flood control facility—attempted to trick

6  Colonies into agreeing to hand over the land and build the basin itself.  He did so by

7  lying about the amount of water involved and the necessary size of the flood control

8  facility.  The truth was that existing flood control facilities were utterly inadequate

9  to contain the up to 80 million gallons of water per hour that could be unleashed

10  onto the property through the 20th Street Storm Drain.  Despite having no legal

11  obligation to do so, Colonies offered to end the dispute by giving the County and

12  District the necessary acreage so long as the County and District would pay for the

13  construction of a basin sufficient to control the new storm waters resulting from the

14  210 freeway project and the 20th Street Storm Drain.  The County and District

15  refused.

16      30.    Instead, the County and District, spurred by their attorneys, some of

17  the County Supervisors, and District management, stubbornly insisted that limited

18  easements dating from the 1930s permitted them to redirect the massive flood

19  waters created by the freeway's construction onto Colonies' land—and that it was

20  then Colonies' responsibility to construct and pay for the necessary regional flood

21  control facilities.  The County and District also tried to argue that they had obtained

22  "consent" from Colonies in 1999, conveniently ignoring that the only "consent"

23  was as to the physical and geographic placement of the 20th Street Storm Drain,

24  and that even this limited "consent" was based on fraud and deceit.  Colonies never

25  consented to the County or District diverting flood water onto Colonies' property

26  without just compensation.

27      31.    Facing an intransigent County and District, and with the 20th Street

28  Storm Drain on the verge of being "turned on" with no facilities to contain the

resultant flood waters, Colonies had no other option than to file a quiet title action in March 2002 to vindicate its property rights.  That action went to trial in 2003 before San Bernardino County Superior Court Judge Peter H. Norell.  Colonies won the action when Judge Norell ruled that the County and District had no right to divert and dump flood water onto Colonies' property without just compensation. Undeterred, and still refusing to take responsibility for their actions, the County and District doubled down and appealed the decision, leading to a second trial on the issue three years later.

32.     In the meantime, recognizing that the lack of adequate flood control facilities posed a grave threat to public safety, Colonies built a new flood control basin on its own land and at its own expense, rushing to finish it before an anticipated El Niño winter deluge in 2003-04.  Shockingly, the County and District's lawyers and public safety officers at this point turned on a dime:  After years of haranguing, cajoling, urging, and threatening Colonies to build the basin, they now filed a petition for writ of supersedeas to *stop* Colonies from constructing the basin—an all-too transparent effort to gain a litigation advantage in the pending appeal.  Fortunately, the Court of Appeal rejected this ill-conceived gambit, recognizing that the County and District's interference posed an imminent threat to public safety.

33.     The seven-year civil battle over Colonies' land ultimately came to a head in a second trial before San Bernardino County Superior Court Judge Christopher J. Warner in 2006.  After hearing six weeks of testimony, Judge Warner released a blistering statement of intended decision on July 31, 2006, finding not only that Colonies was legally right, but also confirming that the County and District had peddled in fraud, coercion, and deceit.  Among other things, Judge Warner found that:

a) The County and District's claimed easements were insufficient to justify the necessary flood control facilities, and thus the County and District's

actions constituted a "gross surcharge" that permanently extinguished any easements on Colonies' land—meaning the County and District had no right to dump *any* water onto the property;

b) The County and District had played "hide the ball," engaged in "deceit," and tried to "coerce" Colonies into giving up its land rights;

c) The County and District had held Colonies' development "hostage" in an effort to get free flood control construction and had "unreasonably and unjustifiably interfere[d] with [Colonies'] business";

d) County and District employees, including Mr. Miller, had been untruthful or not credible when testifying under oath at trial;

e) The County and District had "turned on" the 20th Street Storm Drain in 2002 "without providing for any viable flood-control facilities on [Colonies'] property and without ensuring public safety from the flooding hazard"; and

f) Colonies had taken "every reasonable action to protect the public" even in the face of the County and District's "deceit and misinformation."

34.     County attorney Mitchell Norton later told investigators that Judge Warner's opinion was "Armageddon" for the County and District.  He explained that had Judge Warner's intended decision become final, it would have paved the way for Colonies to recover upwards of $300 million in damages in an inverse condemnation action that had been stayed pending resolution of the quiet title case. Moreover, Judge Warner's multiple findings of bad faith by the County and District would have severely threatened their attempts to obtain indemnification from the other government agencies involved in the 210 freeway expansion.

35.     Facing this dire legal position, four out of the five County Supervisors repeatedly voted in favor of settlement—yet County lawyers and officials continued to do everything possible to stop a settlement.  For example, Mr. Norton bragged that he had inserted "poison pills" into a draft settlement agreement for the purpose

of sabotaging the agreement.  And Defendant Stringer refused to sign off on the legality of the settlement even though she later admitted having very little involvement with, or understanding of, the underlying civil litigation, and therefore no basis on which to decide that the proposed settlement was unlawful or even improvident.

36.     The County and District's high-priced outside attorneys—who had just lost the Colonies trial—likewise had no basis to justify their opposition to settlement.  The County and District had unwisely spent millions of dollars on law firms whose lawyers had little or no background in land disputes.  Embarrassed by their repeated defeats, these outside attorneys joined County Counsel and other County and District officials in digging their heels in, trying to scuttle the settlement, and championing further appeal and delay.

37.     In the months following Judge Warner's tentative decision, Colonies— by and through Mr. Burum—repeatedly commented publicly on the County and District's intransigence, causing the County, District, and their employees further public embarrassment.  As a result, the County suffered a steady stream of negative press articles and public opinion expressing concern that the County and District's incompetence and misconduct had exposed taxpayers to such massive risk.  Additionally, as part of the effort to informally resolve the litigation, Colonies—by and through Mr. Burum—actively and directly petitioned members of the Board of Supervisors and other County officials and employees to accept responsibility for the County and District's actions and reasonably settle the dispute.

38.     These exercises of Colonies' First Amendment rights mirrored Colonies' strategy throughout the civil litigation.  In addition to litigating the dispute in court, Colonies actively participated in the political process.  It retained professionals such as former California State Senator James Brulte and media consultant Patrick O'Reilly, both of whom were integral to Colonies' direct communications with County Supervisors and its efforts to shape public discourse

regarding the dispute.  These efforts publicized the role of County lawyers and staff in botching the dispute, angering these individuals and giving them additional motive for retaliatory action.

39.    Defendants' motive for retaliation was particularly acute because Colonies had been effective in exercising lawful political influence and convincing voters to upend the do-nothing status quo.  In 2002, Colonies publicly and aggressively opposed the re-election campaign of then-Supervisor Jon Mikels of the Second District—the district in which the development was located.  Colonies' leadership had met with Mr. Mikels prior to filing its lawsuit to discuss informally resolving the dispute.  Mr. Mikels rudely and vulgarly rejected Colonies, declaring his absolute opposition to even negotiating a settlement.  Rejected by their own Board representative, Colonies unsurprisingly supported Mr. Mikels' opponent, Rancho Cucamonga City Councilman Paul Biane, who won the 2002 supervisorial election by a large margin.  Colonies also financially supported Ontario Mayor Gary Ovitt—another staunchly pro-development politician—in his successful 2004 run for Supervisor.  Colonies' successful engagement in the political process scared and inflamed others who realized that Colonies' vigorous public participation could be turned against them as well.  It also concerned County lawyers and staff who were concerned that newly-elected officials might not automatically defer to their self-proclaimed expertise.  So, when Colonies' persistence in court and in petitioning the government eventually succeeded, Defendants were unwilling to let Colonies' success in enforcing its rights go unanswered.

40.    On November 28, 2006, Colonies, the County, and the District settled the bitter four-year litigation and seven-year public fight over the unlawful "taking" of Colonies' land.  Facing hundreds of millions in damages and the prospect of unending attorneys' fees, the Board of Supervisors voted 3-2 to approve a $102 million settlement in exchange for Colonies releasing all of its damages claims and deeding the subject land to the District for its flood control purposes.  Supervisors

William Postmus, Gary Ovitt, and Paul Biane voted in favor of the settlement; Dennis Hansberger and Defendant Gonzales voted against.  Defendant Gonzales had consistently supported settlement until the eleventh hour.  On information and belief, she changed her vote to avoid the political consequences she feared would flow from her support for a large settlement.  She also had her own large donors to appease, some of whom were competitors of Colonies and had benefited from the distraction that protracted litigation had imposed upon Colonies.

41.    In 2007, months after the settlement vote, Colonies again exercised its First Amendment rights of free speech and petition by making political donations to PACs associated with members of the Board of Supervisors, and others, who had supported the settlement and who would advance pro-development policies. Colonies hoped that these contributions would help get politicians elected who not only would support further development in the Inland Empire, but would exercise appropriate authority and oversight over the County's lawyers and staff so as to avoid future legal debacles.

### The Unlawful Investigation

42.    No sooner was the ink dry on the Settlement Agreement than upset and embarrassed elements within the County apparatus began planning their retaliation. And they were joined by new allies:  The San Bernardino District Attorney's Office and California Attorney General's Office.  Angered over the civil litigation, the Settlement Agreement, and the 2007 PAC contributions, and motivated by illegal and improper purposes, but without any credible evidence of wrongdoing, Defendants orchestrated a campaign to punish Colonies.  Defendants intimidated witnesses, falsified evidence, hid exculpatory evidence, and eventually presented false testimony to two grand juries and the trial jury, all to fabricate a case against the co-managing member of Colonies' general partner, Mr. Burum.  This illegal campaign intentionally punished Colonies for exercising its constitutionally

//

protected rights and chilled Colonies' ability to petition its government or make political contributions after 2007 for fear of continuing and additional reprisals.

43.    The conspiracy to deprive Colonies of its constitutional rights was also politically expedient.  In 2010, Defendants Ramos and Brown held a joint press conference to announce the prosecution of what they called the largest public corruption scandal in the history of California.  Both were facing upcoming elections.  Defendant Brown claimed that it was the "most appalling corruption case in decades" and "a shocking example of how money can corrupt the government process"—statements made, as though proven facts, even as Defendant Brown was collecting record amounts of campaign cash for his own race for California Governor.  Defendant Ramos noted that two Colonies partners had been named as unindicted co-conspirators at the time, and warned that there was an "ongoing investigation."  Defendant Ramos then decried, again stated as though a proven fact, "a well-orchestrated political and personal attack on this District Attorney, attempting to intimidate me in obstructing justice and finishing this job."  Defendant Ramos, recognizing that Colonies was a threat to his power, declared that he was going to "finish the job" by aggressively investigating Colonies.

44.    Leaving no doubt that this was a joint campaign between the San Bernardino County District Attorney's Office and the California Attorney General's Office, Defendant Ramos assured the public that Defendant Brown was his "crime-fighting partner," and that both were responsible for the investigation.  Defendant Ramos explained that the Attorney General's Office "went through all of our evidence, and now have worked with us every day on this."  Defendant Ramos expressly named Defendants Hackleman, Schons, and Mandel, and explained that they were "working together every day" on the investigation.

45.    Defendants Brown and Ramos both made it clear that their real target in the criminal investigation was Colonies.  Defendant Ramos lamented that Colonies had obtained compensation for its property in "these tough economic

times," and explained that his goal was to "get that money back to the citizens," a statement he repeated innumerable times at various political and fund-raising events throughout the Colonies prosecution.  Defendant Ramos further claimed that these "well-funded folks, developers" were somehow trying to "attack and control the D.A's office for exposing this corruption."  The truth was the precise opposite: Defendant Ramos was on the attack, using the media and the power of his office to advance the orchestrated campaign of retaliation against Colonies.

46.   Defendant Brown demonstrated similar animus against Colonies, stating that he found it significant that there was "$102 million being voted on," and explaining that the settlement would be "void" and the $102 million would be paid back to the County by Colonies.  He also claimed as fact that there was "no basis" for the $102 million settlement, a position readily disproven by a host of witnesses and contemporary documentation.  But Defendant Brown, like the other Defendants that participated in the retaliation campaign, had no interest in the actual facts of the case or a fair investigation.

47.   After Defendant Harris took office as Attorney General, she issued a press release taking credit for the indictments as "the result of a combined effort by Attorney General Kamala D. Harris and San Bernardino County District Attorney Michael A. Ramos."  The Attorney General's Office explained that the "two agencies jointly investigated the case and presented it to the grand jury."  Moreover, the press release revealed that the case was "part of a continuing probe by both the Attorney General and the DA into corruption in San Bernardino County."  Attempting to use the indictments for political gain and to turn the public against Colonies, Defendant Harris claimed that her office was sending "a strong message that we will never tolerate this sort of abuse of public trust."  In just one early demonstration of the Orwellian nature of Defendants' invented case, the press release claimed that the criminal defendants "used political action committees to conceal the bribes."  And yet, all of the PAC contributions at issue had been

15

*disclosed* on public records in the normal course of required reporting under the Political Reform Act.

48.     Later, Defendant Harris confirmed to local media outlets that Defendant Schons, Defendant Mandel, and Deputy Attorney General Emily Hanks would continue to "assist" County prosecutors in the Colonies case at Defendant Harris's direction, while confirming that she was "committed to doing everything" she could to support the ongoing investigation.

49.     In 2011, Defendant Ramos held yet another press conference after Mr. Burum, Mark Kirk, James Erwin, and Mr. Biane were indicted and arrested. During that press conference, Defendant Ramos quoted Defendant Mandel as calling the prosecution team "Team Justice," a pretext in the ongoing battle to win public support for the retaliation scheme.  Defendant Ramos identified "Team Justice" as including Defendant Cope, Defendant Randles, Defendant Schreiber, Defendant Hackleman, Deputy District Attorney Michael Smith, Deputy District Attorney John Goritz, Defendants Schons, Mandel, Brown, and Harris, and others. Defendant Ramos claimed that the team "worked hard" together and uncovered a "significant amount of evidence."  He claimed that "Team Justice" had gathered dozens of witnesses.  He claimed that Mr. Postmus's guilty plea supported what "Team Justice . . . already knew":  The Colonies defendants were guilty.  Defendant Ramos's conduct in this matter demonstrates that when he exclaimed that "corruption would not be tolerated in San Bernardino County," what he really meant was that "Colonies would not be tolerated in San Bernardino County."

50.     During this 2011 press conference, Defendant Ramos again brought up the $102 million settlement payment, and explained that "Team Justice" was going to seek an order of restitution requiring Colonies to return the settlement payment— even though the District had already received 72 acres of Colonies' developable land for regional flood control use.  Defendants, angry that the District had been forced to compensate Colonies for that land, used the pretext of the prosecution to

pressure Colonies to disgorge its hard-won compensation guaranteed under the Fifth Amendment.  Indeed, Defendant Ramos explained during the press conference that the District Attorney's Office was also "partners" with the San Bernardino County Counsel's office in their efforts to recover the $102 million, leaving no doubt about the County's and Defendant Ramos's complicity in their joint retaliation scheme.

51.     Defendant Schons also spoke at the press conference on behalf of the California Attorney General's Office.  Defendant Schons emphasized the "equal partnership" shared between the District Attorney's Office and the Attorney General's Office in investigating and prosecuting the case.

52.     For his part, Defendant Ramos recognized that the investigation was the ideal opportunity to not only retaliate against and politically neutralize Colonies, but to make his vendetta the centerpiece of his supposedly "anti-corruption" reelection campaigns.  At one point, Defendant Ramos's agents described political contributions against him by Mr. Burum's and Colonies' supporters as "felony stupid"—an unsubtle threat that those supporting Defendant Ramos's opponents would suffer from similar retributive action.  Defendants Mandel, Cope, Randles, and Schreiber, as well as numerous other County officials, likewise used the unlawful and retaliatory investigation to advance their careers.

53.     The pretext for the retaliatory investigation against Colonies was an allegation that the 2007 PAC contributions were "secret" payoffs for the three votes that approved the Colonies settlement.  Of course, there was no credible evidence that bribery had taken place, and not even any evidence that the campaign contributions were "secret"—all of them were fully disclosed.  On information and belief, because prosecutors and investigators—including Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons—pursued the investigation for reasons having nothing to do with actual guilt, they ignored or buried all the significant exculpatory evidence they uncovered.

54.     Defendants' retaliatory investigation was not about pursuing justice, or any search for truth.  By advancing flimsy charges, ignoring or hiding exculpatory evidence, misleading grand juries, and intimidating and manipulating witnesses, Defendants knew they could deter Colonies from further exercises of First and Fifth Amendment rights.  Defendants knew that Colonies would be severely limited in participating in future elections.  This was important to Defendants, particularly given Defendant Ramos's periodic reelection campaigns.  Keeping Defendant Ramos in office was a necessary part of the retaliation scheme, as Defendant Ramos was willing to abuse the power of his office to pursue Defendants' common goal of punishing and deterring Colonies.

55.     On information and belief, because Defendants' motivation was retribution and revenge against Colonies, rather than justice, Defendants ignored that the 2006 settlement legitimately and reasonably ended four years of contentious civil litigation.  They ignored that the County was facing legal defeat following Judge Warner's July 2006 tentative ruling in the underlying civil case.  And they ignored that the County avoided financial annihilation by settling a $300 million claim for $102 million—a conclusion the County and County-retained counsel and expert witnesses had already recognized and were affirmatively arguing in the County's ongoing insurance indemnity litigation.

56.     Investigators and prosecutors—including Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons—also disregarded other evidence of the Settlement Agreement's legality.  For example, in 2007 the San Bernardino County Superior Court conclusively held that the Settlement Agreement was legal and valid following a validation action supported by a unanimous Board of Supervisors and *brought by the County*—a holding subsequently upheld by the Court of Appeal in dismissing a 2012 lawsuit brought by taxpayer groups seeking to challenge and invalidate the settlement (the "Taxpayer Action").  Defendants also ignored evidence from Deputy County

Counsel Norton that the 2006 settlement was objectively reasonable given the County's risk at the time.

57.    Investigators and prosecutors—including Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons—not only ignored this and other exculpatory evidence, they withheld all manner of exculpatory evidence from the grand jury for the purpose of obtaining an indictment against Mr. Burum, which they knew would require a vast commitment of Colonies' time and resources to defend.

58.    Moreover, Defendants Hackleman and Stringer agreed in 2010 to pursue a dishonest "two paths" strategy, documented in written correspondence discovered during the criminal prosecution.  These documents demonstrate that the County agreed to defend the legality of the settlement in its civil indemnity litigation, while prosecutors would simultaneously try to prove its criminality as part of Mr. Burum's prosecution.  On information and belief, they reasoned that by pursuing both paths, at least one of them would succeed in punishing Colonies. Defendant Stringer even violated her ethical duties in her zeal to punish Colonies and Mr. Burum by sharing attorney-client privileged information with Defendant Hackleman *before* the Board of Supervisors voted to waive the privilege.

59.    Prosecutors and investigators did not stop at ignoring or burying exculpatory evidence.  Members of the prosecution team—including Defendants Randles and Schreiber—affirmatively fabricated evidence to prop up their case. And, on information and belief, they were supervised in doing so by Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and/or Schons.

60.    Most egregiously, they coerced Mr. Postmus into giving false testimony and leveraged his drug addiction to manipulate his memory.  Mr. Postmus was one of the Supervisors who voted in favor of the Settlement Agreement.  He was also affiliated with one of the PACs that received political contributions from Colonies in 2007.  Investigators needed someone to tie these

two events together to build their case of bribery against Mr. Burum—and Defendants Randles and Schreiber, on information and belief supervised by Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and/or Schons, targeted Mr. Postmus as someone they could manipulate because of his ongoing and longstanding methamphetamine addiction and the numerous felony charges he faced based on his drug use and illegal conduct in the Assessor's Office.

61.    Mr. Postmus had left the Board of Supervisors after being elected to the position of County Assessor in January 2007. As he has since admitted, he was battling severe drug addiction at that time, and the impact of that drug use soon became apparent, especially to trained law enforcement officials. By January 2011, Mr. Postmus had been forced to resign as Assessor and was facing numerous felony charges for actions unrelated to Colonies. He was even arrested in court for making an appearance under the influence of methamphetamine.

62.    On information and belief, Defendants Randles and Schreiber knew all of this because of their involvement in the criminal investigation and case against Mr. Postmus. And because they knew full well how methamphetamine abuse impacts memory—among other things, making someone more susceptible to having false memories implanted by coercive questioning—they recognized and seized the opportunity to manipulate Mr. Postmus into becoming their star witness for their campaign of retaliation and retribution against Colonies and Mr. Burum. In fact, they went so far as to avoid drug testing Mr. Postmus, giving Defendants Cope and Mandel plausible deniability when they eventually elicited false testimony from Mr. Postmus before the indicting grand jury in which he claimed to have been sober for months (only to later admit that he had been using methamphetamine throughout his cooperation with the District Attorney's Office and his grand jury testimony). Of course, failing to drug test Mr. Postmus had the added benefit to Defendants Randles and Schreiber of increasing the likelihood that //

1   Mr. Postmus would continue his methamphetamine abuse and thus remain in the
2   drug-addled state they needed to continue manipulating him.

3          63.    Defendants' strategy worked.  Over the course of five interviews in
4   early 2011, Defendants Randles and Schreiber repeatedly and successfully
5   manipulated Mr. Postmus's memory and coerced him into saying what they wanted
6   to hear.

7          64.    Most critically, investigators and prosecutors—including Defendants
8   Ramos, Cope, Hackleman, Randles, Schreiber, Harris, Mandel, and Schons—
9   refused to accept Mr. Postmus's repeated denials of a corrupt *quid pro quo*
10  agreement to exchange his vote for the 2007 campaign contributions.  In his initial
11  interviews with Defendants Randles and Schreiber, Mr. Postmus explicitly and
12  repeatedly denied that he had ever accepted a bribe in exchange for his pro-
13  settlement vote.  And he emphatically stated that Mr. Burum had "never crossed the
14  line" with him in dealing with the Colonies matter.  On information and belief,
15  Defendants refused to accept this truth because it did not further their retribution
16  campaign against Colonies.  So, over the course of several interviews, Defendants
17  Randles and Schreiber—on information and belief, supervised by Defendants
18  Ramos, Cope, Hackleman, Harris, Mandel, and/or Schons—convinced Mr. Postmus
19  that he had committed various felony offenses related to the settlement, and coerced
20  him into pleading guilty and testifying to those supposed offenses before the
21  indicting grand jury.

22         65.    Defendants Randles and Schreiber also planted smaller deceptions for
23  the purpose of manipulating Mr. Postmus into telling larger lies.  For example, they
24  convinced Mr. Postmus during their interviews that he had fired the County's
25  outside counsel in 2004 at Mr. Burum's insistence.  But they knew that could not be
26  true, as Mr. Postmus had already told them he did not get to know Mr. Burum until
27  a trip to China over a year later.  Indeed, it eventually became part of the
28  prosecution's narrative to claim that Mr. Burum had arranged to go on the 2005

COMPLAINT

China trip for the precise purpose of meeting and "grooming" Mr. Postmus.  Of course, even that premise was easily disproven by an objective investigation, which would have found that Mr. Postmus had been invited to go on that China trip a year earlier for reasons entirely unrelated to Mr. Burum.  Mr. Postmus later recognized and admitted that his contradictory and nonsensical "memories" of these events had been planted by an unscrupulous and coercive prosecution team.

66.    Defendants Randles and Schreiber—on information and belief, supervised by Defendants Ramos, Cope, Hackleman, Brown, Mandel, and/or Schons—reinforced their manipulation of Mr. Postmus by using his purported friend, Defendant Aleman, to secretly record conversations in which he tried to trick Mr. Postmus into confirming the false allegations of bribery.  But even this exercise soon became mired in fraud and cover-up.  Defendants Randles and Schreiber became aware soon after their first meeting with Defendant Aleman that in his eagerness to join the conspiracy, he had already secretly taped a conversation with Mr. Postmus.  This was a violation of California law, as Defendant Aleman had not yet been authorized to record any conversations as an agent of the state.  Of course, Defendant Aleman already had enough legal trouble, so Defendants Randles and Schreiber went into full cover-up mode.  They both filed after-the-fact reports claiming to have given Defendant Aleman timely permission to record Mr. Postmus.  But they failed to coordinate their stories, and their separate reports told contradictory accounts of when and how Mr. Aleman was first authorized to secretly record Mr. Postmus.

67.    Defendants Randles and Schreiber—on information and belief, supervised by Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and/or Schons—also threatened and intimidated other witnesses, including Matt Brown, in attempts to obtain false testimony.  Mr. Brown was Mr. Biane's Chief of Staff at the time of the Colonies settlement and subsequent PAC contributions.  Defendants intimidated Mr. Brown into wearing a wire and making secret

recordings of his conversations with Mr. Biane, Mr. Postmus, and others.  Although Mr. Brown recorded dozens of conversations with men who knew and trusted him in 2009 and 2010, none of these recordings revealed the slightest evidence of corruption or bribery.  To the contrary, Mr. Brown recorded Mr. Postmus stating that there was no bribe.  Of course, this notable absence of evidence did not deter Defendants in the slightest.  Defendants Cope and Mandel—on information and belief, supervised by Defendants Ramos and Harris—simply hid the exculpatory lack of evidence from the grand jury, and later, the trial jury.  In fact, not only did prosecutors fail to introduce a single one of these recorded conversations into evidence during the trial, they aggressively opposed Mr. Burum's defense team's efforts to play them for the jury, or even inform the jury that none of the recordings contained any inculpatory evidence.

68.     As for the District Attorney investigators, they continued pursuing the aggressive and illegal tactics that had justifiably earned them the nickname of the "Thug Squad."  During one interview, Defendant Randles exclaimed that he and the "Public Integrity Unit" were "elephant hunters . . . out for big game," leaving no doubt that his big game targets were Colonies and Mr. Burum.  Instead of using legitimate interview techniques, these investigators bullied witnesses, put words in witnesses' mouths, and engaged in a scorched-earth mission to bring down Colonies no matter the cost.  One such witness, Dino DeFazio, recently had trumped-up perjury charges against him dismissed after they had been pending for eight years.  Mr. DeFazio's lone fault was telling the grand jury the truth, which was not what the "Thug Squad" wanted to hear.

69.     Defendant Randles's vendetta against Colonies was further motivated by his discovery that Colonies and Mr. Burum had worked with Mr. Erwin when exercising their First Amendment rights to petition the Board of Supervisors to approve the Settlement Agreement.  Defendant Randles held a grudge against Mr. Erwin, as illustrated by a statement he made in 2008 that Mr. Erwin was in line to

become Chief of Staff to a San Bernardino County Supervisor "unless somebody can stop him."  Defendant Randles's vendettas against both Colonies and Mr. Erwin escalated when he discovered that they were working together.  On information and belief, the mere fact of their association further inflamed his desire for revenge.  Despite (or perhaps because of) these obvious biases, Mr. Randles was named as "lead investigator" for the Colonies investigation and remained the lead investigator throughout the entire retaliation campaign.

70.    As evidenced by the above and other conduct, the entire structure of the "Public Integrity Unit," led by Defendants Cope and Hackleman and overseen and supervised by Defendant Ramos, directly led to the unlawful and unjustified violation of Colonies' constitutional rights.  The District Attorney investigators and prosecutors were part of a single organizational unit with no true separation between the investigation and prosecution.  Defendants Cope and Hackleman were directly involved in the botched and corrupt investigation, rather than remaining sufficiently separate to ensure its integrity and ultimately make independent charging decisions.  This commingling of roles led to investigators and prosecutors failing to verify or corroborate false information obtained from Mr. Postmus, Defendant Aleman, Defendant Gonzales, and others.  Prosecutors, investigators, and County witnesses with an axe to grind reinforced each other's passions and prejudices, feeding false information and unsubstantiated allegations into a self-deluding "echo chamber" through which the Defendants' prejudices against Colonies could take voice.

71.    The result was that Defendants Randles and Schreiber elicited and even fabricated false information, Defendants Cope, Hackleman, Mandel, and Schons—on information and belief, supervised by Defendants Ramos, Brown, and Harris—pushed the investigation to its predetermined outcome, and no one bothered to augment their zeal for retribution with even a shred of concern for truth and justice.  Instead, investigators and prosecutors—including Defendants Ramos,

Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons—pursued a wrongful investigation and, ultimately, felony charges against Mr. Burum, despite ample evidence that they were meritless.

### Other Conspirators in the Unlawful Retaliation

72.     Other current and former County employees instigated and championed the bogus investigation.  On information and belief, at least two—Defendants Gonzales and Aleman—conspired with the other Defendants to retaliate against Colonies for exercising its constitutional rights.  Among other things, Defendants Gonzales and Aleman helped initiate the wrongful investigation and the eventual prosecution of Mr. Burum by providing false statements to District Attorney investigators, and then agreed to repeat those false statements in perjurious testimony before the grand juries and criminal trial jury.

73.     On information and belief, Defendant Gonzales helped initiate the investigation by making a false report in late 2006 or early 2007 to the District Attorney's Office, apparently claiming that the Settlement Agreement was procured by corruption.  Of course, Defendant Gonzales had no actual evidence of corruption to report; rather, on information and belief, she was motivated to avoid political fallout from the size of the settlement and to appease some of her largest financial backers who were rival land developers of Colonies.

74.     Beginning in 2008, Defendant Gonzales volunteered other false information to District Attorney investigators and the grand jury, including that Mr. Burum had supposedly intimidated her in the run-up to the 2006 settlement.  For example, Defendant Gonzales falsely claimed that Mr. Burum menaced her in China prior to the settlement, to the point that she feared he was going to kidnap, drug, and take compromising photographs of her.  Supposedly the purpose of all this was to intimidate or extort her into voting for the Settlement Agreement.  This was fantasy:  Defendant Gonzales and Mr. Burum were never in China at the same

//

1  time, a fact known by prosecutors who nonetheless elicited this false testimony

2  before the grand jury and during Mr. Burum's trial.

3       75.    On information and belief, Defendant Gonzales entered into an

4  agreement with one or more of the other Defendants to make false statements and

5  provide perjurious testimony as part of the conspiracy to retaliate against Colonies

6  for having exercised its First and Fifth Amendment rights.  Defendant Gonzales

7  was motivated to conspire with other Defendants and make these false statements

8  by her desire to punish Colonies for vindicating its First and Fifth Amendment

9  rights to approach the government and seek fair compensation in the civil litigation

10  with the County and District, for successfully petitioning the government in

11  connection with the Settlement Agreement, and for making political contributions

12  to PACs associated with Defendant Gonzales's political rivals.

13       76.    Defendant Aleman also conspired with one or more of the other

14  Defendants to initiate the wrongful investigation and prosecution.  Beginning in

15  2008, Defendant Aleman started supplying investigators and prosecutors with

16  knowingly false information to initiate and encourage the criminal investigation

17  against Mr. Burum.  At the time, Defendant Aleman himself was under

18  investigation for various criminal conduct in the County Assessor's Office.  As

19  Defendant Aleman has since admitted, he had lied about Mr. Postmus's drug use

20  and sexuality, used campaign accounts as his own personal slush fund, physically

21  destroyed County equipment to cover up his and Mr. Postmus's misdeeds, altered

22  public documents sought by the civil grand jury in their investigation of the

23  Assessor's Office, and lied under oath to that grand jury.

24       77.    Seeking to obtain a favorable plea deal, Defendant Aleman claimed he

25  had information about other criminal conduct in the County.  Under questioning by

26  Defendants Randles and Schreiber, Defendant Aleman at first truthfully reported

27  that he had very little information about the Colonies settlement and knew nothing

28  of any crimes in that context.  But when it became clear that investigators were

willing to ignore Defendant Aleman's wrongdoing in return for his cooperation in the retaliation scheme, Defendant Aleman began to exaggerate his role in the settlement negotiations and to fabricate claims of bribery and corruption.  He did this because he knew investigators and prosecutors were focused on punishing Colonies for the Settlement Agreement and PAC contributions, and joining the conspiracy against Colonies was the best way to avoid consequences for his own illegal actions.

78.    At the invitation of Defendants Randles and Schreiber—on information and belief, supervised by Defendants Ramos, Cope, Hackleman, Brown, Mandel, and/or Schons—Defendant Aleman began "developing" evidence against Mr. Postmus and Mr. Burum.  In text messages and secretly recorded conversations, Defendant Aleman began feeding Mr. Postmus the false narrative that Mr. Burum had bribed Mr. Postmus.  Defendant Aleman knew more than anyone else how drug-addled and vulnerable Mr. Postmus was, and how susceptible his memory was to accepting this confabulation as the truth.  Defendant Aleman also began to tell investigators he had firsthand information that Colonies and Mr. Burum made the 2007 PAC contributions in a *quid pro quo* exchange for Mr. Postmus's vote.  For example, Defendant Aleman invented meetings between Mr. Postmus and Mr. Burum in 2006 during which the corrupt agreement was supposedly struck and at which Defendant Aleman claimed to be present.  The meetings were entirely imaginary.  Defendant Aleman even placed some of these meetings at the Red Hill Country Club's clubhouse at a time when it did not exist (having been demolished to make way for a new clubhouse), a fact that was readily discoverable had Defendants bothered to engage in objective investigation instead of blindly pursuing their efforts to retaliate against Colonies.  Despite these obvious lies, prosecutors advocated in Defendant Aleman's subsequent sentencing hearing that he had told the truth, and urged leniency for his crimes.  Thus, just as he had hoped, Defendants Ramos, Cope, Mandel, and others ultimately allowed Defendant

Aleman to walk away with little more than a slap on the wrist in appreciation for cooperating with the scheme.

79.     On information and belief, Defendant Aleman entered into an agreement with one or more of the other Defendants to make these false statements and provide perjurious testimony as part of a conspiracy to retaliate against Colonies for having exercised its First and Fifth Amendment rights.

80.     Another member of the conspiracy to illegally retaliate against Colonies was Defendant Stringer, the San Bernardino County Counsel at the time of the Settlement Agreement and throughout much of the criminal investigation.  In 2010 (if not earlier), Defendant Stringer began cooperating and conspiring with Defendant Hackleman and the District Attorney's Office in the retaliation campaign.  Among other things, Defendant Stringer:

   a) Met with prosecutors regarding their suggestion to "move towards the filing of a GC1092 [Government Code § 1092] action to recover the $102M";

   b) Voluntarily met with prosecutors at least a dozen times in 2010 to assist with their investigation and prosecution of Mr. Burum;

   c) Voluntarily provided feedback to prosecutors on the felony complaint attacking the Settlement Agreement and its legality;

   d) Signed a voluntary waiver of the attorney-client privilege and the mediation privilege on behalf of the County as to "any request by the prosecutors to produce or examine any documents maintained by the County" or to interview witnesses;

   e) Provided attorney-client privileged information to investigators even before the attorney-client privilege was waived by the County; and

   f) Voluntarily met with prosecutors at least an additional two dozen times in 2011, prior to Mr. Burum's indictment, to assist them in developing the

//

1   false narrative that the Settlement Agreement was unreasonable and
2   illegal.

3       81.   Defendant Hackleman expressly told Defendant Stringer that it was the
4   District Attorney's goal to "be prepared to show that [the settlement] was
5   unreasonable" even though the County was simultaneously defending the
6   reasonableness of the settlement in its indemnity litigation in court and in its
7   insurance arbitrations.  Defendant Hackleman went on to explain that having the
8   District Attorney follow a diametrically different path than the County was "an epic
9   challenge."  Nevertheless, on information and belief, Defendant Stringer entered
10  into an agreement with one or more of the other Defendants to continue providing
11  assistance in pursuing the illegal Colonies investigation as part of the conspiracy to
12  retaliate against Colonies for having exercised its First and Fifth Amendment rights.

13  **Presentation of False Testimony and Evidence**

14      82.   Defendants Cope and Mandel—on information and belief, supervised
15  by Defendants Ramos, Brown, and/or Harris—presented fraudulent evidence to
16  grand juries in both 2009 and 2011 to secure Mr. Burum's indictment on false
17  charges and without probable cause.  Among other things, they presented Mr.
18  Postmus's, Defendant Aleman's, and Defendant Gonzales's false testimony
19  discussed above.  They also pressured other witnesses, including Mr. Brown, to
20  give false testimony.  And Defendant Randles testified falsely about the timing of
21  his investigation in order to prevent certain charges from being barred due to the
22  statute of limitations.

23      83.   Defendants Cope and Mandel—on information and belief, supervised
24  by Defendants Ramos and/or Harris—also manipulated the grand jury process to
25  hide exculpatory evidence.  For example, they presented evidence that Judge
26  Warner and others had been the subject of a judicial ethics investigation due to
27  alleged inappropriate contacts with Mr. Burum, knowing that the instigator of that
28  investigation—James Lindley—had recanted his allegations.  Mr. Lindley was a

County employee who had claimed in 2006 that he had information that one of the judges for the civil case (either Judge Norell or Judge Warner) was golfing buddies with Mr. Burum—with the clear implication being that this improper relationship impacted the case.  Defendants Cope and Mandel presented this accusation to the indicting grand jury through testimony from former County Counsel Dennis Wagner, without informing the grand jury at that time that Mr. Lindley had recanted his claim.  Then, in what they admitted was a highly unusual move, they called Mr. Lindley to testify in front of a separate civil grand jury at the same time that the criminal grand jury was sitting.  During his testimony, Mr. Lindley candidly admitted that he had no basis for the damaging accusation and had presented it to his superiors to inflate his reputation.  But because the prosecution manipulated the grand jury process, the indicting grand jury did not get to hear Mr. Lindley's rueful recantation.  Instead, Defendants Cope and Mandel waited until the very end of the grand jury process to present a secondhand, sanitized version of Mr. Lindley's admissions.  This allowed them to present the rumor to the grand jury as further "evidence" of corruption, while hiding for as long as possible the fact that Mr. Lindley's account was wholly fictitious, and depriving the grand jury of the opportunity to evaluate Mr. Lindley's credibility or ask him any questions of their own.  This strategy paid off, as grand jurors openly wondered—without any basis in reality—whether "Judge Warner was in Jeff Burum's pocket financially or otherwise."

84.    Defendants Cope and Mandel—on information and belief, supervised by Defendants Ramos and/or Harris—also presented other "evidence" to the grand jury that unfairly impugned the reputation of retired California Supreme Court Justice Edward Panelli, who had served as mediator in the Colonies civil case. They introduced testimony from Defendant Gonzales claiming that she saw Mr. Burum talking to Justice Panelli after a mediation session and supposedly giving him a ride in Mr. Burum's car, and that she knew that this encounter was

"extremely wrong" and perhaps "extremely illegal."  Defendants Cope and Mandel also asked a witness hypothetically—without presenting any evidence—if he would have had concerns if Justice Panelli had accepted a plane ride from Mr. Burum. They elicited this testimony despite having no basis to believe that Justice Panelli had engaged in any impropriety.  Indeed, as a mediator, Justice Panelli had no decision-making authority over the civil case, so this "evidence" had no relevance to the bribery allegations.

85.     On information and belief, Defendants Cope and Mandel—supervised by Defendants Ramos and/or Harris—introduced these allegations regarding Judge Warner, Judge Norell, and Justice Panelli in order to create an aura of corruption over the entire civil case, to hint at additional acts of uncharged and unproven crimes by Mr. Burum and others, and to cast doubt over the reasonable—and legal—basis for the Settlement Agreement.  In this manner, they implied and ultimately argued, without evidence, that the only possible reason for the Settlement Agreement was bribery and corruption.

86.     As a result of the Defendants' fraud, perjury, threats, lies, and sham investigation, the 2011 grand jury indicted Mr. Burum on seven felony charges.

87.     The criminal trial that eventually followed only served to further expose that the Colonies investigation had not been a legitimate attempt to uncover the truth, but instead a retaliation campaign.  The following are only some of the examples of testimony and evidence elicited by the prosecution at trial that backfired, exposing the fraudulent and retaliatory nature of the Colonies investigation:

   a) Defendant Randles again claimed, as he had before the indicting grand jury, that prior to his November 1, 2008 interview of Defendant Aleman, he did not know who Mr. Burum was, a highly material allegation relevant to the delayed discovery exception rule to the statute of limitations.  On cross-examination, Defendant Randles's own words

31

1    exposed his claim as a lie.  Indeed, tapes of Defendant Randles discussing

2    Mr. Burum in earlier 2008 interviews were played in the courtroom.

3    b) Defendant Gonzales told the trial jury that Mr. Burum was lurking in

4    China in 2005 for the purpose of taking advantage of her and intimidating

5    her into voting for the Settlement Agreement.  On cross-examination, it

6    was proven that Defendant Gonzales was not in China in 2005—she was

7    at various well-publicized events in San Bernardino and Louisiana.

8    Defendant Gonzales then changed her story, under oath, and claimed it

9    was in 2006 that she saw Mr. Burum in China.  But Mr. Burum was not in

10   China during that 2006 trip.  He was in Palm Springs at the wedding of

11   his business partner's daughter.  When confronted with Mr. Burum's

12   passport, which established that Mr. Burum did not go to China in 2006,

13   Defendant Gonzales stubbornly refused to admit her lies, instead claiming

14   that he could have flown into Communist China on a private jet and

15   evaded customs.  Defendant Gonzales also testified that she had a long

16   record of voting against the Colonies settlement, which was entirely

17   contradicted by her actual voting record of voting in favor of settlement at

18   every opportunity until the very end.  At no point during several days of

19   this contradictory, fabricated, and outlandish testimony did prosecutors

20   attempt to prevent or correct this perjury from their own witness; instead,

21   they continued to elicit it and doubled down in redirect examination.

22   c) Defendant Aleman testified on direct examination that Mr. Postmus only

23   became involved in the Colonies litigation after a trip to China in

24   September 2005 that both Mr. Postmus and Mr. Burum attended.  This

25   was false, as Defendant Aleman conceded under cross-examination.

26   Defendant Aleman also claimed that he attended several meetings at the

27   Red Hill Country Club clubhouse in 2006 in which Mr. Postmus and Mr.

28   Burum supposedly discussed the alleged bribe.  But the evidence showed

32

1    that there was no Red Hill Country Club clubhouse in that period; it had

2    been torn down and was being rebuilt—a fact anyone could have

3    discovered with little investigation.  Defendant Aleman lied about the

4    locations of other supposed meetings as well, with cross-examination

5    exposing that he had told different stories at different times.

6    d) Defendant Mandel also helped Defendant Aleman cover up his illegal

7    receipt of campaign funds.  When initially asked about having obtained

8    personal reimbursement for a political event, Defendant Aleman denied

9    having ever done so.  Defense counsel then confronted Defendant Aleman

10   with public records evidencing that he received an unlawful personal

11   reimbursement for campaign expenditures.  Defense counsel eventually

12   forced Defendant Aleman to admit that he had lied about receiving these

13   funds.  Nevertheless, on redirect examination, Defendant Mandel

14   attempted to rehabilitate Defendant Aleman's credibility.  She elicited

15   further perjurious testimony from Defendant Aleman that he had not

16   unlawfully received campaign funds, which was contradicted by the

17   documentary evidence she—and everyone in the courtroom—had just

18   viewed.  Defendant Mandel also asked questions designed to whitewash

19   Defendant Aleman's embezzlement and dishonesty by eliciting testimony

20   that reimbursement from campaign funds was routine and legal—although

21   they were nothing of the sort in this instance.  In doing so, Defendant

22   Mandel tried to hide Defendant Aleman's theft, hide his lies about the

23   theft, and knowingly suborned perjury.

24   e) Defendants Randles and Schreiber became aware soon after first meeting

25   with Defendant Aleman that he had secretly taped a conversation with Mr.

26   Postmus, a violation of California law because he had not yet been

27   authorized to record as an agent of the state.  Defendant Aleman admitted

28   that he lied on the stand when he initially claimed he had authority to

make the recordings.  But Defendant Randles nevertheless insisted that Defendant Aleman had been authorized.  On cross-examination, it was shown that Defendants Randles and Schreiber had conspired to provide Defendant Aleman with a cover story—but they failed to coordinate their stories, filing separate police reports with entirely different accounts of when and how Defendant Aleman was first authorized to secretly record Mr. Postmus.

f) Mr. Postmus falsely testified on direct examination that he had been bribed by Mr. Burum.  Defendants Cope and Mandel—on information and belief, supervised by Defendants Ramos and/or Harris—allowed this testimony despite the fact that Mr. Postmus had repeatedly told their investigators that there was no *quid pro quo* agreement to accept a bribe in exchange for a pro-settlement vote, and that Mr. Burum had never "crossed the line" to obtain the Settlement Agreement.  On cross-examination, Mr. Postmus was shown how Defendants Randles and Schreiber had bullied and manipulated him into "confessing" to crimes that never occurred.  After recognizing how he had been taken advantage of, Mr. Postmus testified on cross-examination that he was "100% positive" no bribery had occurred, and reaffirmed that Mr. Burum had "never crossed the line" in advocating for the Colonies settlement.

g) Mr. Postmus also testified on direct examination that Mr. Burum had engineered Mr. Postmus's attendance on a 2005 trip to China, which prosecutors argued was an effort to "groom" him to accept bribes.  In reality, and as confirmed by documents in the prosecution's possession, Mr. Postmus had been invited by an unrelated third party a year earlier.

88.   In short, cross-examination revealed the prosecution's "evidence" to be pure farce.  Indeed, after six months of impeaching every prosecution witness on multiple points, Mr. Burum rested his defense case without calling a single witness.

And it took only two days of deliberation for the jury to acquit Mr. Burum on all remaining charges on August 28, 2017, after Judge Smith had already dismissed a number of counts for either legal deficiency and/or failure to present evidence to support them.

89.     Interviewed after their verdict, members of Mr. Burum's jury made no secret of their outrage at the waste of taxpayer dollars and the evident incompetence and fraud they witnessed for so many months.  Indeed, they wondered—among other things—why prosecutors had presented obviously false testimony and why Defendants Randles and Gonzales were not facing prosecution for perjury.   One juror expressed that prosecutors "lacked any type of grounds to prosecute." Another juror expressed that Defendant Aleman was untrustworthy and not credible, and "never" should have been on the witness stand.  A third, wondering why the trial took several months, suggested that if there had been proof of guilt, the prosecution should have "shown that right away."

90.     The answer, of course, is that none of the Defendants had any interest in pursuing justice.  The entire exercise was a pure act of retaliation against Colonies for exercising its First and Fifth Amendment rights.  Judge Warner was absolutely correct when he stated in a September 6, 2017 newspaper op-ed that the criminal trial was a "travesty" which "should never have occurred."  And though Colonies and Mr. Burum were finally vindicated, it was at the cost of millions of dollars and irreparable damage to their public reputations.

**The County's and District's Breaches of Their Contractual Obligations Under the Settlement Agreement**

91.     While all of these actions were both disappointing and legally actionable, they did not come as a surprise.  It was apparent even in the midst of negotiating the Settlement Agreement that some elements of County government— namely, the same employees and officials who had grossly mismanaged the flood basin dispute, and then the subsequent litigation—would not lay down their arms

35

after a settlement.  Instead, it was all too likely that these employees and officials would emerge with fresh challenges and new strategies to undermine and invalidate the Settlement Agreement.  Accordingly, Colonies insisted on including—as material terms of the agreement—express and broad defense and indemnification clauses so that when these inevitable challenges emerged, from whatever source, the County and District would have contractual responsibilities to (1) support the Settlement Agreement's legality and validity; (2) refrain from instituting or assisting in any future legal action against Colonies relating to the Settlement Agreement; (3) defend Colonies against any claim or action seeking to invalidate the Settlement Agreement or force return of the settlement proceeds; and (4) indemnify Colonies for any and all costs, liabilities, debts, etc. arising out of any attempted challenge to the Settlement Agreement.  These were critical terms for Colonies, as they were necessary to ensure that the already near-decade-long dispute was actually being settled once and for all.

92.    Specifically, and in relevant part, the parties agreed to the following provisions setting forth the County's and District's obligations going forward:

> 3.3 Request for Interlocutory Judgment; Dismissal with Prejudice. … Each party shall refrain and forbear from commencing, instituting, or assisting in, either as a named or unnamed party, the prosecution of any lawsuit, action or other proceeding against the parties hereto, or any of them, whether brought by themselves or by others on their behalf, based on or arising out of the Actions.

> 4.3 Indemnification. [The District] shall indemnify, defend with counsel reasonably satisfactory to COLONIES PARTNERS, and hold COLONIES PARTNERS harmless from all actions, causes of action, claims, demands, damages, costs, loss of service, expenses and debts whatsoever, in law or equity, arising or allegedly arising from the acts or omissions of [the District] relating to Basin A or Basin B, Flood Control Works, discharges and drainage to or from Basin A or Basin B, and/or the performance of obligations to be performed by [the District] hereunder.

//

6.3 Defense of Agreement. [The District] shall take all actions which are necessary or reasonably requested by COLONIES PARTNERS to uphold the validity and enforceability of this AGREEMENT.

93.     Despite these broad obligations to indemnify and defend Colonies, the District has steadfastly refused to do so with respect to the claims, damages, costs, expenses, and debts Colonies incurred in connection with the Criminal Action. These include, but are not limited to, the attorneys' fees and costs Colonies has incurred indemnifying and defending Mr. Burum and his co-defendant Mr. Erwin—both of whom submitted claims to Colonies for indemnification and defense because they were being investigated and prosecuted based on their actions as Colonies' agents.  The central theory of the prosecution's case was that the District's payment of $102 million was obtained corruptly through bribery, and both Mr. Burum and Mr. Erwin were charged with aiding and abetting Supervisors Postmus and Biane in alleged crimes arising out of the payment of those settlement funds.  The settlement payment was, of course, one of the "obligations to be performed" by the District under the Settlement Agreement.  As such, Section 4.3's indemnity and defense provisions applied.

94.     The District has also refused to indemnify and defend Colonies in connection with the Taxpayer Action, a civil lawsuit filed on February 6, 2012 by two taxpayer groups challenging the legality of the Settlement Agreement.  The Taxpayer Action sought to invalidate the Settlement Agreement based on allegations that the District's payment of $102 million was tainted by conflicts of interest in violation of Government Code § 1090.  Again, because the settlement payment was one of the "obligations to be performed" by the District under the Settlement Agreement, Section 4.3's indemnity and defense provisions applied.

95.     Notwithstanding the District's obligation to defend and indemnify Colonies and to defend the validity of the Settlement Agreement, the County and District's attorneys were antagonistic and uncooperative from the start of the

Taxpayer Action.  The County and District, through their attorneys' actions and their litigation strategy, made it clear that they considered themselves on opposite sides of the Taxpayer Action from Colonies, and that if the taxpayer plaintiffs were successful in voiding the Settlement Agreement, the County and District were looking to recoup the $102 million settlement payment.  In short, the County and District treated the Taxpayer Action as yet another way to use a third party to evade their contractual obligations and punish the Colonies.

96.     In letters dated March 26, May 14, and May 18, 2012, Colonies requested, in writing, that the County and District defend and indemnify Colonies with respect to the Taxpayer Action pursuant to Section 4.3 of the Settlement Agreement, and that they "take all actions necessary" to uphold the Settlement Agreement pursuant to Section 6.3 of the Settlement Agreement.  The District and County refused.

97.     Colonies specifically requested that the County and District join its March 2012 demurrer to the Taxpayer Action complaint as a means of defending the Settlement Agreement.  Instead, on May 16, 2012, the County and District filed a motion to stay the taxpayer litigation.  Because the court was already scheduled to hear Colonies' demurrer, this action *hindered* Colonies' litigation defenses and its support of the Settlement Agreement.  On May 21, 2012, the County and District wrote to Colonies and stated that they would not assist in defending the Settlement Agreement by withdrawing their motion to stay.

98.     In September 2012, the County and District's refusal to fully assist Colonies in defending the validity of the Settlement Agreement had its expected result:  The Court overruled Colonies' demurrer and held that the taxpayer groups had standing to sue Colonies "on behalf of the County."  On September 26, 2012, Colonies wrote to the County and District again and explained in detail why they were contractually required to assist Colonies in defending against the Taxpayer Lawsuit.  Colonies again highlighted the County and District's obligations under

Sections 4.3 and 6.3 of the Settlement Agreement and asked that the County and District join Colonies by filing a demurrer seeking dismissal based on both (1) the 2007 validation judgment upholding the legality of the Settlement Agreement, and (2) the taxpayer group plaintiffs' lack of standing.

99.    On October 15, 2012, the County and District finally did file a demurrer—but not on the basis that the validation judgment conclusively barred collateral attacks on the Settlement Agreement.  Instead, the County and District demurred only on the basis of taxpayer standing—on information and belief, because the County and District were still strategizing their own challenge to the Settlement Agreement.  Of course, because the Court had already rejected Colonies' standing argument while the County and District were on the sidelines, it was no surprise when the Court overruled their demurrer as well.

100.   The County and District's refusal to defend the legality of the agreement was particularly egregious because they had been asserting the validity and fairness of the Settlement Agreement in their contribution and indemnity litigation against their insurers and against SANBAG, the City of Upland, and Caltrans.

101.   Faced with Colonies' repeated demands that the County and District fulfill their contractual obligations, the County and District eventually demanded that Colonies enter into a tolling agreement regarding the statute of limitations for any such claims, as well as claims the County and District might bring against Colonies.  The parties thus executed a tolling agreement effective July 1, 2013, preserving all claims between and among the parties relating to the Settlement Agreement.

102.   The direct result of the District's refusal to indemnify and defend Colonies was that Colonies had to fund its own defense to the Taxpayer Action. The action ultimately spanned almost four years, including an appeal.  The validity of the Settlement Agreement was finally upheld when the action was dismissed on

January 21, 2016 after the Court of Appeal granted Colonies' petition for writ of mandate directing the trial court to sustain the demurrer.

103. The County and District also breached Section 3.3 of the Settlement Agreement by voluntarily and extensively assisting prosecutors in the Criminal Action in an effort to undermine the Settlement Agreement, including the following:

a) Members of the County Counsel's office met with prosecutors to discuss "mov[ing] towards" suing Colonies for "a GC1092 [Government Code § 1092] action to recover the $102M";

b) The County and District voluntarily waived the attorney-client privilege and the mediation privilege as to "any request by the prosecutors to produce or examine any documents maintained by the County" or to interview witnesses to assist the government in prosecuting the Criminal Action;

c) Members of the County Counsel's office divulged attorney-client privileged information to prosecutors even before the County and District formally waived the privilege;

d) Members of the County Counsel's office and other County and District employees voluntarily met with prosecutors dozens of times in 2010 and 2011 to assist in prosecuting the Criminal Action—and then refused to meet with Colonies' and Mr. Burum's attorneys to assist in the defense of the Criminal Action; and

e) County and District employees, and even members of the Board of Supervisors, provided false and misleading testimony before two grand juries and at the trial in the Criminal Action, including the perjurious testimony set forth above.

104. In addition to breaching the Settlement Agreement, the District and County breached the implied covenant of good faith and fair dealing by refusing to

defend or indemnify Colonies for the defense costs it spent during the Criminal Action and Taxpayer Action, refusing to help Colonies defend the Settlement Agreement's validity in the Taxpayer Action, and voluntarily assisting in the prosecution of the Criminal Action—all as set forth in detail above.  The District's and County's bad faith actions unfairly frustrated the agreed purpose of the Settlement Agreement and deprived Colonies of its right to receive some of the benefits of that agreement—namely, indemnity, defense, and support for the validity of the Settlement Agreement.

105.   On January 26, 2016, shortly after the Taxpayer Action was dismissed, Colonies again demanded that the County and District provide indemnity and defense for the legal fees and costs incurred in defending Colonies and Mr. Burum. The County and District's outside counsel, Kevin Dorse from the law firm of Theodora Oringher PC, replied that he believed it was premature to evaluate the merits of Colonies' claims for defense and indemnity, or to attempt to resolve those claims, given that the tolling agreement was in effect and the Criminal Action was ongoing.

106.   On September 25, 2017, Colonies gave the County and District notice that the Criminal Action had concluded with full acquittals of three defendants— including Mr. Burum—and dismissal of all charges against the fourth defendant. As all pending litigation had been resolved, and all doubts as to the Settlement Agreement's validity had been put to rest, Colonies stated that the time for indemnity had come.  The County and District did not respond.

107.   On October 23, 2017, Colonies issued notice to the County and District that Colonies was terminating the Tolling Agreement effective November 22, 2017.  Colonies again demanded that the County and District provide indemnification for legal fees and costs incurred in the Taxpayer Action and Criminal Action in an amount in excess of $32 million, not including interest or other damages.  Colonies' counsel appeared before the Board of Supervisors on

41

November 14, 2017 to present them with extensive materials to evaluate Colonies'
indemnification demand.  The County and District did not respond.

108.   On December 14, 2017, pursuant to Government Code §§ 810 et seq.,
Colonies submitted its state law claims to the County and District.  On January 26,
2018, the County and District finally responded, rejecting all of Colonies' claims by
stating that they were taking no action on Colonies' claims because they were
supposedly not timely presented.

109.   In sum, the County and District have refused to accept responsibility
for having breached the Settlement Agreement by the District's failure and refusal
to indemnify and defend Colonies for the Taxpayer Action and Criminal Action
(Section 4.3); the District and County's failure to refrain from assisting in the
prosecution of any lawsuits, actions, or proceedings arising out of the Colonies civil
litigation (Section 3.3); and the District and County's failure to take all necessary
and reasonably requested actions to uphold the validity and enforceability of the
Settlement Agreement (Section 6.3).

# FIRST CLAIM

## Retaliation – 42 U.S.C. § 1983

## Against All Individual Defendants

110.   Plaintiff re-alleges and incorporates each allegation in Paragraphs 1
through 109 of this Complaint as though fully set forth herein.

111.   The individual Defendants, all state actors or acting under color of
state law, had a duty to permit Plaintiff free exercise of its First and Fifth
Amendment rights.

112.   When Plaintiff exercised these rights, as set forth above, the individual
Defendants retaliated against Plaintiff in the manner alleged herein for participation
in what Defendants knew were First and Fifth Amendment protected activities.  The
individual Defendants' retaliatory conduct included, but is not limited to, the
following:

a)  Initiating a fraudulent and illegitimate criminal investigation into Colonies and its management;

b)  Publically threatening to use the criminal investigation as a means to take back the $102 million Colonies had received as just compensation for the County and District's taking of its land;

c)  Manipulating and coercing Mr. Postmus into falsely claiming that his vote in favor of the Settlement Agreement had been corruptly influenced by Colonies and Mr. Burum;

d)  Eliciting false statements during the investigation, and eventually perjurious testimony, from Defendants Gonzales, Aleman, and others;

e)  Threatening and attempting to coerce other witnesses, such as Matt Brown, into making false statements during the investigation and providing perjurious testimony;

f)  Fabricating and falsifying evidence during the investigation; and

g)  Hiding exculpatory evidence from two grand juries.

113.   Plaintiff's exercise of its First and Fifth Amendment rights, as set forth above, was a substantial and/or motivating factor in Defendants' wrongful retaliatory conduct.

114.   Defendants' actions against Plaintiff would chill a person of ordinary firmness from continuing to exercise their First and/or Fifth Amendment rights;

115.   The harm to Plaintiff from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

116.   Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for Plaintiff's rights and therefore warrants the imposition of exemplary and punitive damages as to each of them.

//

## SECOND CLAIM

### *Monell* Claim – 42 U.S.C. § 1983

### Against Defendant County

117.    Plaintiff re-alleges and incorporates each allegation in Paragraphs 1 through 116 of this Complaint as though fully set forth herein.

118.    Plaintiff exercised its First and Fifth Amendment rights as set forth above.  The individual Defendants, acting under color of state law, then retaliated against Plaintiff in the manner alleged herein for participation in what Defendants knew were First and Fifth Amendment protected activities.

119.    The County had in place official, widespread, and/or longstanding policies, practices, and/or customs that amounted to deliberate indifference to Plaintiff's right to exercise its constitutional rights without government retaliation. These policies, practices, and/or customs were a moving force behind this illegal retaliatory conduct.  Specifically, the County maintained or permitted policies, practices, and/or customs that included the following:

        a) Permitting, condoning, and/or ratifying the District Attorney's Office to engage its investigators and resources in politically-charged criminal investigations without regard for the existence of credible evidence;

        b) Permitting, condoning, and/or ratifying County employees in the District Attorney's Office to execute falsified search warrants and engage in unwarranted criminal investigations in a manner intended to punish, harass, and embarrass as retaliation;

        c) Permitting, condoning, and/or ratifying collusive action between the District Attorney's Office and other County employees for the purpose of engaging in unwarranted criminal investigations in a manner intended to punish, harass, and embarrass as retaliation;

        d) Permitting, condoning, and/or ratifying the District Attorney's Office

to target constitutionally-protected First Amendment speech through unwarranted criminal investigations for the purpose of chilling such speech; and

    e)  Permitting, condoning, and/or ratifying the Public Integrity Unity of the District Attorney's Office to employ investigators dedicated to working on Public Integrity Unit investigations, thereby removing important checks and balances between investigators and prosecutors.

120.   Additionally, Defendant Ramos as the District Attorney is an official with final policymaking authority as it relates to the District Attorney's Office's criminal investigations.  As such, his conduct alleged herein—including his supervision of the Public Integrity Unit and his conscious, affirmative ratification of the wrongful and retaliatory criminal investigation of Colonies and Mr. Burum—constituted an act of official government policy.

121.   As a legal and proximate result of the County's policies, practices, and/or customs alleged herein, and/or Defendant Ramos's conduct as an official with final policymaking authority, the County violated Plaintiff's right to exercise its First and Fifth Amendment rights without government retaliation, causing Plaintiff to suffer injury and harm, including lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

122.   The County's conduct was willful, wanton, malicious, and done with reckless disregard for Plaintiff's rights and therefore warrants the imposition of exemplary and punitive damages.

//

//

//

//

//

45

COMPLAINT

### THIRD CLAIM

**Supervisorial Liability – 42 U.S.C. § 1983**

**Against Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and Schons**

123.   Plaintiff re-alleges and incorporates each allegation in Paragraphs 1 through 122 of this Complaint as though fully set forth herein.

124.   On information and belief, Defendant Ramos supervised Defendants Cope, Hackleman, Randles, and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Ramos knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Colonies' rights as alleged herein.  Moreover, Defendant Ramos's training, supervision, and/or control of Defendants Cope, Hackleman, Randles, and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Colonies' rights.

125.   On information and belief, Defendant Cope supervised Defendants Randles and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Cope knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Colonies' rights as alleged herein.  Moreover, Defendant Cope's training, supervision, and/or control of Defendants Randles and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Colonies' rights.

126.   On information and belief, Defendant Hackleman supervised Defendants Cope, Randles, and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Hackleman knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Colonies' rights as alleged herein.  Moreover,

1  Defendant Hackleman's training, supervision, and/or control of Defendants Cope,

2  Randles, and Schreiber was a legal and proximate cause of their illegal retaliatory

3  conduct and/or constituted deliberate indifference to the deprivations of Colonies'

4  rights.

5       127.   On information and belief, Defendant Brown supervised Defendants

6  Mandel and Schons with regard to their conduct alleged herein.  In this capacity,

7  Defendant Brown knew or should have known of their illegal retaliatory conduct,

8  yet he failed to take action to prevent that conduct and/or acquiesced in the

9  deprivation of Colonies' rights as alleged herein.  Moreover, Defendant Brown's

10  training, supervision, and/or control of Defendants Mandel and Schons was a legal

11  and proximate cause of their illegal retaliatory conduct and/or constituted deliberate

12  indifference to the deprivations of Colonies' rights.

13       128.   On information and belief, Defendant Harris supervised Defendant

14  Mandel with regard to her conduct alleged herein.  In this capacity, Defendant

15  Harris knew or should have known of Defendant Mandel's illegal retaliatory

16  conduct, yet she failed to take action to prevent that conduct and/or acquiesced in

17  the deprivation of Colonies' rights as alleged herein.  Moreover, Defendant Harris's

18  training, supervision, and/or control of Defendant Mandel was a legal and

19  proximate cause of her illegal retaliatory conduct and/or constituted deliberate

20  indifference to the deprivations of Colonies' rights.

21       129.   On information and belief, Defendant Mandel supervised Defendants

22  Randles and Schreiber with regard to their conduct alleged herein.  In this capacity,

23  Defendant Mandel knew or should have known of their illegal retaliatory conduct,

24  yet she failed to take action to prevent that conduct and/or acquiesced in the

25  deprivation of Colonies' rights as alleged herein.  Moreover, Defendant Mandel's

26  training, supervision, and/or control of Defendants Randles and Schreiber was a

27  legal and proximate cause of their illegal retaliatory conduct and/or constituted

28  deliberate indifference to the deprivations of Colonies' rights.

130.   On information and belief, Defendant Schons supervised Defendants Randles and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Schons knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Colonies' rights as alleged herein.  Moreover, Defendant Schons's training, supervision, and/or control of Defendants Randles and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Colonies' rights.

131.   The supervisory Defendants' conduct as described herein was so closely related to the deprivation of Colonies' rights as to be the moving force that caused the ultimate injury.  Further, each of the supervisory Defendants was acting under color of state law.

132.   As a legal and proximate result of Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and Schons's supervisorial conduct, Plaintiff's right to exercise its First and Fifth Amendment rights without government retaliation was violated, causing Plaintiff to suffer injury and harm, including lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

133.   Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and Schons's supervisorial conduct was willful, wanton, malicious, and done with reckless disregard for Plaintiff's rights and therefore warrants the imposition of exemplary and punitive damages.

## **FOURTH CLAIM**

### **Conspiracy – 42 U.S.C. § 1983**

### **Against All Defendants**

134.   Plaintiff re-alleges and incorporates each allegation in Paragraphs 1 through 133 of this Complaint as though fully set forth herein.

135.   Defendants formed a combination of two or more persons acting in concert to commit the individual acts described above, the principal element of which was the agreement between the Defendants to illegally retaliate against Plaintiff and deprive Plaintiff of its constitutional rights.

136.   Defendants combined, colluded, conspired, and/or agreed to act in concert to wrongfully investigate and prosecute Mr. Burum for the purpose of retaliating against Plaintiff for engaging in litigation against the County and District, for achieving the Settlement Agreement, and for making political contributions, all as alleged herein.

137.   Defendants performed overt acts in furtherance of the conspiracy as alleged herein.

138.   This conspiracy was the proximate cause of the illegal retaliation against Colonies and the deprivation of Colonies' constitutional rights, as alleged herein.

139.   As a direct result of this conspiracy, Plaintiff suffered injury and harm, including lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

140.   Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for Plaintiff's rights and therefore warrants the imposition of exemplary and punitive damages as to each of them.

## FIFTH CLAIM

### Breach of Contract

### Against Defendants County and District

141.   Plaintiff re-alleges and incorporates each allegation in Paragraphs 1 through 109 of this Complaint as though fully set forth herein.

142.   On or about November 28, 2006, Plaintiff and Defendants County and District entered into the Settlement Agreement, a written contract resolving civil

litigation over the County and District's uncompensated taking of Colonies' land.

143.   Plaintiff has performed all of its obligations, covenants, and conditions required of it under the Settlement Agreement, except to the extent any such obligations, covenants, or conditions have been excused, prevented, or waived by the County and District's acts and/or omissions.

144.   As alleged herein, Defendant District has breached Section 4.3 of the Settlement Agreement by failing to indemnify and defend Colonies in connection with the Criminal Action and the Taxpayer Action.

145.   As alleged herein, Defendants County and District have breached Section 3.3 of the Settlement Agreement by voluntarily and extensively assisting prosecutors in the Criminal Action in an effort to undermine the Settlement Agreement.

146.   As alleged herein, Defendants County and District have breached Section 6.3 of the Settlement Agreement by failing and refusing to take all actions necessary or reasonably requested by Colonies to uphold the validity and enforceability of the Settlement Agreement.

147.   As a direct result of Defendants' breaches of the Settlement Agreement, Plaintiff suffered injury and harm, including lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

## SIXTH CLAIM

### Breach of Implied Covenant of Good Faith and Fair Dealing

### Against Defendants County and District

148.   Plaintiff re-alleges and incorporates each allegation in Paragraphs 1 through 109 of this Complaint as though fully set forth herein.

149.   On or about November 28, 2006, Plaintiff and Defendants County and District entered into the Settlement Agreement, a written contract resolving civil litigation over the County and District's taking of Colonies' land.

150.   Defendants County and District were obligated under the implied covenant of good faith and fair dealing to deal with Colonies honestly, fairly, and in good faith, so as to not destroy Colonies' right to receive the benefits of the Settlement Agreement.

151.   As alleged herein, Defendants County and District breached the implied covenant of good faith and fair dealing by refusing to defend or indemnify Colonies for the costs, losses, and/or debts it incurred during the Criminal Action and Taxpayer Action, refusing to help Colonies defend the Settlement Agreement's validity in the Taxpayer Action, and voluntarily assisting in the prosecution of the Criminal Action.

152.   Defendants County and District's bad faith actions unfairly frustrated the agreed purpose of the Settlement Agreement and deprived Colonies of its right to receive some of the benefits of that agreement—namely, indemnity, defense, and support for the validity of the Settlement Agreement.

153.   As a direct result of Defendants County and District's breaches of the implied covenant of good faith and fair dealing, Plaintiff suffered injury and harm, including lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF demands judgment against DEFENDANTS for the following relief:

A.   Compensatory damages, including for indemnity, lost income, lost business opportunities, and loss of reputation, of no less than $60 million, but in an amount ultimately to be proven at trial;

B.   Punitive damages against Defendants of no less than $20 million, but in an amount ultimately to be proven at trial;

//

C.      An award of reasonable attorneys' fees, costs, and expenses to Plaintiff, pursuant to 42 U.S.C. § 1988, in an amount to be proven at trial;

D.      For costs of suit herein incurred;

E.      Pre-judgment interest;

F.      Such other and further relief as this Court shall find just and proper.

Dated:  March 1, 2018                          **LARSON O'BRIEN LLP**


By:  /s/ Stephen G. Larson
     Stephen G. Larson
     Jonathan E. Phillips
     Attorneys for Plaintiff
     COLONIES PARTNERS, L.P.


## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues so triable.


Dated:  March 1, 2018                          **LARSON O'BRIEN LLP**


By:  /s/ Stephen G. Larson
     Stephen G. Larson
     Jonathan E. Phillips
     Attorneys for Plaintiff
     COLONIES PARTNERS, L.P.

COMPLAINT