Name  Charles E. Slyngstad

Address  444 South Flower Street, Suite 2400

City, State, Zip  Los Angeles, CA 90071

Phone  (213) 236-2709

Fax  (213) 236-2700

E-Mail  cslyngstad@bwslaw.com

☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☒ Retained

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Paul Biane

PLAINTIFF(S),

v.

County of San Bernardino, et al.

DEFENDANT(S).

CASE NUMBER:

5:18-cv-00420-JGB-SHK / 5:18-cv-02202-JGB-SHK

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that  Hollis "Bud" Randles; Robert Schreiber; Michael Ramos  hereby appeals to

*Name of Appellant*

the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
    motions for summary judgment (immunity)

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on _____7/28/20_____ . Entered on the docket in this action on 7/29/20_____.

A copy of said judgment or order is attached hereto.

_____August 26, 2020_____

Date

/s/ Charles E. Slyngstad

Signature

☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:**   The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number of copies of the Notice of  Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 18-420 JGB (SHKx)** | | Date | July 28, 2020 |
|---|---|---|---|---|
| Title | ***Colonies Partners LP v. County of San Bernardino, et al.*** | | | |

Present: The Honorable     JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):     Attorney(s) Present for Defendant(s):

None Present                    None Present

**Proceedings:**     **Order (1) GRANTING IN PART AND DENYING IN PART Defendants' Motions for Summary Judgment (Dkt. Nos. 277, 278, 279, 281, 282); (2) GRANTING Defendant Cope's Motion for Summary Judgment (Dkt. No. 280); and (3) DENYING Plaintiff James Howard Erwin's Motion for Summary Judgment (Dkt. No. 294) (IN CHAMBERS)**

Before the Court are the following six motions[1] for summary judgment:

- Filed by Defendant County of San Bernardino ("the County"), ("County MSJ," Dkt. No. 277);
- Filed by Defendant James Hackleman ("Hackleman"), ("Hackleman MSJ," Dkt. No. 278);
- Filed by Defendant Michael A Ramos ("Ramos"), ("Ramos MSJ," Dkt. Nos. 279, 284);
- Filed by Defendant R. Lewis Cope ("Cope"), ("Cope MSJ," Dkt. No. 280);
- Filed by Defendant Robert Schreiber ("Schreiber"), ("Schreiber MSJ," Dkt. No. 281); and

---

[1] A motion for summary judgment filed by Defendant John Goritz, (Dkt. No. 275), was withdrawn, after the parties agreed to dismiss claims against him. (See Dkt. Nos. 302, 320).

---

**CIVIL MINUTES—GENERAL**

- Filed by Defendant Hollis Bud Randles ("Randles"), ("Randles MSJ," Dkt. Nos. 282, 285) (collectively, "MSJs").

A docket entry styled as a motion for summary judgment is also pending, filed by Plaintiff James Howard Erwin ("Erwin"),[2] ("Erwin Opposition," Dkt. No. 294.)

The Court held a hearing on these matters on July 13, 2020. After considering the oral argument and papers filed in support of, and in opposition to, the matters, the Court GRANTS IN PART AND DENIES IN PART Defendants' MSJs, except Cope's MSJ, which is GRANTED. The Court DENIES Erwin's Motion.

## I.     BACKGROUND

### A.     Overview of the Six Operative Complaints and Consolidation under the Lead Case, Colonies

The Motions arise from six similar actions against the County and several County actors. Defendants allegedly investigated and maliciously prosecuted Plaintiffs in retaliation for Plaintiffs' protected first amendment activity. The actions have been gradually consolidated under this lead case, Colonies. This section summarizes the claims and parties in each operative complaint.

### 1.     Colonies Partners LP v. County of San Bernardino, et al.

On March 1, 2018, Plaintiff Colonies Partners LP ("Colonies") filed a complaint against the County, the San Bernardino County Flood Control District ("the District"), Ramos, Cope, Hackleman, Randles, Schreiber, Josie Gonzales ("Gonzales"), Ruth Stringer ("Stringer"), Adam Aleman ("Aleman"), Edmund G. Brown, Jr., Kamala D. Harris, Melissa Mandel, and Gary Schons. (Dkt. No. 1.) On June 1, 2018, Defendants Edmund G. Brown, Jr., Kamala D. Harris, Melissa Mandel, and Gary Schons ("AG Defendants") moved to dismiss. (Dkt. Nos. 50, 57.) On July 12, 2018, the Court granted AG Defendants' motion and dismissed the Complaint with leave to amend. (Dkt. No. 62.) Colonies filed a First Amended Complaint on July 25, 2018. ("Colonies FAC," Dkt. No. 64.)

The Colonies FAC alleges six causes of action: (1) retaliation under 42 U.S.C. § 1983 (against all "Individual Defendants"); (2) Monell municipal liability under 42 U.S.C. § 1983 (against the County); (3) supervisorial liability under 42 U.S.C. § 1983 (against Ramos, Cope, Hackleman, and certain AG Defendants); (4) conspiracy under 42 U.S.C. § 1983 (against all Defendants); (5) breach of contract (against the County and the District); and (6) breach of

---

[2] The text for Dkt. No. 294 appears to notice a cross motion for summary judgment, but is in fact Erwin's "Consolidated Opposition to Defendants' Motion for Summary Judgment," so the Court DENIES Erwin's "motion" and treats the document as an opposition. (See Dkt. No. 294.)

implied covenant of good faith and fair dealing (against the County and the District). (Id.) On August 15, 2018, AG Defendants moved to dismiss all claims against them in the FAC. (Dkt. No. 67). The Court Granted the motion and dismissed all claims against the AG Defendants, without leave to amend. (Dkt. No. 86.) The Court granted AG Defendants' request for entry of a final judgment in their favor. (Dkt. Nos. 215, 216.)

The District and Colonies filed cross motions for summary judgment in October 2017. Colonies sought summary judgment on its fifth cause of action against the District, for breach of contract, and the District sought summary judgment on each of Colonies' claims against it, including conspiracy, breach of contract, and breach of the implied covenant of good faith and fair dealing. (Dkt. Nos. 221, 223.) On November 14, 2019, the Court denied Colonies' motion and granted in part and denied in part the District's motion. ("MSJ Order," Dkt. No. 247 (granting the District's motion with regard to certain claims of breach of contract, as well as conspiracy and the implied covenant).)

### 2. <u>Jeffrey S. Burum v. County of San Bernardino, et al.</u>

The facts and claims alleged in <u>Colonies</u> are nearly identical to those in <u>Jeffrey S. Burum v. County of San Bernardino, et. al</u>, No. 5:18-cv-672-JGB (SHKx) ("<u>Burum</u>"). On April 2, 2018, Plaintiff Jeffrey S. Burum ("Burum") filed a complaint against the County, Ramos, Cope, Hackleman, Randles, Schreiber, Gonzales, Stringer, Aleman, Edmund G. Brown, Jr., Kamala D. Harris, Melissa Mandel, and Gary Schons. (<u>Burum</u> Dkt. No. 1.) On July 25, 2018, the Court granted Plaintiff leave to file a Second Amended Complaint. (<u>Burum</u> Dkt. No. 52) On July 25, 2018 Plaintiff filed a Second Amended Complaint. ("<u>Burum</u> SAC," <u>Burum</u> Dkt. No. 53.)

The <u>Burum</u> SAC alleges eight cause of action: (1) retaliation under 42 U.S.C. § 1983 (against Ramos, Cope, Hackleman, Randles, Schreiber, and certain AG Defendants); (2) malicious prosecution under 42 U.S.C. § 1983 (against Cope, Randles, and Schreiber); (3) fabrication of evidence under 42 U.S.C. § 1983 (against Randles and Schreiber); (4) <u>Monell</u> municipal liability under 42 U.S.C. § 1983 (against the County); (5) supervisorial liability under 42 U.S.C. § 1983 (against Ramos, Cope, Hackleman, and certain AG Defendants); (6) conspiracy under 42 U.S.C. § 1983 (against all Defendants); (7) negligence (against the County, Ramos, Cope, Hackleman, Randles, Schreiber, and certain AG Defendants); and (8) intentional infliction of emotional distress (against the County, Ramos, Cope, Hackleman, Randles, Schreiber, and certain AG Defendants). (Id.) On October 2, 2018, the Court Granted a motion to dismiss all claims against the AG Defendants in the <u>Burum</u> SAC, without leave to amend. (Dkt. No. 86.).

On September 17, 2018, the parties in <u>Colonies</u> and <u>Burum</u> appeared for a scheduling conference, at which the Court ordered the consolidation of <u>Colonies</u> and <u>Burum</u>, along with <u>James Howard Erwin v. County of San Bernardino, et al.</u>, No. 5:18-cv-01216-JGB (SHKx) and <u>Mark A. Kirk v. County of San Bernardino, et al.</u>, 5:18-cv-01597-JGB (SHKx). <u>Colonies</u> would remain the lead case.

---

**CIVIL MINUTES—GENERAL**      Initials of Deputy Clerk <u>MG</u>

### 3. **James Howard Erwin v. County of San Bernardino, et al.**

The facts and claims in Colonies and Burum are similar to those in James Howard Erwin v. County of San Bernardino, et al., No. 5:18-cv-01216-JGB (SHKx) ("Erwin"). Erwin commenced the action on June 6, 2018, (Erwin Dkt. No. 1), and filed a first amended complaint on November 2, 2018, after consolidation of the cases, ("Erwin FAC," Dkt. No. 97). The Erwin FAC names as Defendants the County, Ramos, Cope, Hackleman, Randles, Schreiber, Gonzales, Stringer, and Aleman, and asserts nine causes of action: (1) retaliation under 42 U.S.C. § 1983 (against Ramos, Cope, Hackleman, Randles, and Schreiber); (2) malicious prosecution under 42 U.S.C. § 1983 (against Cope, Randles, and Schreiber); (3) fabrication of evidence under 42 U.S.C. § 1983 (against Randles and Schreiber); (4) Monell municipal liability under 42 U.S.C. § 1983 (against the County); (5) supervisorial liability under 42 U.S.C. § 1983 (against Ramos, Cope, and Hackleman); (6) conspiracy under 42 U.S.C. § 1983 (against all Defendants); (7) malicious prosecution (California Law) (against Aleman and Gonzales); (8) negligence (against all Defendants); and (9) intentional infliction of emotional distress (against all Defendants). (Id.)

### 4. **Mark A. Kirk v. County of San Bernardino, et al.**

The facts and claims in Colonies and Burum are similar to those in Mark A. Kirk v. County of San Bernardino, et al., 5:18-cv-01597-JGB (SHKx) ("Kirk"). Mark A. Kirk ("Kirk") commenced the action on July 30, 2018, (Kirk Dkt. No. 1), and filed a first amended complaint on February 6, 2019 after consolidation with Colonies, ("Kirk FAC," Dkt. No. 131). The Kirk FAC names the County, Ramos, Cope, Randles, Schreiber, Gonzales, and Aleman as Defendants, and asserts six causes of action: (1) malicious prosecution under 42 U.S.C. § 1983 (against Ramos, Cope, Randles, and Schreiber); (2) retaliation under 42 U.S.C. § 1983 (against Ramos, Cope, Randles, and Schreiber); (3) fabrication of evidence under 42 U.S.C. § 1983 (against Randles and Schreiber); (4) Monell municipal liability under 42 U.S.C. § 1983 (against the County); (5) supervisorial liability under 42 U.S.C. § 1983 (against Ramos and Cope); and (6) conspiracy under 42 U.S.C. § 1983 (against all Defendants). (Id.)

### 5. **Paul Biane v. County of San Bernardino, et al.**

The facts and claims in Colonies and Burum are similar to those in Paul Biane v. County of San Bernardino, et al., 5:18-cv-02202-JGB (SHKx) ("Biane"). Plaintiff Paul Biane ("Biane") commenced the action on October 15, 2018. (Biane Dkt. No. 1.) On February 8, 2019 the Court granted the parties' joint request to consolidate Biane with the other consolidated cases, under the lead case Colonies. (Dkt. No. 134.) On the same day, Biane filed a first amended complaint. ("Biane FAC," Biane Dkt. No. 19.) The Biane FAC names the County, Ramos, Cope, Randles, and Schreiber as Defendants, and asserts six causes of action: (1) malicious prosecution under 42 U.S.C. § 1983 (against Ramos, Cope, Randles, and Schreiber); (2) retaliation under 42 U.S.C. § 1983 (against Ramos, Cope, Randles, and Schreiber); (3) fabrication of evidence under 42 U.S.C. § 1983 (against Randles and Schreiber); (4) Monell municipal liability under 42 U.S.C. § 1983 (against the County); (5) supervisorial liability under 42 U.S.C. § 1983 (against Ramos and Cope); and (6) conspiracy under 42 U.S.C. § 1983 (against Ramos Cope Randles, and Schreiber). (Id.)

6.    **John Dino DeFazio v. County of San Bernardino, et al.**

The facts and claims in Colonies and Burum are similar to those in John Dino DeFazio v. County of San Bernardino, et al., 5:19-cv-00554-JGB (SHKx) ("DeFazio"). John Dino DeFazio ("DeFazio") commenced the action on March 28, 2019. ("DeFazio Complaint," DeFazio Dkt. No. 1.) On August 15, 2019, the Court granted the parties' joint request to consolidate DeFazio with the other consolidated cases, under the lead case Colonies. (Dkt. No. 220). The DeFazio Complaint names the County, Ramos, Randles, Schreiber, Aleman, and John Goritz[3] ("Goritz") as Defendants, and asserts six causes of action: : (1) malicious prosecution under 42 U.S.C. § 1983 (against all Defendants); (2) retaliation under 42 U.S.C. § 1983 (against all Defendants); (3) fabrication of evidence under 42 U.S.C. § 1983 (against all Defendants); (4) Monell municipal liability under 42 U.S.C. § 1983 (against the County); (5) supervisorial liability under 42 U.S.C. § 1983 (against Ramos); and (6) conspiracy under 42 U.S.C. § 1983 (against all Defendants). (DeFazio Compl.)

**B.    The Motions and Supporting Documents**

The County, Hackleman, Ramos, Cope, Schreiber, and Randles ("Defendants") filed the Motions on January 27, 2020. (County MSJ; Hackleman MSJ; Ramos MSJ; Cope MSJ; Schreiber MSJ; Randles MSJ.)  The Motions are accompanied by identical statements of undisputed fact and requests for judicial notice. ("DSUF," Dkt. Nos. 277-2, 278-2, 284-3, 280-2, 281-2, 285-3; "RJN," Dkt. Nos 277-3, 279-2, 284-4, 280-3, 281-3, 285-4.)[4]  In addition, Defendants compiled an appendix of 125 Exhibits, (see "Compendium," Dkt. Nos. 283, 283-1 to 283-7, 286, 304).

The Court notes significant verbatim repetition of arguments in the Motions, with the exception of the County MSJ, which is unique.  In essence there is one "prosecutor" template brief (for Ramos, Hackleman, and Cope) and one "investigator" template brief (for Randles and Schreiber), with name substitutions throughout to match the particular Defendant.[5]

---

[3] On February 18, 2018, the parties stipulated to the dismissal of Goritz in DeFazio. (Dkt. No. 297.)  Goritz then withdrew his motion for summary judgment. (Dkt. No. 320.)  The motion is still a useful reference, because the Motions incorporate by reference Goritz's statement of facts.

[4] The Court GRANTS the RJN, because their authenticity is not disputed and state court records are an appropriate object of judicial notice.  See Louis v. McCormick & Schmick Rest. Corp., 460 F. Supp. 2d 1153, 1156 n.4 (C.D. Cal. 2006); Fed. R. Evid. 201(b).

[5] Ramos, Cope, and Hackleman advance virtually identical prosecutor-specific arguments, and Randles and Schreiber advance the same investigator-specific arguments (for example, on fabrication of evidence or investigator immunity).  As a general rule, in instances of repetitive argument by Defendants, the Court cites to just one of the briefs, typically

On February 18, 2020, Plaintiffs filed their oppositions.  Burum filed a consolidated opposition, ("Consolidated Opposition," Dkt. No. 291), and with Colonies, filed a joint statement of genuine disputes of material fact in support of the Consolidated Opposition, ("Joint SGD," Dkt. No. 291-1).  Burum and Colonies included a statement of additional material facts. ("Joint SAF," Dkt. No. 291-1 (starting at page 53).)  Burum and Colonies filed joint consolidated evidentiary objections, ("Consolidated Objections," Dkt. No. 291-2), as well as the following supporting documents:

- Declaration of Bruce A. Green, ("Green Declaration," Dkt. No. 291-3 (attaching expert report as Exhibit 1));
- Declaration of Kathryane O. Foster, ("Foster Declaration I," Dkt. No. 291-5 (attaching Exhibits 1 to 134, at Dkt. Nos. 291-6 to 291-8, and 298)

Plaintiffs other than Burum opposed the Motions as follows:

- Colonies filed an opposition, ("Colonies Opposition," Dkt. No. 292), which joins the Introduction, Factual Background, and Sections A, B, E, and F of the Consolidated Opposition, (id.).
- Erwin filed an opposition, ("Erwin Opposition," Dkt. No. 294), which joins the same parts of the Consolidated Opposition as Colonies, and joins the SGD and supporting documents, (id.).
- Biane filed an opposition, ("Biane Opposition," Dkt. No. 295), which joins[6] the Consolidated Opposition with regard to everything but Part III (legal standard), and joins the Joint SAF, (id. at 6 n.2.  Biane included in support of his Opposition the Declaration of Dale K. Galipo.  ("Galipo Declaration," Dkt. No. 295-2 (attaching Exhibit A).)
- DeFazio filed an opposition, (DeFazio Opposition," Dkt. No. 296), which joins the Consolidated Opposition, Joint SAF, and supporting exhibits, and includes a separate SGD, ("DeFazio SGD," Dkt. No. 296-1), and statement of additional material facts, ("DeFazio SAF," Dkt. No. 296-1, starting at page 9).  DeFazio also includes the Declaration of Darren M. Harris, in support of his Opposition. ("Harris Declaration," Dkt. No. 296-2 (attaching Exhibits A and B).)
- Kirk filed an Opposition, ("Kirk Opposition," Dkt. Nos. 293, 299), which joins the Consolidated Opposition and Objections, Joint SGD, and Foster Declaration. (Id.; Dkt. No. 300).

---

(continued …)  the Ramos MSJ as representative of the prosecutors, and the Schreiber MSJ as representative of the two investigators.

[6] Biane filed a separate notice to clarify that he joins the Joint SGD, Consolidated Objections, and Green and Foster Declarations and Exhibits.  (Dkt. No. 303.)

**CIVIL MINUTES—GENERAL**           Initials of Deputy Clerk MG

The Oppositions also include a great deal of verbatim repetition with name substitution. Accordingly, the Court primarily cites the Consolidated Opposition in the discussion to follow, noting differences of position only where necessary.

The six Defendants replied on March 9, 2020. ("Ramos Reply," Dkt. No. 307; "Schreiber Reply," Dkt. No. 308; "Cope Reply," Dkt. No. 309; "Hackleman Reply," Dkt. No. 310; "Randles Reply," Dkt. No. 311; "County Reply," Dkt. No. 312.) Defendants filed a second compendium of evidence in support of the replies, (Dkt. No. 313 (attaching Exhibits 127 to 180 at Dkt. Nos. 313-1 to 313-5)), and a supplemental request for judicial notice, ("RJN II," Dkt. No. 314). Defendants also responded to the Joint SGD and SAF, ("Response to Joint SGD," and "Response to the Joint SAF," Dkt. Nos. 317, 319), and to the DeFazio SGD, (Dkt. No. 315), filed evidentiary objections to the Joint SGD and Joint SAF, ("Defendants' Objections," Dkt. No. 316), and filed a response to DeFazio's SGD, (Dkt. No. 315).

On March 19, 2020, Plaintiffs filed a supplemental opposition regarding an order of the magistrate judge, (Dkt. No. 326), to which Defendants replied, (Dkt. No. 328). On March 23, 2020, the Court granted the parties' stipulation to dismiss Josie Gonzales as a Defendant. On March 27, the Court accepted the order of the magistrate judge regarding sanctions ("Spoliation Order," Dkt. No. 305). (See Dkt. Nos. 331 (accepting R&R).) The Spoliation Order requires an instruction that the jury may presume information in lost text messages deleted by Ramos on Ramos's personal phone after March 2018 and emails deleted from Ramos's campaign email account was unfavorable to Defendants. (Spoliation Order at 2.) After the July 13, 2020 hearing, DeFazio filed a supplement, (Dkt. No. 406), which Kirk, Biane, and Erwin joined, (Dkt. Nos. 407, 408-409.)

## II.   FACTS

The following material facts are sufficiently supported by admissible evidence and are uncontroverted,[7] unless otherwise noted. They are "admitted to exist without controversy" for purposes of the Motions. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3. The Court considers the parties' objections only where necessary.[8] All other objections are OVERRULED AS MOOT.

---

[7] A summary of the factual allegations in this action may be found in the Court's October 2, 2019 Order. (Dkt. No. 86.)

[8] Much of the evidence consists of witness statements about facts, circumstances, or other persons' statements in which the DA's Office investigators were interested. In response to this type of evidence, the parties often object on the grounds of foundation, or hearsay, etc. (See Consolidated Objections, Defs.' Objections.) But the significance of the statements is not typically the truth of the matter asserted by the witness, but the fact that the witness characterized the facts in such a manner at the time. In addition, "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. Burch v. Regents of Univ.        (continued …)

---

This case challenges the County DA's investigation and prosecution of Plaintiffs. The parties act on a densely populated timeline, and some have fluid or disputed roles. In what follows, the Court takes a roughly chronological approach, detailing a 2006 settlement agreement and the investigation and prosecution of Plaintiffs for procuring the agreement. The Court then summarizes facts relevant to supervisory roles, and concludes by reviewing evidence of Defendants' potential retaliatory motives.

**A.      2002 Colonies Quiet Title Action, and 2006 Settlement for $102 Million**

In 2002, Colonies initiated civil litigation against the County and the District, regarding easements for flood control and for water conservation, affecting title to real property owned by Colonies. (Joint SAF ¶ 6.) After the litigation started, Colonies and Burum[9] made public statements critical of the County and they publicly and successfully supported pro-development candidates for the Board of Supervisors, including Gary Ovitt ("Ovitt") and Plaintiff Biane. (Id.)

On November 28, 2006, the County Board of Supervisors voted 3 to 2 to settle the lawsuits brought by Colonies, and the County and the District entered into a $102 million agreement with Colonies ("Settlement Agreement" or "Settlement"). (DSUF ¶ 1; Joint SAF ¶ 15.) Then-Supervisors Ovitt, Biane, and Bill Postmus ("Postmus") voted in favor of the Settlement. (Id.)

**B.      The Investigation**

At some point, the County District Attorney's Office ("DA's Office") began to investigate the circumstances of the Settlement Agreement, in particular, whether the Settlement was the result of corruption or perhaps a bribe. As described in greater detail below, the investigation paved the way to individual Plaintiffs' indictment, trial, dismissal or acquittal, and now to this civil suit for retaliatory investigation and malicious prosecution.

A key question in this case is exactly when and why the investigation began. The facts tending to support a view that the investigation began early are as follows. Prior to the Settlement, Hackleman, an assistant DA and prosecutor, sent emails that demonstrate he was at least aware of Burum and Colonies' settlement negotiations with the County. (Joint SAF ¶ 12.) Second, after the Settlement, the Public Integrity Unit ("PIU"), within the DA's Office, discussed the Settlement in departmental meetings. (Joint SAF ¶ 16.) Third, around August 4,

---

California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.") At the summary judgment stage, the Court focuses on the admissibility of the evidence's contents, not the admissibility of the evidence's form. Fed. Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) ("the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.")

[9] Burum is a co-managing member of Colonies' general partner.

2008, Randles, a senior investigator, asked associates of Postmus (who had voted in favor of the Settlement) about Burum and the Settlement, and whether Postmus accepted a bribe. (Foster Decl., Ex. 17).

In addition to the timing of the investigation, each Defendant's role is important to keep in mind. Ramos, the District Attorney—stated the PIU was created when he was elected district attorney in 2003, and that it was a "vertical prosecution" unit, where an investigator was assigned a DA, and they would handle the case from the investigation stage all the way through trial until the end of the case. (Foster Decl., Ex. 2 at 88-89.) Again, Hackleman was an Assistant DA. Lewis Cope, a prosecutor, helped jump start the PIU. (Joint SAF ¶ 12.; Foster Decl., Ex. 17.) Randles and Schreiber were PIU investigators.

## C. 2007 DA's Office Investigation into Another Matter, at the Assessor's Office

After voting for the 2006 Settlement, Postmus moved from the Board of Supervisors to the County Assessor's Office. On August 8, 2007, the Board of Supervisors reported to the DA's Office allegations seemingly unrelated to the Settlement: that the County Assessor's Office, under Postmus, improperly utilized the services of a consulting firm. (Id. ¶ 2.) In 2008, the County Grand Jury also made a complaint to the DA Office's PIU regarding operations within the Assessor's Office. (Id. ¶¶ 2-3.) The PIU then initiated an investigation into the Assessor's Office. (Id.) In June 2008, in connection with this investigation, former Assistant Assessor Adam Aleman ("Aleman") was arrested and charged with six felony counts[10] alleging he falsified and destroyed County property and records. (Id. ¶ 4.)

The PIU began investigating conduct relating to the 2006 Settlement no later than November 1, 2008, when investigators interviewed Aleman about Postmus's activity at the Assessor's Office, and the 2006 Settlement became a topic of conversation. (SUF ¶ 6.) Before or during the interviews, the DA's Office provided typical notices to Aleman to provide truthful information.[11] (DSUF ¶ 7.) Thus, Defendants' view is the investigation into the Settlement Agreement began with the Aleman interview in November 2008. Plaintiffs' view is that a retaliatory investigation had already begun.[12]

---

[10] Aleman was charged with three felony counts of preparing false documentary evidence, one felony count of providing false evidence, one felony count of public records violation, and one felony count of vandalism over $400. (Compendium, Ex. 1.)

[11] The parties dispute the extent to which Defendants had reason to believe certain information Aleman provided was in fact truthful, either based on contradictory evidence, or Aleman's general character for untruthfulness based on his prior falsification of documents submitted to a grand jury. (Joint SGD ¶ 7.)

[12] Colonies argues that the PIU began investigating the Settlement in December 2006, almost immediately after it was concluded, and long before Aleman's November 1, 2008 interview. (Joint SGD ¶ 5.) Randles testified that investigators and attorneys investigated the Settlement negotiations in 2005, and discussed the Settlement in meetings (continued …)

---

**CIVIL MINUTES—GENERAL**     Initials of Deputy Clerk MG

## D.  Aleman Interviews in November 2008

Two Defendants participated in the Aleman interviews.  Cope was present at the beginning of the Aleman interviews in November 2008, and Randles was one of the investigators actively questioning him.  (Compendium, Ex. 2.)

The parties supply transcripts and recordings of these and other interviews in the case. Aleman reported[13] to investigators: (1) that prior to the 2006 Settlement, Erwin (a perceived Burum ally)[14] showed him political hit pieces that would be released if the Colonies lawsuit was not settled; (2) that Postmus, Erwin, and Burum conducted pre-settlement "shuttle negotiations"; and (3) that Postmus, Erwin, Biane, and Kirk[15] each received $100,000 payments to political action committees ("PACs") they each effectively controlled, in exchange for voting or delivering BOS votes in favor of the 2006 settlement.  (DSUF ¶¶ 8, 13.)  Aleman also told investigators that Erwin threatened to expose Postmus's homosexuality and drug use and to expose Biane's financial difficulties if they did not vote to settle the Colonies lawsuit.  (DSUF ¶ 9; Joint SGD ¶ 9 (disputing whether it was reasonable for Defendants to believe these statements).)  Finally, Aleman told investigators that Burum took Erwin and another individual on a 2007 post-Settlement trip to New York City, where Burum bought Erwin a Rolex watch and provided $500 to spend on prostitutes.  (DSUF ¶ 23.)

## E.  2008-2009 Follow-Up Investigation and Interview with Erwin

In December 2008, Randles obtained search warrants for Burum's American Express account records and records confirming Burum's January 2007 purchases at a high-end watch

---

as early as December 2006.  Thus, a reasonable juror could infer that the investigation began prior to the Aleman interview.  (See Joint SGD ¶ 5.)

[13] Whether investigators reasonably believed Aleman's statements is disputed.  (Joint SGD ¶ 8; Response to the Joint SAF ¶ 144) (for example, investigator Randles confirmed that in 2007 Colonies made $100,000 payments to the relevant PACs (tending to corroborate Aleman's statements), but Aleman provided unreliable information about his prior meetings with Postmus and Burum (supporting an inference that his other statements in the interview were not truthful)); see also Joint SAF ¶ 136 (adding further contentions about investigators' and prosecutors' beliefs about the reliability of Aleman's statements).)

[14] Around the time of the Settlement negotiations, Erwin states he was the Chief of Administration of the Safety Employee's Benefit Association, and that he was a staunch political ally of Burum.  (Erwin Opp'n at 5.)  In January 2007, Erwin was appointed Assistant Assessor under Bill Postmus.  (Id. at 6.)  Erwin resigned ten months later.  (Id.)  He previously identified himself as management or an extension of Colonies, but Burum denied Erwin acted as a consultant.  (See Dkt. No. 229-1 at 19.)

[15] Kirk states he was chief of staff for Supervisor Ovitt, who voted in favor of the Settlement.  (Kirk Opp'n at 6.)

---

**CIVIL MINUTES—GENERAL**  Initials of Deputy Clerk MG

store in New York. (DSUF ¶¶ 24-25.) Then in January 2009, Schreiber and other investigators served a search warrant at Erwin's residence, where Schreiber found a Rolex watch. (Id. ¶¶ 26-27.) Erwin participated in an interview at the time of the search warrant and stated that he was an intermediary during the Colonies settlement negotiations and agreed it would be "a fair statement" that Burum had discussions with him about "play[ing] hardball and get[ting] private investigators." (DSUF 28; Compendium, Exs. 11-12.)

At the November 2008 Aleman interviews, Aleman had told investigators Burum contributed to several PACs after the Settlement, and that the PACs were controlled by Postmus, Erwin, Biane, and Kirk. Investigators later seized documents from a third person pertaining to the PACs, (DSUF ¶ 29), and noted that Erwin's California Form 700 "Statement of Economic Interest" (filed February 8, 2007, April 1, 2008, and Sept. 30, 2008) did not disclose any benefits received in January 2007 from Colonies (PAC contribution) or from Burum, such as a Rolex or trip. (Id. ¶ 30.) In March 2009, Erwin was arrested and charged with perjury for his failure to disclose in the Form 700 benefits received from Colonies or Burum. (Id. ¶ 31.)

## F.    April 2009 Interview with Kirk

On April 21, 2009, Randles and another investigator interviewed Kirk. (DSUF ¶ 32.) At the interview, Kirk denied he formed the Alliance for Ethical Government PAC and denied he directed its expenditures. (Id. ¶ 33.) Kirk told investigators Erwin gave him a file containing supposedly politically harmful information about Kirk. (Id. ¶ 34.)

In November 2009, in an email discussion about the process for naming a new County Chief Administrative Officer ("CAO"), Hackleman stated Kirk was "reportedly the ramrod" of the firing of the former CAO and that Kirk "intensely dislikes our County Counsel." (Joint SAF ¶ 30 (citing Foster Decl., Ex. 25).) Hackleman also stated "the boys" think "we come up short" on charging Kirk, but "it should go on our agenda for the meeting," and he had "the boys looking at it again." (Id.)

## G.    October 2009 DeFazio Testimony Regarding PACs

In November 2008 Aleman had told investigators that he created an email address for Postmus to control expenditures of the Inland Empire PAC ("IE PAC"), and that he used the email to direct expenditures on behalf of Postmus. (DSUF ¶¶ 36-37; Joint SGD ¶ 36-37 (disputing the truth of those statements).) Yet on October 22, 2009, DeFazio testified before a grand jury that only four individuals (he, Mike Richman ("Richman"), Mike Gallagher ("Gallagher"), and Jeff Bentow ("Bentow")) had control of the IE PAC, that they had regular meetings about the IE PAC, and that no other person directed the IE PACs expenditures. (DSUF ¶ 38; DeFazio SGD ¶ 38.)

On October 30, 2009 Randles followed up with Bentow, who stated: (1) he was unaware he was an officer of the IE PAC, and (2) he hadn't spoken to DeFazio about the IE PAC other than to contribute. (DSUF ¶ 39.) The same day, Randles interviewed     (continued …)

Gallagher, who similarly stated he was unaware he was an officer and had merely spoken to DeFazio to contribute to the PAC.  (Id. ¶ 40.)  In November 2009, Richman began providing information to the DA's Office, and told investigators that Postmus and Aleman asked him to act as an executive director of the IE PAC but stated that Postmus would secretly control the PAC.[16] (Id. ¶¶ 41-43.)

## H.      February 2010 Criminal Complaints Against Erwin, Postmus, and DeFazio

On February 9, 2010, the DA's Office filed a criminal complaint against  Erwin and Postmus for their conduct related to the Settlement.[17]  (Id. ¶ 44.)  Erwin was arrested on February 10, 2010.[18]  (Id. ¶ 45; RJN, Ex. 33.)  On February 24, 2010, the DA's Office filed a criminal complaint against DeFazio, alleging two counts of perjury.  (DSUF ¶ 46; RJN Ex. 34.)

## I.      February and March 2011 Postmus Interviews

In February 2011, Postmus began providing information to the DA's Office.  (DSUF ¶ 50.)  Randles and Schreiber interviewed him on February 16, March 1, and March 10, 2011, after introductions with Cope present to answer questions.  (Id. ¶ 53; Joint SAF ¶ 77.)  On March 28, 2011, Postmus pleaded guilty to charges brought against him in connection with the 2006 Settlement, including asking for or receiving a bribe, and in connection with misconduct while he was serving as County Assessor.  (DSUF ¶¶ 65, 66; Joint SAF ¶ 94.)

At the February 16, 2011 interview, Postmus told Randles and Schreiber that he agreed to and voted for the 2006 Settlement of the Colonies lawsuit because Erwin had threatened to expose Postmus's homosexuality and drug use.  (DSUF ¶ 54; Joint SGD ¶ 54 (disputing extent to which Defendants reasonably believed Erwin was acting on behalf of Burum, based on Postmus's statements and background).)  Postmus also told investigators he created two PACs specifically to receive the $100,000 Colonies contributions: Conservatives for a Public Majority PAC, and the Inland Empire PAC.  (DSUF ¶ 60; Compendium Ex. 44.)

The parties paint dueling caricatures of Postmus's statements at the interview.  (DUSF ¶¶ 54-61.)  For example, the transcript of the interview reflects that Postmus stated he had an

----

[16] (See also DeFazio SGD ¶¶ 38-46 (not disputing the statements, but quarreling with characterization of the evidence).)

[17] The charges were one count of Conspiracy to Commit a Crime (Penal Code section 182(a)(1)), two counts of Bribing a Legislative Body Member (Penal Code section 85), three counts of Bribery (Penal Code section 165), two counts of Extortion (Penal Code section 518), one count of Asking For/Receiving a Bribe (Penal Code section 86), one count of Conflict of Interest (Government Code section 1090), one count of Public Officer Crime (Penal Code section 424), and one count of Forgery (Penal Code section 470(a) and (d)).  (DSUF ¶ 44.)

[18] Recall that Erwin had previously been arrested and charged in March 2009, for perjury relating to the Form 700.  (DSUF ¶ 31.)

interest in settling the Colonies lawsuit and "jump started" efforts with Biane to settle after he
came back from a 2005 trip to China with Burum, during which he got to know Burum.  (DSUF ¶
55.)  The transcript also shows Postmus stated he met Burum after the China trip in a series of
meetings.  (Id. (citing Compendium Exs. 39, at 117).)  Plaintiffs cast doubt on the truth of these
statements and imply investigators should not have believed them or may have manufactured
them.  Plaintiffs cite to Aleman's trial testimony to show that Postmus and Biane were
spearheading efforts to settle prior to the China trip.  (Joint SGD ¶ 55 (citing Foster Exs. 100,
153).)  In another disputed example, Postmus told investigators that he and Burum discussed
Postmus's sexuality and that Burum offered to either support him in political office or set him up
in business if he got the settlement done.  (DSUF ¶¶ 58, 59 (citing Compendium Ex. 42 at 45-46,
112-114).)

Thus, Defendants claim Postmus effectively stated Burum "extorted" or "bribed," him
(DSUF ¶ 58), while Plaintiffs argue Defendants mischaracterize Postmus's vague statements as
legal conclusions and Postmus never described a quid pro quo.  (Joint SGD ¶ 58.)  Plaintiffs
repeatedly cite to Postmus's later statements at Burum's trial that he had memory lapses or may
have gotten the facts or sequence of facts wrong.  (Id. ¶¶ 55, 58.)

The parties also dispute whether investigators fabricated Postmus's statements by
manipulating him.  This much is clear: prior to the interviews, the DA's Office provided the
typical notices.  Postmus was instructed to respond truthfully and completely to interview
questions.  (DUSF ¶ 52.)  While testifying in the later criminal trial, Postmus stated that he told
the truth to the DA's Office investigators during the interviews.  (DSUF ¶ 62.)  But then on
cross examination, Postmus stated it was clear to him now that the investigators put words in his
mouth or filled in details when he had lapses in memory, and he began to believe those details.
(Joint SGD ¶ 17, ¶ 62 (citing Foster Decl., Exs. 94, 97).)  Postmus stated that one of those false
beliefs was this deal he had with Burum.  (Joint SGD ¶ 62 (citing Foster Decl., Ex. 94 at 8470-
74).)

Plaintiffs also point to evidence that Randles and Schreiber knew Postmus had a drug
addiction prior to the indictment of Biane, Kirk, Erwin, and Burum.  (Joint SGD ¶ 58 (Foster Ex.
89 at 76, Ex. 94 at 8431 (showing the investigators knew of Postmus's substance abuse at the time
of interviews)).)  In an August 2010 email, long before the interviews, Hackleman mused in an
email that Postmus's addition left him with an "addled brain" and "I cannot be confident that he
will suddenly develop skills of logic."  (Joint SAF ¶ 90.)  However, after the first Postmus
interview, a prosecutor in the AG's office stated in an email exchange, "I don't think anything
[Postmus] said showed any indicia of reliability," and "we should use great caution in relying on
the information he is providing."  (Foster Decl., Ex. 137; Joint SAF ¶ 83; see also Joint SAF ¶¶
123-28, 131-34 (adding further factual contentions about investigator's beliefs regarding
Postmus's memory and actions to plant "false belief")).)  Defendants respond that Postmus did
not show signs of being under the influence at the interviews.  (Joint SAF Response ¶ 123.)

//
//

**J.      May 2011 Indictment of Biane, Kirk, Erwin, and Burum, and Subsequent Proceedings**

In April 2011, Cope and other prosecutors from the DA and AG's Offices began presenting evidence and witnesses to the Grand Jury.  (Joint SAF ¶ 95.)  On May 9, 2011, a grand jury issued a 29-count indictment against Biane, Kirk, Erwin, and Burum.  (DSUF ¶ 67; Compendium Ex. 48; Joint SAF ¶ 96.)  The DA's Office and the California Attorney General's Office prosecuted the case.  (DSUF ¶ 68.)

On May 19, 2014, Burum filed a Cal. Penal Code § 995 motion to dismiss the indictment based in part on alleged prosecutorial misconduct and alleged coercion of Postmus and Aleman by investigators, (DSUF ¶ 77; RJN Ex. 51), which was joined by Erwin, Biane, and Kirk, (DSUF ¶ 78; RJN Ex. 57).  The Superior Court denied the motions.  (DSUF ¶ 79; RJN Exs. 60-64.)

On July 5, 2017, Burum filed a motion pursuant to Cal. Penal Code § 1118.1 for judgment of acquittal, asserting there was insufficient evidence presented at trial to support the charges against Burum.  (DSUF ¶ 80; RJN Ex. 67.)  Erwin, Biane, and Kirk joined Burum's motion.  (DSUF ¶¶ 81-82; RJN Exs. 68, 121.)  Superior Court Judge Smith denied the motions as to several charges, for each criminal defendant.  (DSUF ¶ 83; RJN Exs. 121, 71-73; Compendium Exs. 76-77.)

In January 2017, the prosecution made opening statements in the Erwin, Biane, Kirk, and Burum matters.  (Joint SAF ¶ 112.)  On August 28, 2017, a jury acquitted Burum of all charges.  (Id. ¶ 116.)

**K.      DeFazio Proceedings**

On February 9 and 14, 2012, a preliminary hearing was held regarding the charges against DeFazio.  (DSUF ¶ 70; RJN 50.)  At the conclusion of the hearing, the court ruled that there was probable cause to believe DeFazio was guilty of the charges.  (Id. ¶ 71.)  On April 4, 2012, DeFazio filed a Motion to Set Aside Information pursuant to Cal. Penal Code § 995, based on his assertion that the prosecution's evidence was insufficient or incomplete.  (Id. ¶ 72.)  The court denied the motion.  (Id. ¶ 73.)  In May 2012, DeFazio filed a Petition for Writ of Prohibition as to the denial, which was also denied.  (Id. ¶¶ 74-75; see also DeFazio SGD ¶¶ 70-75.)

**L.      Each Defendant's Role in the Investigation and Prosecution**

The parties dispute the extent to which investigative and prosecutorial roles blurred within the PIU and DA's Office.  (DSUF ¶ 87.)  Nominally, Schreiber and Randles were investigators, Cope was a prosecutor and Deputy DA who helped "jump start" the PIU, (DSUF ¶ 19), Hackleman was a supervising prosecutor in charge of the PIU and was the assistant DA, (id.), and Ramos was the DA, (id. ¶ 69.)  Cope was part of the joint DA-AG team that presented evidence and witnesses to the Grand Jury to secure the May 2011 indictments.  (Joint SAF ¶ 95.)

From 2003-2009 Ramos was the District Attorney for the County.  (DSUF ¶ 69.)  The parties dispute whether Ramos directed or was apprised of the substance of PIU investigations into the Settlement.  (DSUF ¶ 85; Joint SGD ¶ 85.)  Plaintiffs highlight that Ramos received email and in-person updates from Hackleman on PIU activity generally, and on the Settlement investigation in particular.  (Joint SGD ¶ 85; Foster Decl., Ex. 2 at 97.)  Defendants underline Ramos's deposition.  For example, Ramos stated he understood Postmus's testimony was important to the case against Burum, not based on reading the interview, but because that's what Hackleman "told [him]."  (Id. at 121; Joint SAF ¶ 81)  Regardless, Hackleman regularly updated Ramos and others in the DA Office about the Settlement investigation from approximately May 1, 2010 to July 22, 2011.  (Joint SAF ¶ 57.)  In a March 8, 2012 email, Ramos emailed Cope and others, referencing the Burum case: "I will not allow our team to deviate until we are done[].  I have lived this case since day one."  (Id. ¶ 107.)

The parties also dispute whether and to what extent Hackleman controlled the investigation.  However, he described himself in a 2015 email as "heading the [PIU] during the criminal investigation and ultimate Grand Jury indictment" of Plaintiffs in the criminal case.  (Joint SAF ¶ 60; Foster Decl., Ex. 4.)  In reference to Hackleman's self-description, Michael Fermin wrote that Hackleman's "position was one that could control the investigation and prosecution," (id.), and at a later deposition stated Hackleman "had significant involvement in the review of it and the decision to file."  (Compendium Ex. 169.)  In addition, Ramos stated in a deposition that Hackleman "oversaw" the PIU "I think, weekly, perhaps."  (Foster Decl., Ex. 2 at 97.)

Plaintiffs attach evidence suggesting that Hackleman was involved in planning and strategizing around the Postmus interviews.  In a February 28, 2011 email, Hackleman told Schreiber and others that Postmus could help the DA's Office by explaining the details of the bribe he believed to have occurred.  (Foster Decl., Ex. 131.)  However, Hackleman also stated this was "in the mode of suggestions only" and he was sharing it "in case there is anything you find of value."  (Id.)  Hackleman also stated in a February 8, 2011 email that his prosecutors and investigators were working hard to get essential investigating done before indicting Biane, Kirk, Erwin, or Burum.  (Foster Decl., Ex. 86.)  In March 2011, just before indicting Burum and others, Hackleman and Schreiber emailed back and forth, copying investigators and prosecutors discussing "a case for the culpability of [Burum]," and their strategy for securing pleas.  (Foster Decl., Ex. 137.)  Hackleman proposed that prosecutors suggest areas of inquiry for the investigators to probe during their interview with Postmus.  (Id.)

In January 2011, after Postmus, Erwin, and DeFazio had been charged, but before the charges against Biane, Kirk, and Burum were announced, Hackleman circulated to Cope, Schreiber, Randles, and others, the summary of a meeting between the DA's Office and the California AG Office.  (Joint SAF ¶ 67.)  At the meeting, parties discussed the Settlement investigation and the "AG Proposal to File Charges on Burum and Biane."  (Id.)  Hackleman wrote "[w]e need to act now" to bring charges, due statute of limitations concerns, and noted participants "agreed on the following process to make a final decision . . . The DA PIU will confirm their position on bringing charges after study and a discussion with Ramos."  (Id.

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

(quoting Foster Decl., Ex. 83.).)  Later in January 2011, Hackleman wrote that he "hope[ed] to present the bottom-line recommendation" to Ramos, regarding whether to broaden charges to include the Doe Defendants.  (Id. ¶ 68.)  On February 7, 2011, Hackleman wrote to Schreiber and Cope regarding the "Big Decision" and their "commitment to take a position" to join or oppose the recommendation from the California AG's Office, in the form of a memo.  (Id. ¶ 69; Foster Decl. Ex. 93.)

Randles participated in many of the interviews, including with Aleman, Kirk, and Postmus.  Schreiber, while investigating the Settlement, reported to Hackleman.  (DSUF ¶ 86.) Schreiber interviewed Erwin and Postmus. Cope was present at the beginning of interviews with Aleman in November 2008 and with Postmus in March 2011, but he left after making introductions.  (DSUF ¶ 88.)  He was copied on emails between prosecutors and investigators regarding areas of inquiry to be probed with Postmus. (Joint SGD ¶ 88.)

## M. Potential Retaliatory Motive, or County Policy, Custom, or Practice of Retaliating

Plaintiffs attach emails showing Ramos, at some point after being accused of womanizing and other misconduct by Neil Derry in 2009: (1) directed PIU to focus on filing a criminal complaint before the date candidates for countywide office could file to challenge him, (2) feared a rival would come from the "Burum camp," and (3) told the PIU team he could get more investigators or attorneys if needed.  (Foster Decl., Ex. 33.)  Hackleman "reiterated" to investigators Ramos's "goal of completing all this" before the February 2010 political season during which Ramos would run for reelection "and the importance of it." (SGD ¶ 85 (citing Foster Decl., Ex. 34; Joint SAF ¶ 41-42.)  On February 10, 2010, Ramos and then Attorney General Jerry Brown held a press conference announcing the filing of the felony complaint against Postmus and Erwin, and naming Doe Defendants, and making "characterizations of Burum." (Joint SAF ¶¶ 50, 51 (quoting Foster Decl., Ex. 36 at 37 (Assistant DA Michael Fermin testifying about the press conference)).)

In November and December 2009, in the context of discussing an open County CAO position, potential CAO candidates, and Biane and Burum, Hackleman stated, "I see this as a fight to the death.  They will either get Ramos or he will get them.  And the direction of our County may well be affected for years to come."  Hackleman stated he would "run [] by the boss" a proposal to forestall any effort to make Greg Deveraux the CAO, by making a public referral to the Fair Political Practices Commission regarding Devereaux's Forms 700 for the years 2006, 2007, and 2008.  (Joint SAF Response ¶ 35.)  A few days later, Hackleman wrote that he "sure hop[ed]" that he upset plans to install Devereaux, and "we have some other potential options in that area."  (Joint SAF ¶ 36.)  In early 2010, Hackleman wrote an email referencing Burum and stating "[t]hese guys never stop scheming. And with Deveraux about to go in they have control of just about everything."  (Joint SAF ¶ 39.)

On August 13, 2010, after Postmus was arrested on a drug possession charge, Hackleman described Postmus as "the key to getting $102 million out of Burum's pocket and back into the public treasury." (Joint SAF ¶ 61.)  And in December 2010, Hackleman emailed Ramos and

others, stating his belief that "we will need at least every pressure we can bring to bear on [Postmus] if we ever have any hopes of seeing him turn." (Id. ¶ 63.)

Hackleman wrote in a February 8, 2011, email regarding the decision to charge the Doe defendants that he remained "emotionally excited about going after these bastards," but intellectually, remained "short of being confident" due to a lack of significant evidence beyond Aleman's interview, and noting he hoped to conduct additional interviews. (Id. ¶ 72; Foster Decl., Ex. 82 ("I am not yet convinced we have enough to file [on Biane] . . . we come up short on a viable case against Paul [Biane] or Jeff [Burum], as of this date.")) The February and March 2011 Postmus interviews had not yet occurred.

After the First Postmus interview, Hackleman wrote about budget cuts in the DA's Office, and noted "setting aside this theft of $102 million would have a powerful cheering effect and would hurt Burum badly." (Id. ¶ 91.) He also noted that Postmus's plea would "knock down . . . Biane, Kirk, and Erwin" and eventually "absolutely ruin Burum as a political operator." (Id.) In the same email exchange, an AG Defendant referred to Burum as "Dr. Evil," and Ramos responded "[w]ell said." (Id. ¶ 92.)

A Deputy DA emailed Ramos on May 13, 2017, linking to news about a Colonies supporter donating to Ramos's opponent in the 2018 election. (Joint SAF ¶ 113.) Ramos forwarded the email to Ellis, his campaign advisor, who responded, "we'll stick it up his ass," and Ramos forwarded Ellis's response to members of the DA's Office. (Id.)

In September 2017, after Burum's acquittal, Ramos emailed DA Office staff expressing his belief that the Office "may need to keep a close eye" on a County Supervisor he perceived to be Burum-friendly. (Foster Decl., Ex. 59 ("The next step may be laundering campaign funds . . . It will happen.").) Ramos's campaign advisor emailed Ramos asking about political contributions to the IE PAC he believed to be linked to Burum, and Ramos stated from his campaign email "we may need to refer to FPPC or start our own investigation. Their next step will be to launder money." (Joint SAF ¶ 121; Foster Decl. Ex. 60.) In a later deposition, Ramos stated that he did not renew his campaign email account, and with the knowledge that this would result in the loss of his campaign emails, after Plaintiffs had propounded discovery in this case. (Foster Decl., Ex. 2.)

On March 13, 2018 Hackleman emailed an AG attorney that "some good" resulted from the trials. Otherwise, Kirk would have become politically powerful, and would have formed an alliance with developers. (Joint SAF ¶ 121.)

In June 2018, Ramos lost his bid for reelection as the San Bernardino DA. (Spoliation Order at 6.) Ramos allowed his campaign emails located at mike@joinmikeramos.com to be deleted, and he deleted texts from his personal phone after March 2018. (Id. at 6, 9.) Ramos continued deleting text messages and allowed campaign emails to be deleted after this litigation commenced, and long after litigation was foreseeable. The Court has imposed and adverse inference instruction as a sanction. (Id. at 18.)

## III.     LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of informing the district court of the basis for its motion and identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.  Celotex, 477 U.S. at 325.  Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case.  Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).  The party seeking summary judgment must show that "under the governing law, there can be but one reasonable conclusion as to the verdict."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial.  Celotex, 477 U.S. at 324.  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248.  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence."  In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).  The non-moving party must make this showing on all matters placed at issue by the motion as to which it has the burden of proof at trial.  Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252.

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party.  Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991).  Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.     DISCUSSION

The parties present a whirl of mutually implicative claims and doctrines: prosecutorial immunity, retaliatory investigation, municipal policy of retaliation, fabrication of evidence, malicious prosecution, and conspiracy to retaliate, among others.  Rather than producing the typical linear progression of isolated causes of action, the claims are like spokes issuing from central hub: First Amendment retaliation. Accordingly, the Court focuses on whether a reasonable jury could conclude Defendants subjected each Plaintiff to a retaliatory investigation, and works out from there.

In Part IV.A, the Court opens discussion with the doctrine of absolute prosecutorial immunity, and concludes that much of Defendants' conduct is not absolutely immune.  Whether a given act was directed primarily at advocacy (and is absolutely immune) or investigation (and is not) will continue to be an important question, and a potential bottleneck, in these proceedings.

The Court then evaluates in Part IV.B Plaintiffs' claims of retaliatory investigation: the heart of the case.  The Court concludes the no-probable-cause pleading requirement articulated by the Supreme Court for a narrow class of such claims does not apply here.  In other words, Plaintiffs do not need to establish the lack of probable cause to investigate in order to proceed.  Instead, they must raise a triable question whether their protected First Amendment conduct "substantially motivated" a particular investigative action.  Only two Plaintiffs—Burum and Colonies—manage to do so, and they do so only for two Defendants—Ramos and Hackleman.  In Part IV.C the Court considers, and rejects, their invocation of qualified immunity, because the right to be free from retaliatory official conduct was clearly established at the time of the investigation.

Part IV.D evaluates Plaintiffs' claim of a municipal policy, custom, or practice of retaliation under Monell, 436 U.S. 658, 690-91 (1978), or in Plaintiffs' words, the County's "premeditated plan" to retaliate.  The Court finds Burum and Colonies state a Monell claim under one or more theories.  As to the other Plaintiffs, the asserted policy or practice was not sufficiently widespread or established, or the decision of a final policymaker for the County was not the moving force behind the asserted harm.  In any case, those Plaintiffs did not provide enough evidence to support a retaliatory investigation, and their Monell claims of a policy of retaliation are similarly unsubstantiated.

Part IV.E takes up fabrication of evidence, a claim which requires direct or circumstantial proof that Defendants deliberately concocted false statements or other false proofs to prosecute Plaintiffs.  The Court identifies a genuine dispute whether investigators Randles and Schreiber manipulated Postmus in the March and February 2011 interviews.  The Postmus interviews were more than a trivial matter in the decision to pursue an indictment against Burum, Kirk, and Biane, but were not significant in the prosecution of claims against Erwin or DeFazio.  As a result, the deliberate fabrication claims of the former withstand summary judgment.  The claims of the latter do not.

Part IV.F, on the subject of malicious prosecution, builds on the conclusion that the decision to indict may have been premised on false and fabricated evidence.  Reliance on such false and fabricated evidence rebuts Defendants' asserted probable cause to prosecute.  In addition, malicious prosecution requires deprivation of a specific constitutional right.  There is no substantive due process right to be free from a prosecution without probable cause, and the only other right in play in this case is the First Amendment right against retaliation.  Only Burum's retaliation claim remains, and so too with the claim of malicious prosecution.

Plaintiffs also assert a conspiracy to retaliate.  Part IV.G finds a jury must resolve whether there was concerted action by Hackleman and Ramos to retaliate against Colonies and Burum.

Three areas remain for consideration.  In Part IV.H, factual debate over the nature and extent of Hackleman and Ramos's oversight of the PIU precludes summary judgment on the supervisory claims.  In Part IV.I, the Court grants summary judgment on the negligence and

intentional infliction of emotional distress claims, which are time barred.  Finally, in Part IV.J, the Court observes Colonies did not oppose the County's MSJ on the contract claims, and accordingly grants summary judgment on those claims.

## A.    Absolute Immunity

Although the parties leave this issue towards the end of their respective briefs, the doctrine of absolute prosecutorial immunity exerts a gravitational pull on the causes of action in this case, and so the Court discusses it first.  The Supreme Court held in Buckley v. Fitzsimmons that fabrication of evidence "during the early stages of [an] investigation" is not subject to absolute immunity.  509 U.S. at 262–63, 275–76 (1993).  However, the line is difficult to draw between qualifiedly immune investigative functions and absolutely immune advocacy ones.  In this Section, the Court sketches some of the boundaries.  The Court reserves discussion of qualified immunity for later, because that two-step inquiry requires consideration of whether a constitutional violation occurred and whether the violation was clearly established.

### 1.    Legal Standard

Under Section 1983, certain government officials are entitled to absolute immunity from damages liability when performing certain functions.  This "functional approach" looks to "the nature of the function performed, not the identity of the actor who performed it."  Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993) (quoting Forrester v. White, 484 U.S. 219, 229 (1988)).  For prosecutors, the Supreme Court has concluded that activities "intimately associated with the judicial phase of the criminal process" are entitled to absolute immunity.  Imbler v. Pachtman, 424 U.S. 409, 430 (1976).  Thus, a prosecutor is absolutely immune from liability for "initiating a prosecution" and "presenting the State's case."  Id. at 431.  Moreover, an attorney "supervising a trial prosecutor who is absolutely immune is also absolutely immune."  Garmon v. Cty. of Los Angeles, 828 F.3d 837, 845 (9th Cir. 2016).  However, a prosecutor's "administrative duties" and "investigatory functions" that do not relate to an "advocate's preparation for the initiation of a prosecution or for judicial proceedings" are not entitled to absolute immunity.  Buckley, 509 U.S. at 273.  Instead, qualified immunity applies to prosecutors performing investigative functions "normally performed by a detective or police officer."  See id. at 273.

"Determining what functions are prosecutorial is an inexact science."  Lacey v. Maricopa Cty., 693 F.3d 896, 912 (9th Cir. 2012).  Since Imbler, the Supreme Court has held absolute immunity applies when a prosecutor appears in court to apply for a search warrant, Burns v. Reed, 500 U.S. 478, 492 (1991), and to how supervisory prosecutors manage a trial-related information system, Van de Kamp v. Goldstein, 555 U.S. 335, 349 (2009).  Conversely, absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, Burns, 500 U.S. at 496, when a prosecutor makes statements to the press, Buckley, 509 U.S. at 277, or to a prosecutor's fabrication of false evidence during a preliminary investigation, 509 U.S. at 275.  Although the Supreme Court has resisted drawing a bright line between investigative and advocacy work, it has noted a prosecutor "neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."  Id. at 274.  Where absolute

immunity is not applicable, courts assume that qualified immunity sufficiently protects
government officials in the exercise of their duties.  <u>Burns</u>, 500 U.S. at 486-87.

### 2. The Parties' Contentions

The Prosecutor Defendants argue they are absolutely immune for "many of the acts"
alleged.  (Ramos MSJ at 26 (compiling immunity cases).)  They also claim immunity for "quasi
judicial activities" taken within the scope of their authority, such as gathering evidence after
probable cause is established.  (<u>Id.</u> at 26.)  They argue that as to Erwin, they are absolutely
immune from March 19, 2009 forward, because that is the date Erwin was first arrested and
charged with perjury.  (Ramos MSJ at 26.)  For Burum, Biane, and Kirk, Defendants argue
absolute prosecutorial immunity should attach "on the eve of the grand jury [convening]" in
April 2009, but they do not provide a certain cutoff.  (<u>Id.</u> (citing <u>Imbler</u>, 424 U.S. at 431 n.33).)

Defendants also contend that the activity of an investigator carried out in preparation for
a prosecutor's case, after probable cause is established, enjoys absolute immunity.  (Ramos MSJ
at 23-24 n.17 (citing <u>Broam v. Bogan</u>, 320 F.3d 1023, 1033 (9th Cir. 2003)).)  Depending on the
function, and whether it is carried out pursuant to the preparation of the prosecution's case,
investigators may be absolutely immune.  (Schreiber MSJ at 28-29 (citing <u>KRL v. Moore</u>, 384
F.3d 1105, 1113 (9th Cir. 2004)).)  The Investigators Defendants also argue that once probable
cause to arrest is established, the officer need not investigate independently every claim of
innocence.  (<u>Id.</u> (citing <u>Baker v. McCollan</u>, 443 U.S. 137, 145-46 (1979)).)

Plaintiffs concede prosecutors and investigators enjoy absolute immunity, but remark the
doctrine applies only in narrow circumstances when the action is "intimately associated" with
the "judicial phase of the criminal process."  (Consolidated Opp'n at 48 (citing <u>Van de Kamp</u>,
555 U.S. at 341).)  Biane urges that this narrow immunity should not apply to the alleged
egregious misconduct.[19]  (Biane Opp'n at 23.)  Plaintiffs remind the Court it previously
determined that conduct "before the 2009 grand jury was empaneled or between the 2011 grand
jury proceedings" appeared to be investigative, and therefore unprotected by absolute immunity.
(<u>Id.</u> (citing Dkt. No. 86 at 9).)  Plaintiffs also argue that, using a conduct-based or functional
approach, certain actions after the 2011 grand jury indictment is not off limits.  (<u>Id.</u> (citing
<u>Buckley</u>, 509 U.S. at 274 n.5; <u>Kalina v. Fletcher</u>, 522 U.S. 118, 127 (1997)).)  Even after the
commencement of judicial proceedings, purely investigative or administrative functions,
Plaintiffs reiterate, are not absolutely immune.  As examples, they point to Cope and Randles'
confirmation in 2012 of the inaccuracy of statements made by Gonzales to the grand jury, and
Ramos's monitoring of Burum's donations and discussion of starting a new investigation, in
2018.  (<u>Id.</u> (citing SAF ¶¶ 153, 119).)

---

[19] Biane cites <u>KRL v. Moore</u>, 384 F.3d 1105, 1111 (9th Cir. 2004) ("[T]he functions of an
advocate do not include . . . fabricating evidence before probable cause has been established . . . .
"), and <u>Tennison v. City and County of San Francisco</u>, 2006 WL 733470, at *23 (N.D. Cal. Mar.
22, 2006) ("Intimidating and coercing a witness to change her testimony are not advocacy and
are not entitled to absolute immunity").  (Biane Opp'n at 23.)

### 3.    Discussion

As an initial matter, the Court notes that the party asserting absolute immunity bears the burden to show that such protection is justified.  See Burns v. Reed, 500 U.S. 478, 486 (1991). The Court is therefore underwhelmed with Defendants' vague assertion that absolute immunity attaches for "many of the acts" alleged, with little detail regarding which specific acts—or functions—must be absolutely removed from consideration.  (Ramos MSJ at 26.)  The Court therefore declines to grant summary judgment on the grounds of absolute immunity, where Defendants have failed to apply the Supreme Court's functional approach to each act for which they seek that highest level of protection.  Under Burns, it is the prosecutor defendants' burden—not the Court's—to establish "immunity is justified for the function in question."  500 U.S. 478, 486 (1991) (collecting cases and noting that, at a time when qualified immunity was weaker than it is today, the presumption is that qualified immunity is sufficient to protect officials acting reasonably).  Absolute immunity "is an extreme remedy, and it is justified only where 'any lesser degree of immunity could impair the judicial process itself.'"  Garmon v. Cty. of Los Angeles, 828 F.3d 837, 843 (9th Cir. 2016) (quoting Lacey v. Maricopa Cty., 693 F.3d 896, 912 (9th Cir. 2012) (en banc)).[20]

In Buckley, the Court stated that absolute immunity certainly does not attach before probable cause to arrest exists, and even after probable cause is established, absolute immunity might not apply to primarily administrative or investigative activity.[21]  509 U.S. at 274 n.5.  Under Buckley, then, the absence of probable cause to arrest would preclude absolute immunity.  The Ninth Circuit reiterated this rule in Genzler v. Longanbach, 410 F.3d 630, 639-40 (9th Cir. 2005).  The timing is thus a "relevant, but not necessarily determinative" factor in determining if the character of an interview or action is quasi-judicial advocacy or police-type investigative work.  Id.  Here, Plaintiffs focus on actions taken at the investigative stage and actions chronologically or functionally remote from the judicial proceedings.

//

---

[20] This result is consistent with the Court's order on the AG defendants' motion to dismiss, (Dkt. No. 62), which noted that acts during the investigative phase are potentially not subject to absolute immunity, unless Defendants can show they interviewed Postmus and other witnesses in preparation for trial or the grand jury, (id at 9).

[21] The Court therefore rejects Prosecutor Defendants' argument that they are necessarily absolute immune from March 19, 2009 forward, on Erwin's claims.  First, it is unclear whether the filing of charges is the same as probable cause to arrest.  Second, Erwin was charged multiple times.  March 19, 2009 was the date he was charged with perjury for failure to disclose information in the Form 700 (benefits received from Colonies or Burum), but further charges would be forthcoming.  Erwin was charged (with Postmus) for crimes relating to the Settlement on February 9, 2010 and arrested the next day.  And Hackleman stated in a February 8, 2011 email that essential investigating was still being conducted before indicting Erwin (along with Biane, Kirk, and Burum) in April and May 2011.

The chronology of interviews, charges, and judicial proceedings is as follows.

- November 1, 11, and 21, 2008: interviews with Aleman touch on the subject of the 2006 Settlement and whether Burum or Erwin acted illegally.  (Compendium, Exs. 3, 5, 7.)
- January 15, 2009: Erwin participated in interview at the time of a search of his home.  (Compendium, Ex. 11.)
- March 2009: Erwin arrested and charged with perjury for failure to disclose benefits received from Colonies or Burum.  (DSUF ¶ 31.)
- April 21, 2009: Kirk interviewed.  (Compendium, Ex. 15.)
- February 9, 2010: felony complaint filed against Postmus, Erwin, and John Does for conduct relating to the Settlement.  (Id., Ex. 33.)
- February 10, 2010: Erwin is arrested on charges related to the Settlement.  (Joint SAF ¶ 45.)
- February 24, 2010: felony complaint filed against DeFazio alleging two counts of perjury.  (Compendium, Ex. 34.)
- February 15, March 1, and March 10, 2011: Postmus interviewed.  (Compendium, Exs. 39, 41, 44.)
- March 28, 2011: Postmus agrees to plead guilty to misappropriation of funds.  (Compendium, Exs. 44, 46.)
- April 7, 2011: evidence and witnesses are presented to the Grand Jury against Biane, Kirk, Erwin, and Burum.  (Joint SAF ¶ 95; DSUF ¶ 67.)
- May 9, 2011: the Grand Jury indicts Biane, Kirk, Erwin, and Burum, relating to the Settlement Agreement.  (Compendium, Ex. 48.)
- February 9 and 14 2012: DeFazio's preliminary hearing.  (Foster Decl., Ex. 95.)

Several difficulties arise in applying absolute immunity rules to these events, which the parties largely neglect.  The Court feels bound to consider, if not decide, these issues for purposes of clarification and to benefit future proceedings in this matter.

The first difficulty is that there were multiple criminal suspects and multiple complaints.  Thus, a question arises whether official actions were absolutely immune against all Plaintiffs' claims, if those actions were arguably supported by probable cause and intimately tied to the judicial phase of proceedings of any one Plaintiff.  For example, Erwin was charged and arrested on March 19, 2009.  Several interviews relevant to Erwin's case occurred after that date but may have veered into topics of a more "investigative" or acquisitive nature for the suspects who had yet to be arrested or charged.

To resolve this problem, the Court looks to KRL v. Moore, which suggests the same prosecutorial action can be subject to absolute immunity as to one set of claims and merely qualified immunity as to another set.  384 F.3d 1105, 1110–12 (9th Cir. 2004) (concluding a post-indictment search was subject to absolute immunity, regarding crimes charged in indictment, and was only subject to qualified immunity to the extent officers searched for evidence of crimes not charged).  It stands to reason that conduct during interviews in this case, even if excepted from

consideration as to one suspect, would be fair grounds for a claim by another suspect for whom probable cause was not yet established.

A second difficulty is the presence of multiple investigators and prosecutors with slightly different "functions" or roles at different stages of the criminal investigation. The record suggests that within Ramos's "vertical prosecution" Public Integrity Unit, both prosecutors and investigators carried out investigative work, and roles merged. (Foster Decl., Ex. 2 at 88-89.) The quaint notion of a clear dividing line between prosecutorial and police work is hard to apply to such a unit. Defendants do not set forth the roles of each PIU team member in their statement of undisputed facts, provide PIU regulations or policy documents, or otherwise offer factual matter that would aid the Court in applying the functional approach to find them absolutely immune during the investigation stage.

Third, Buckley and progeny do not explicitly state how to determine whether probable cause exists to arrest a suspect. 509 U.S. 259, 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.") For example, Buckley is unclear whether probable cause to arrest is determined by reference to: (1) the perception of the official at the time, (2) the ruling or determination of third party in the eventual criminal proceeding (e.g. a grand jury or judge); or (3) whether probable cause it is an objective inquiry that must be assessed retrospectively by the court considering whether to grant absolute immunity from the suspect's claim of damages.

Broam suggests that the individual official's perception is one way of ascertaining probable cause to arrest for absolute immunity purposes. Broam v. Bogan, 320 F.3d 1023, 1033 (9th Cir. 2003) ("[W]e cannot determine whether the alleged constitutional violations were committed before or after [investigating Sergeant] Ingram concluded that probable cause existed to arrest . . . ") (emphasis added). KRL v. Moore also supports a view that the goal or purpose of each official action is key: that court held a post-indictment search warrant could both prosecute the pending indictment (absolute immunity applies to that purpose) and investigate or uncover new crimes (absolute immunity does not apply). KRL v. Moore, 384 F.3d 1105, 1111 (9th Cir. 2004).

In light of these difficulties, and viewing the evidence in the light most favorable to Plaintiffs, Defendants do not meet their burden to show they were performing functions "intimately associated" with the judicial phase of the criminal process" as to the Doe Defendants (Burum, Kirk, Biane) named in the May 9, 2011 indictment until, at the earliest, April 7, 2011, when evidence and witnesses were actively presented to the Grand Jury. The Court does not understand the mere filing of a complaint with Doe defendants in February 9, 2010 to be necessarily "intimately associated" with the judicial phase, especially in a felony case.[22] Genzler v. Longanbach, 410 F.3d 630, 641 (9th Cir. 2005) (". . . [W]e do not view the

---

[22] The "Felony Complaint" is signed under penalty of perjury by Randles, the declarant and complainant. (Compendium, Ex. 33.) In California, the first pleading        (continued …)

filing of the complaint as an event after which, by definition, all actions by the prosecutor and his staff are protected by absolute immunity.") Because Erwin was arrested the day after the February 9, 2010 felony complaint, however, it is more likely that Defendants' interviews after that point were quasi-judicial, with respect to Erwin only.

After the February 9, 2010 felony complaint, and the closer one gets chronologically to the April 7, 2011 grand jury proceedings, the more difficult it becomes to determine the applicable function. Perhaps the most important question for Defendants is whether absolute immunity applies to the Postmus interviews, which occurred after the felony complaint but a month or so before presentation of evidence to the Grand Jury and indictment of the Does. The answer to this question turns on whether "a decision to seek an indictment ha[d] been made," by the time those interviews occurred, and whether the acts involved professional evaluation of the evidence assembled and appropriate preparation "before a grand jury." Buckley, 509 U.S. at 273. Another way to frame the question is whether the purpose of the Postmus interviews, vis-à-vis Plaintiffs, was akin to organizing, evaluating, and marshalling, or was more like the activity of "acquiring" evidence. Garmon, 828 F.3d 837, 844 (9th Cir. 2016) (citations omitted).

Curiously, Defendants appear to cede the point, by invoking absolute immunity only on the "eve" of the April 2011 grand jury proceedings, for damages claims arising from the eventual May 2011 indictment. (Ramos MSJ at 26.) Even if Defendants did not mean to concede this point, Plaintiffs marshal enough evidence to show the Postmus interviews were more acquisition than advocacy oriented. Buckley, 509 U.S. at 273–74, (stating that "the detective's role [is] searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested"). For example, prior to the Postmus interviews, Hackleman remained excited about prosecuting the Does but "short of being confident," and it does not appear the DA and AG offices reached a final decision to indict until after those interviews,[23] or after

_____

by the prosecution in felony cases is generally either an indictment or an information, however. 4 Witkin, Cal. Crim. Law 4th Pretrial § 199 (2020). A defendant is not "charged" with a felony within the meaning of Cal. Penal Code § 691 until an information or indictment is filed or a complaint is certified to the superior court by the magistrate under Penal Code § 859a (requiring the defendant to plead guilty or nolo contendere). Id. § 177. Thus, a defendant cannot be prosecuted for a felony on a complaint unless he pleads guilty or nolo contendere before the committing magistrate.

[23] A series of emails between Defendants tends to show that a firm decision was supposed to be made in early March 2011, and that Hackleman believed more investigative work had yet to be accomplished. (Foster Decl., Ex. 86 ("we have no quotes nor documentary evidence that we can throw at the Does, as we can with Postmus and Erwin. Conspiracies are wonderful things, but we still need some 'good stuff' to get us to beyond a reasonable doubt.").) Hackleman also noted he would like to keep to that timeline, but wanted time to "gather more facts" and that his "prosecutors are not there yet" but were "working hard with the investigators to get the essential investigating done—including talking to Postmus." (Id.) He proposed meeting on February 28, 2011, which would give them time to "develop additional evidence," "get all on the same page," and "get a Grand Jury [e]mpaneled." (Id.)

Postmus signed a plea deal.  (Joint SAF ¶ 72.)  Construing this evidence in the light most
favorable to Plaintiffs, the purpose of the Postmus interviews was investigative, and accordingly,
official actions during those interviews are not subject to absolute immunity.

The last topic for discussion in this Section is whether Defendants are immune for actions
after the existence probable cause, and if so, for which actions.  Defendants claim absolute
immunity for quasi-judicial activities after this point in a conclusory and unhelpful manner.
(Ramos MSJ at 26.)  In future proceedings, Defendants will have to establish the quasi-judicial
purpose of each official action, and cannot simply label the act as such without more, and expect
the Court to blindly assume the action was closely associated with the judicial process.  Genzler,
410 F.3d 630, 637-38 (9th Cir. 2005) (citing Milstein, 257 F.3d at 1011) ("If not done in a quasi-
judicial capacity, the acquisition or manufacturing of evidence is not protected by absolute
immunity.")  Buckley, 509 U.S. 259, 274 n.5.  Plaintiffs provide two examples of what they deem
non-judicial activity after the existence of probable cause: (1) Cope and Randles' confirmation in
2012 of the inaccuracy of statements made to the Grand Jury by a third person; and (2) Ramos's
monitoring of Burum allies' donations and discussions of a new investigation in 2018, after
Burum's acquittal.  (Biane Opp'n at 23.)  The Court does not decide the issue now, but is
inclined to think the first action may be quasi-judicial (although it is hard to understand what
action Plaintiffs are referring to), and the second likely is not.  Unless the parties determine a
system of mutually agreeing how to apply the quasi-judicial label, ad hoc absolute immunity
determinations may become a recurring battleground in this litigation.[24]

## B.      First Amendment – Retaliatory Investigation

Plaintiffs allege retaliation under 42 U.S.C. § 1983 as follows: Colonies against all
individual defendants; Burum against Ramos, Cope, Hackleman, Randles, and Schreiber; Erwin
against the same as Burum; Kirk against Ramos, Cope, Randles, and Schreiber; Biane against the
same as Kirk; and DeFazio against the County, Ramos, Randles, Schreiber, and Aleman.
(Colonies FAC; Burum SAC; Erwin FAC; Kirk FAC; Biane FAC; DeFazio Compl.)

### 1.      Legal Standard

Official reprisal for protected speech "offends the Constitution [because] it threatens to
inhibit exercise of the protected right," Crawford–El v. Britton, 523 U.S. 574, 588, n. 10 (1998).
"[T]o demonstrate a First Amendment violation, a plaintiff must provide evidence showing that
'by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such
deterrence was a substantial or motivating factor in [the defendant's] conduct.'"  Mendocino
Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting Sloman v. Tadlock,
21 F.3d 1462, 1469 (9th Cir. 1994)).  There is no requirement that the "speech [be] actually

---

[24] The Court's previous order on the AG Defendants' motions to dismiss lists some of
the clearer-cut categories of absolutely immune conduct.  (Dkt. No. 86 at 8-9.)  However, it is
inadequate to invoke categories without applying them to the facts and specifying to which
Defendant and which Plaintiff's claims the immunity applies.

inhibited or suppressed." Id. Courts only consider "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." Id. (quoting Crawford–El v. Britton, 93 F.3d 813, 826 (D.C. Cir. 1996)). The plaintiff must "prove the elements of retaliatory animus as the cause of injury," with causation being "understood to be but-for causation." Hartman v. Moore, 547 U.S. 250, 260 (2006).

The causation element in particular has generated much debate. In Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274 (1977), the Supreme Court considered the manner of proof of causation for a First Amendment retaliation claim, in the civil employment context. Id. Under Mt. Healthy, the plaintiff bears the burden of demonstrating that unconstitutional animus was a "substantial factor" or a "motivating factor" for an adverse action. 429 U.S. at 287. The burden then shifts to the defendant to demonstrate that, even without any impetus to retaliate, the defendant would have taken the action complained of. Id. (placing the burden on the employer to show it would have acted the same way even in the absence of the protected conduct).

Decades later, in Hartman, 547 U.S. 250 (2006), the Court held that a plaintiff alleging retaliatory prosecution must show the absence of probable cause for the underlying criminal charge, to satisfy the causation element. "If there was probable cause, the case ends. If the plaintiff proves the absence of probable cause, then the Mt. Healthy test governs." Lozman v. City of Riviera Beach, Fla., 138 S. Ct. 1945, 1952-53 (2018) (summarizing the holding in Hartman). Hartman remarks that a retaliatory prosecution case will not be brought against the prosecutor, due to absolute immunity for the decision to prosecute, but against a nonprosecutor official who "influenced the decision but did not himself make it." Hartman, 547 U.S. 250, 262 (2006). The lack of probable cause is thus required to strengthen the causal link between the improperly motivated official and the prosecutor and to give the claim "vitality." 547 U.S. at 264-65.

In Lozman, the Court was presented with a binary choice to apply Mt. Healthy or Hartman to a retaliatory arrest claim. Charting a third, narrower, way, the Supreme Court found that if the plaintiff alleges an official municipal policy of intimidation, then he need not prove the absence of probable cause with respect to that arrest. 138 S. Ct. at 1953-55. Then in a very recent case, Nieves v. Bartlett, the Supreme Court considered a retaliatory arrest claim not subject to the Lozman exception, and squarely held the plaintiff must plead and prove the absence of probable cause. 139 S. Ct. 1715, 1724 (2019). In both retaliatory prosecution and arrest cases, the Court found, it is "particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct." Id. (citation omitted).

//
//
//
//

2.        **The Parties' Contentions**

Concentrating their firepower on this causation element, Ramos, Hackleman, Cope,
Randles, and Schreiber[25] argue that the retaliation claims against them fail, because Defendants'
supposed desire to chill First Amendment activity was not the "but for" cause of Plaintiffs'
injury. (See Ramos MSJ at 2-3 (citing Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019)).) In
particular, Defendants urge that a finding of probable cause bars the suspect from bringing a
retaliation claim. (Id.) A finding of probable cause shows the officers had an objectively
reasonable basis for their actions, and strongly suggests alleged retaliatory motive did not
"cause" the officer conduct. Defendants assert Plaintiffs must establish the objective
unreasonableness of the decision to investigate or press charges as an element of their claim. (Id.
at 3 (citing Hartman v. Moore, 547 U.S. 250, 263-65 (2006)).) In addition, Defendants invoke
the doctrine of collateral estoppel to prevent the relitigation of prior findings of probable cause.
(Id. at 4-5 (citing Greene v. Bank of Am., 236 Cal. App. 4th 922, 933 (2015)).)

Plaintiffs defend the viability of their retaliation claims in several ways. First, they
breezily assert Defendants concede Plaintiffs satisfy all the other elements of retaliation.[26]
(Consol. Opp'n at 24; see also Biane Opp'n at 7-8; DeFazio Opp'n at 12-15 (same, but setting
forth argument on the protected speech and chilling of speech elements anyway).) Accordingly,
Plaintiffs focus on the causation issue in the briefs. Plaintiffs contend that they are not required
to show a lack of probable cause to establish causation, because this requirement appears only in
retaliatory arrest and prosecution cases, (Hartman and Nieves, respectively), which have a
"problem of multi-layered causation." The no-probable-cause requirement does not apply in an
"ordinary retaliation case" where the individual who takes adverse action and the individual with
retaliatory motive are one and the same. (Id. at 29-30 (citing Hartman, 547 U.S. at 259; Nieves,
139 S. Ct. at 1723).) Unlike Hartman and Nieves, Plaintiffs argue, there is no causal attenuation
here, because Defendants alleged to have retaliatory motives also carried out the alleged
retaliatory acts. (Id. at 31 (citing Denney, 508 F. Supp. 2d at 830, n.4 (retaliatory investigation
case in which the court does not apply the probable cause standard); Skoog v. County of
Clackamas, 469 F.3d 1221, 1234 (9th Cir. 2006).) Finally, an investigation does not require
probable cause, and therefore, it would be nonsensical to extend a no-probable-cause requirement
to claims of retaliatory investigation.

Next, Plaintiffs assert they need not demonstrate the objective unreasonableness of the
investigation: instead the Court should consider whether there are sufficient "circumstantial"
factors to show retaliation in this "ordinary" retaliation case. (Id. at 34-35 (citing 547 U.S. at
260).) Defendants' cases discussing objective reasonableness, Plaintiffs argue, are
distinguishable as cases involving retaliatory arrest. (Id. at 34 n.11.) They also respond to

---

[25] These Defendants make nearly identical arguments on retaliation, and for ease of
reference the Court will cite primarily to the Ramos MSJ and the Consolidated Opposition.

[26] The Court disagrees with this characterization of the Motions. Defendants clearly raise
the issue of retaliatory motivation, which is part and parcel of the causation inquiry.

---

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk MG

circumstantial factors offered by Defendants' (e.g. proximity in time, etc.). Plaintiffs insist that
employment retaliation factors are inapplicable, but in any case, there is a triable issue on those
factors.[27]  (Id. at 34 n.11, 38-39.)

Colonies argues separately that it has standing to pursue a Section 1983 claim, including
retaliation, as long as there is a factual basis to assert the claim on its own behalf.  (Colonies
Opp'n at 3 (citing Outdoor Media Grp., Inc. v. City of Beaumont, 464 F. App'x 611, 613 (9th Cir.
2011)); Am. News & Info. Servs., Inc. v. Gore, 778 F. App'x 429, 432 (9th Cir. 2019)).)  It
contends the investigation team specifically focused on Colonies, as well as Burum individually,
for example by seeking to harm Colonies financially and bringing a Section 1092 taxpayer lawsuit
against Colonies. (Id. at 4-5.)

### 3. Discussion

#### a. Applicability of Hartman's No-Probable-Cause Requirement

The Court rejects Defendants' argument that Plaintiffs must establish a lack of probable
cause in order to satisfy the but-for causation prong of their retaliation claims.  It would be
incongruous to extend Hartman and Nieves's severe rule on causation to officials' investigative
or administrative acts.  The causal complexity in Hartman arose primarily because of absolute
immunity and the tenuous link between a biased investigator and an independent prosecutor,
who ultimately decided to pursue the case.  547 U.S. 250, 262 n.7.  The Supreme Court expressly
reserved whether the adverse consequences of a retaliatory investigation would ever justify
recognizing a distinct constitutional violation.  547 U.S. 250, 262 n.8.

Since then, several courts have recognized a cause of action for retaliatory investigation,
and have not required the plaintiff to establish a lack of probable cause. Lacey v. Maricopa Cty.,
693 F.3d 896, 917 (9th Cir. 2012) (prosecutor's conduct—issuance of invalid subpoenas and
authorization of warrantless arrests—was not absolutely immune and subjected him to first
amendment retaliation claim, as did Sheriff's conduct during a years-long intrusive
investigation); Denney v. Drug Enf't Admin., 508 F. Supp. 2d 815, 830 (E.D. Cal. 2007)
(recognizing cause of action for retaliatory investigation in the case of physician who alleged he
was investigated in retaliation for speech concerning medical marijuana); see also Gagliardi v.
Fisher, 513 F. Supp. 2d 457, 487 (W.D. Pa. 2007) ("Hartman does not foreclose plaintiff's

---

[27] Biane agrees that the "additional" circumstantial factors do not apply in this case, and
argues separately that several circumstances support an inference that the Defendants would not
have investigated and prosecuted him but for his constitutionally protected speech: his private
and political affiliations, support from Colonies and Burum, vote in favor of settlement,
association with San Bernardino Young Republicans PAC, and Defendants' personal enmity and
opportunism.  (Biane Opp'n at 8-9.)  He argues, nevertheless, that each additional factor is met,
because: the investigation began in December 2006 just after the settlement (proximity).  (Id. at
9-10.)

retaliatory investigation claim notwithstanding the court's determination that the ensuing investigation, search, arrest and prosecution were supported by probable cause.").

Defendants rely on <u>Sterner</u> for the opposite result or to bootstrap a pleading requirement of "objective unreasonableness,"[28] (Ramos MSJ at 9), but the Court does not find this authority applicable or persuasive, at least for the conclusion urged by Defendants.  <u>Sterner v. United States Drug Enf't Agency</u>, 2008 WL 11508384, at *5 (S.D. Cal. Sept. 8, 2008).  <u>Sterner</u> presented a multi-tiered causation problem more similar to <u>Hartman</u>: the plaintiff alleged conspiracy between state actors, the DEA and the IRS, in criminal and administrative investigations.  In addition, <u>Sterner</u> did not cite authority for what would be a significant extension of <u>Hartman</u>'s no-probable cause requirement.  <u>Id.</u>

As a result, the Court finds that the no-probable-cause requirement does not apply in this case.  The Court does not consider at this juncture whether exceptions to the requirement apply, such as the <u>Lozman</u> exception for "premeditated plans" of retaliation as a municipal policy or custom, or the false-or-fabricated-evidence exception.  Nor is it necessary to determine at this time whether collateral estoppel applies to prior determinations of probable cause.

### b.    But-For Causation

The Court's next task is to determine whether Plaintiffs raise an issue regarding a causal connection between each Defendants' "retaliatory animus" and Plaintiffs' "subsequent injury." <u>Hartman</u>, 547 U.S. 250, 259 (2006).  Specifically, Plaintiffs must raise a triable issue that Defendants' retaliatory animus was "a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." <u>Nieves</u>, 139 S. Ct. at 1722 (quoting <u>Hartman</u>, 547 U.S. at 259).

The parties' arguments about but-for causation are confused, and a few words of clarification are in order.  The first needed clarification is the official's <u>retaliatory animus or motive</u> must cause the adverse action.  (<u>Id.</u>)  Defendants misstate the standard by asking whether the <u>protected First Amendment activity</u> caused the adverse action.  (<u>See</u> Ramos MSJ at 12-22.) Naturally, the question of whether each Defendant was aware of the First Amendment activity blends into retaliatory motive, and motive blends into the question of causation: if no motive can be established, then the requisite causal connection is necessarily lacking.  Although Defendants

---

[28] In opposing the application of an "objective reasonableness" test, Plaintiffs notch one more argument worth highlighting.  In a case without the causation problems mentioned, the existence of a legitimate motive does not defeat a retaliation claim, if the evidence also supports a view that the investigation would not have occurred without the impetus to retaliate. (Consolidated Opp'n at 28 (citing <u>Hartman</u>, 547 U.S. at 260; <u>Capp</u>, 940 F.3d at 1056).)

repeatedly state that Plaintiffs do not establish but-for cause, (id.), they mostly provide reasons that Plaintiffs fail to establish each Defendant's retaliatory motive.[29]

The second needed clarification relates to the burden of proof.  The parties acknowledge the "but-for" causation requirement applies to retaliation cases, (Consol. Opp'n at 28), but the parties implicitly disagree whether it is Plaintiffs' burden to prove but-for causation as part of the prima facie case and what type of pleading would accomplish this.  As Justice Ginsburg noted in her dissent in Hartman, the majority "assign[s] to the plaintiff the burden of pleading and proving the absence of probable cause for the prosecution," whereas before, the assumption was that the burden of proving the absence of causation--which the lack of probable cause tends to establish—had fallen to the defendant prosecutor.  Hartman v. Moore, 547 U.S. 250, 266 (2006) (Ginsburg, J., dissenting).  Thus, in Hartman and now in Nieves-like cases, the burden of disproving what used to be a defense to causation now falls to plaintiffs, and "only entirely 'baseless prosecutions' [are] checked."  Id. (citation omitted).

Capp v. County of San Diego illustrates the default burden allocation.  In Capp, the Ninth Circuit held that the plaintiff need only plausibly allege retaliatory animus was a "substantial motivating factor" and explicitly noted Plaintiff was not required to plead but-for causation.[30] Capp, 940 F.3d 1046, 1058 (9th Cir. 2019).  In essence, pleading that animus was a substantial motivating factor leads to an inference of but-for causation, which Defendants may later disprove.  The exceptions are those cases (retaliatory prosecution or arrest) in which the no-probable-cause requirement falls on plaintiff's shoulders.

### c.    Substantial Motivating Factor

The next question—squarely but perhaps not artfully raised by Defendants—is whether Plaintiffs establish that retaliatory animus was a substantial motivating factor in any of Defendants' actions during the investigation.  (Ramos MSJ at 13-22.)  Capp 940 F.3d 1046, 1055

---

[29] For example, when Capp discusses whether protected "criticism" was a "substantial motivating factor" for official conduct, 940 F.3d at 1055, it is discussing whether the plaintiff has established the motivation or animus prong, and by extension plausibly alleged "but-for" causation (which officials then have the burden of negating).

[30] The "mixed motive" analysis for First Amendment claims under Mt. Healthy is not to be confused with the burden-shifting framework under McDonnel Douglas Corp., which applies in Title VII cases and allocates burdens of proof more favorably to Defendants.  See Allen v. Iranon, 283 F.3d 1070, 1074 (9th Cir. 2002).  By insisting on a requirement that Plaintiffs show a lack of objective reasonableness, Defendants are essentially attempting to use the McDonnel Douglas framework: the defendant cites a legitimate reason for its action, then it is the plaintiff's burden to establish this reason is pretextual.  But that is not the standard.  Although a requirement that the suspect show objective unreasonableness may be consistent with other decisions that have expanded Nieves and Hartman to other contexts, (Ramos MSJ at 10), the weight of authority appears to be against such a requirement in retaliatory investigation cases.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

(9th Cir. 2019). The intent to inhibit speech can be demonstrated through direct or circumstantial evidence. Mendocino, 192 F.3d at 1301–02. Circumstantial evidence of motive usually includes: (1) proximity in time between the protected action and the allegedly retaliatory response, from which a jury logically could infer retaliation speech; (2) evidence that the official expressed opposition to the speech; (3) evidence that the official's explanations for the action were false and pretextual. See Coszalter v. City of Salem, 320 F.3d 968, 977 (9th Cir. 2003) (discussing circumstantial factors in an adverse employment case). The Court observes that the second example seems rather like a type of direct evidence,[31] and that the third appears to be a catch-all category allowing flexible application. The parties' feud about which circumstantial factors apply is therefore unnecessary.

The Court's task is to correlate speech to animus to action. Unfortunately, Plaintiffs tend to lump together their protected activities. Defendants are careful to distinguish the protected activity, (Ramos MSJ at 12-22), but as noted above, improperly allocate the burden of proof. In their Oppositions, Plaintiffs do not methodically name the direct and circumstantial factors that support an inference that each Defendant harbored animus towards each Plaintiff. (Consol. Opp'n at 38-39.) Instead Plaintiffs continue to characterize Defendants' individual actions within the PIU and DA's Office as part of the same global "conspiracy" that coalesced in August 2009 to take them out of politics.[32]

Even assuming a conspiracy to violate Plaintiffs' rights took shape at that time, however, this alone would not raise a triable issue on retaliatory investigation. A meeting of the minds to violate Burum's rights, for example, could be substantially motivated by any number of factors wholly unrelated to Burum's protected activity, such as aggrandizing the prosecutors, appearing tough on perceived corruption in the County, or submitting to exterior pressures. Moreover, the retaliatory investigation precedents upon which Plaintiffs have principally relied, especially Denney, painstakingly considered each investigative actor, his actions, and whether those official actions were motivated by speech-related animus.

In other words, where Plaintiffs insist they are bringing an "ordinary" retaliation claim that lacks multi-tiered causation problems, they cannot—in an about-face—rely on a sweeping conspiracy theory to prove that speech retaliation substantially motivated each Defendant. The relevant retaliatory actions taken by each Defendant must be more clearly defined, so the Court may consider which Defendant was responsible for the action, and whether he was potentially

---

[31] The parties do not discuss what constitutes direct evidence, but analogizing from the Title VII context, the Court considers direct evidence to be evidence which, if believed, proves the fact of retaliatory motive or animus without the need of inference, and typically consists of clear statements that the reason for the action is to retaliate against protected speech. Dominguez–Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1038 (9th Cir. 2005).

[32] Burum maintains, for example, "[a]t the end of the day, while all of the various parties involved in the investigation may have entered the conspiracy with differing motives for retaliation, all of those motives merged into one overriding goal when the Defendants joined forces in August 2009." (Burum SAC ¶ 64.)

substantially motivated to act by animus relating to one or more examples of Plaintiffs' protected speech.

### d. Plaintiff and Speech; Defendant and Action; Direct or Circumstantial Evidence of Motive; and Result

#### 1. Burum

The Court begins with Burum, and his protected conduct. Burum asserts he engaged in the following protected conduct: (1) advocating for the 2006 Settlement and criticizing the County during the Settlement process; (2) advocating for Measure P[33] in the fall of 2006; (3) obtaining the Settlement on November 28, 2006; and (3) directing donations in 2007[34] to "political to general purpose PACs affiliated with pro-development politicians, including members of the San Bernardino County Board of Supervisors and others who had supported the settlement." (Burum SAC at ¶ 3.) As discussed in the next subsection, Burum cannot claim retaliation based on Colonies' protected First Amendment conduct, and depend on his own protected activity. That does not include the Settlement (to which Burum was not a party).[35]

The Consolidated Opposition and Joint SAF mention for the first time several potentially protected actions that are not linked to advocacy in favor of the 2006 Settlement or 2007 PAC payments, such as the acquisition of 1200 acres around 2009, or other political influence Burum was perceived to exercise, directly or indirectly. (Joint SAF ¶¶ 28, 44, 54, 91.) That asserted protected activity is either so vague that it cannot be tied directly to Burum or pinned to any particular time, or it is not clearly or fairly delineated as protected in the SAC. A different set of facts would tend to prove or disprove whether and when that additional activity occurred, whether it was protected, and whether it was a substantial motivating factor in any Defendant's investigative actions. In addition, it would be highly prejudicial to Defendants to permit Burum to expand the scope of his asserted First Amendment activity at this late stage in the proceeding. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1291–92 (9th Cir. 2000) (holding the district court did not err when it refused to entertain a new theory of liability raised for first time at the

---

[33] Burum alleges the measure purported to be a term-limit proposal but its passage would have increased by 50% the salary of County Supervisors. (Burum SAC ¶ 43.)

[34] (Compendium, Exs. 91 to 94 (displaying checks from Colonies payable to the relevant PACs, dated June 29, 2007 through May 24, 2007), Ex. 106 at 67 (showing that investigators asked Aleman about the 2007 payments ).)

[35] The Consolidated Opposition ignores the argument, (Ramos MSJ n.9), that Burum cannot assert retaliation based on Colonies' protected right to receive just compensation for the uncompensated taking of land by the County and District. As a result, the Court deems any argument to the contrary waived. Pac. Dawn LLC v. Pritzker, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016). Defendants do not explicitly argue—and the Court does not consider—whether Burum may assert that "directing" Colonies to make a PAC contribution qualifies as protected conduct.

summary judgment stage); <u>Apache Survival Coalition v. United States</u>, 21 F.3d 895, 910 (9th Cir. 1994) (when new issues or evidence supporting a legal theory outside scope of complaint are introduced in opposition to summary judgment, district court should construe matter as request to amend pleadings).[36]  The Court therefore rules out protected activity materially distinct from the 2006 and 2007 activities clearly within the scope of the SAC.  (<u>Burum</u> SAC ¶¶ 38-46, 119.)

The next step is to consider each Defendant and his or her actions and potential retaliatory motive, relative to Burum's speech.  Burum asserts his First Amendment Retaliation claim against Ramos, Hackleman, Cope, Randles, and Schreiber.  (<u>Burum</u> SAC at 45.)  The Court beings with Hackleman and Ramos, then discusses the remaining Defendants.

Burum offers adequate evidence of Hackleman's retaliatory animus to survive summary judgment.  <u>See</u> Part II.L.  For example, in June 2006, Hackleman expressed his opposition to Burum's Op-Ed discussing settlement negotiations.  (Joint SAF ¶ 12.)  In August 2010 Hackleman stated Postmus was the key to getting back the Settlement money from Burum's pocket.  (<u>Id.</u> ¶ 61.)  Hackleman wrote in February 8, 2011 he was "emotionally excited about going after these bastards," prior to the Postmus interviews, referencing Burum and the other Does.  <u>Id.</u>  And after the first Postmus interview, Hackleman expressed a desire to "absolutely ruin[] Burum as a political operator."  <u>Id.</u>  The same year, Hackleman sent a letter to the editor asking a local newspaper to reconsider its endorsement of a candidate who received political donations from Burum's partner.  (Joint SAF ¶ 103.)  A reasonable juror could infer from this evidence that Hackleman was moved largely by his dislike of Burum's 2006 and 2007 advocacy, political activity, or donations.

Burum's evidence against Ramos is also adequate to show substantial retaliatory motivation.  The most direct examples are a Ramos email on July 30, 2011 that "[s]omething is not right, [Burum] still has influence," and an August 23, 2011 statement that "Burum is feeling cocky and is spreading his political power around."  (Joint SAF ¶¶ 100, 104-105.)  On the more circumstantial end of the spectrum,  Ramos: (1) agreed that Burum was "Dr. Evil," (2) stated that "Burum is . . . a dirty word," and (3) emailed DA's Office personnel they "may" need to keep an eye on "Burum & Co." because their next step "may be laundering campaign funds." (Joint SAF ¶¶ 44, 91, 100, 104-105, 118.)

The question remains <u>which</u> investigative actions[37] by Hackleman or Ramos (or ratified by them) were motivated by retaliation.  Against Hackleman, the Court finds a triable issue on

---

[36] The Court also notes allegations regarding Burum's broad-based political activity and contributions, (<u>Burum</u> SAC ¶ 58-59) (alleging Burum was widely understood to have contributed more than $1.2 million to PACs since 2003), but observes that the timing and scope of these contributions, and whether Burum made or simply directed them, is never clearly specified, either in the SAC or the Joint SAF.

[37] For example, the parties dispute when precisely the investigation started.  Another triable issue might be whether the investigation, once it got rolling, was          (continued …)

any investigative action from the Settlement forward. Even before the Settlement, on June 22, 2006, Hackleman expressed (and later admitted) his opposition to Burum's speech in favor of the Settlement. (Joint SAF ¶¶ 12-13.) Against Ramos, however, the Court has difficulty locating any direct or circumstantial evidence of retaliatory motive tied to Burum's protected speech before 2011. (Joint SAF ¶ 24.) Despite the significant lapse in time, the Court finds a genuine dispute whether Ramos was substantially motivated to retaliate, because of (1) the disputed extent of Ramos's supervision of Hackleman, and (2) the fairly direct nature of Ramos's statements. However, "when?" and "which investigative acts?" remain key questions going forward. Accordingly, the Court DENIES Ramos and Hackleman's MSJs on Burum's retaliation claims against them.

Next, the Court considers Cope, Schreiber, and Randles' MSJs on Burum's retaliation claims. The Court has already enumerated the relevant protected conduct. The earliest investigative action directed at Burum by Randles or Cope was the November 2008 Aleman interview. (Compendium Ex. 2.) Cope, Schreiber, and Randles carried out numerous investigative acts over several years, from obtaining search warrants to conducting interviews. See generally Part II.

Plaintiffs fail to identify "more than the mere existence of a scintilla of evidence," In re Oracle Corp. Sec. Litig., 627 F.3d at 38, that Cope, Schreiber, or Randles acted with any retaliatory motive specific to Burum. The fact that the PIU team discussed the Colonies settlement at departmental meetings in 2006 does not show retaliatory motive. (Joint SAF ¶ 16.) Nor does the fact that individuals in the PIU office viewed themselves as "elephant hunters" bear on their motive to chill speech. (Id. ¶ 19.) The Court takes for granted that Cope, Schreiber, and Randles knew of Burum or Colonies at the time of the Aleman interview in November 2008 and during subsequent investigative acts (such as obtaining search warrants or conducting interviews). But the speech of which they were aware occurred about two years prior to the vast majority of their investigative undertakings.[38] This mere awareness of Burum's protected activity is inadequate circumstantial proof to infer retaliatory animus "substantially" motivated their actions. The Court is also hesitant to find a triable issue on Cope, Schreiber, and Randles' "substantial" motivation to chill Burum's speech where the record points almost exclusively to Hackleman, and to a lesser extent, Ramos, as the instigators of the ill-fated investigation.

Schreiber, Randles, and Copes' investigative actions are untethered to any motive to silence Burum. Plaintiffs imply Schreiber may have desired to block Burum's (or a perceived Burum associate's) purchase of a 1200-acre property, (Joint SAF ¶ 54 (referencing February 24,

---

revealed to be meritless, and so whether the continuation of the investigation at some moment became primarily motivated by retaliation. Finally, it is possible that discrete investigative actions, such as the Postmus interviews, were motivated by retaliatory animus.

[38] Keyser, 265 F.3d at 752 (finding that, where there was a two-year gap between protected speech and an adverse action, the proximity in time did not in itself give rise to an inference of retaliation)

2010 email)), but the evidence does not suggest Schreiber harbored any desire to chill Burum's participation in politics, which is the focus of the Burum SAC. The 1200-acre property is not referenced in the Burum SAC, and Plaintiffs do not elaborate why purchase of the property is a protected first amendment activity, or indeed whether it was Burum himself who sought to make the purchase. Next, Plaintiffs insist Randles, Schreiber, or Cope threatened and pressured Postmus in the March and February 2011 interviews. Assuming they did, however, it is far from obvious that they were "substantially" motivated to do so by a desire to silence Burum. Similarly unclear is why an asserted "cover-up," in which Randles and Schreiber wrote conflicting reports about authorizing Aleman to record Postmus, (Joint SAF ¶ 146), was motivated by retaliatory animus directed specifically at Burum.

The Court is mindful that "[q]uestions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment." Braxton–Secret v. Robins Co., 769 F.2d 528, 531 (9th Cir. 1985). Nevertheless, the Court finds significant in this case—of five-foot-high-bank-box stack proportions—that Burum does not point to emails authored by Cope, Randles, or Schreiber, to deposition statements, or to interview excerpts, that would more strongly support the existence of retaliatory motive.[39] Anthoine v. North Central Counties Consortium, 605 F.3d 740, 753 (9th Cir. 2010) (where plaintiff relies on circumstantial evidence to show retaliation, that evidence must be specific to defeat the motion for summary judgment). Moreover, imputing Hackleman and Ramos's animus to each PIU inferior results in serious Hartman-like problem of attenuated causation.[40] Accordingly, the Court GRANTS Schreiber, Randles, and Cope's MSJs on Burum's retaliation claim.

## 2. Colonies

Defendants argue that Colonies cannot assert a Section 1983 retaliatory investigation claim, because Colonies was not the subject of the allegedly retaliatory investigation or prosecution. (Ramos MSJ at 13 n.9.) Colonies replies that entity defendants have standing to assert constitutional injures. (Colonies Opp'n at 3.)

The Court agrees with Colonies that an entity can pursue a Section 1983 claim where it suffered financial loss as a result of unconstitutional conduct. (See id. (citing Outdoor Media

---

[39] At most, the record would create a triable issue on whether Randles, Cope, or Schreiber were animated by a vague impression that "Burum is a bad guy" or "Burum is probably a criminal" or "we need to do our jobs, please our supervisors, and get Burum" or the like. That view of suspects is not adequate to establish a retaliatory investigation. The authorities discussed above are clear that knowledge of and desire to silence protected speech must be a "substantially motivating" factor for there to be a triable issue on causation.

[40] And to the extent such a problem exists, some courts would require Plaintiffs to plead no-probable cause or perhaps the objective unreasonableness of each act. Sterner v. United States Drug Enf't Agency, 2008 WL 11508384, at *5 (S.D. Cal. Sept. 8, 2008). Even without imposing those pleading requirements, the lack of retaliatory animus is clear enough for these Defendants to prevail on summary judgment.

Grp., Inc. v. City of Beaumont, 464 F. App'x 611, 613 (9th Cir. 2011)); MSJ Order at 16-20, Dkt. No. 247.)  The question remains, however, whether Colonies raises a triable issue that it was the target of a retaliatory investigation and suffered financially as a result.  The Court finds there is a triable issue on the first issue, because of the tendency of investigators to conflate Colonies and Burum, and the possibility that Defendants retaliated against both Plaintiffs simultaneously. (Colonies Opp'n at 4-5 (collecting examples).)  The Court DENIES Ramos and Hackleman's MSJs on Colonies' retaliation claim and GRANTS Schreiber, Randles, and Copes' MSJs on the same.

A related question is whether Burum may claim retaliation based on the protected conduct of Colonies, which is a separate entity, and vice versa.  (Ramos MSJ at 13 n.9 (citing Van Leeuwen v. United States, 868 F.2d 300, 301 (8th Cir. 1989); Am. News & Info. Servs., Inc. v. Gore, 778 F. App'x 429, 432 (9th Cir. 2019) ("American News cannot vicariously assert claims based on Playford's Fourth Amendment rights.")).)  Colonies asserts that there is a separate factual basis for it to assert retaliation, because it too was targeted.  (Colonies Opp'n at 3-4.)  The response avoids the issue and fails to offer authority on whether one entity—harmed by retaliatory conduct directed at a third party's First Amendment conduct—may vicariously assert the rights of the third. The Court therefore agrees with Defendants that Plaintiffs cannot assert retaliation claims based on one-another's protected conduct, even if it is harmed by the asserted retaliation.  (Reply at 24 n. 18 (citing Outdoor Media Grp., 464 F. App'x at 613 ("[A]ppellants are unable to assert the First Amendment rights of the third parties . . . .").)

### 3.  Erwin

The Court agrees with Defendants that Erwin cannot "glom onto" Burum or Colonies' asserted First Amendment Activity.  (Ramos MSJ at 17; Erwin Opp'n at 11 (failing to respond to this argument).)  The Court therefore focuses on the protected activity Erwin alleges he engaged in himself.  Erwin claims Defendants retaliated against him for: (1) directly petitioning government officials and obtaining a favorable settlement in the underlying civil litigation, (Erwin FAC ¶ 3); (2) commenting publicly on County intransigence during the settlement process, (id. ¶ 32); (3) sharing similar political interests and goals with Burum and Colonies and the prospect that these shared goals might find effective expression (id. ¶ 4); and (4) his own political activism and advocacy, (id. ¶ 34).  Many of these asserted First Amendment activities are so vague, unbounded by time, or even prospective, that it is difficult to consider with any precision whether one or more of these factors "substantially motivated" Defendants to investigate.

Although Erwin was arrested on several occasions, he does not assert a retaliatory arrest claim, and essentially repeats Burum's retaliatory investigation claim verbatim.  (Erwin Opp'n at 11-25.)  Like Burum, Erwin is overbroad in characterizing the investigative acts that were retaliatory, and essentially claims that the investigation as a whole was motivated by a broad-based conspiracy.

Erwin's analysis of direct and circumstantial evidence of retaliatory motive directed at him is similarly unhelpful.  He only repeats the same Joint SAF citations as Burum.  (Erwin

---

**CIVIL MINUTES—GENERAL**

Opp'n at 25.)  Closer examination of the Joint SAF as a whole does not reveal direct or circumstantial evidence of retaliatory motive against Erwin specifically.  The record only shows that Defendants investigated Erwin, because they believed he had been acting on behalf of Burum (e.g. by threating to expose Postmus's homosexuality and drug use) or had received a Rolex or other gifts from Burum.  Similarly, Hackleman's 2006 email arguably expressed opposition to Burum's speech in favor of settlement, but Erwin fails to explain why this raises triable issue on his (unspecified, undated) speech acts in favor of Settlement.  Other potential evidence is that in February 2010 Ramos replied "ARREST" to an email regarding the forthcoming felony complaint, which named Erwin.  (Joint SAF ¶ 45.)  Enthusiasm to arrest does not equate with substantial retaliatory motivation during the preliminary investigative phase.  The evidence that Cope, Randles, or Schreiber were substantially motivated to act by retaliatory animus is similarly lacking.[41]  As a result, a reasonable juror could not find that the investigation as a whole or any individual investigative act was substantially motivated by retaliation for Erwin's protected conduct.  The Court therefore GRANTS Ramos, Hackleman, Cope, Randles, and Schreiber's MSJs on Erwin's retaliation claim against them.

### 4.   Biane

Biane alleges Defendants were "motivated by personal enmity, political opportunism, and the pursuit of partisan advantages" and aimed to "punish and humiliate Colonies" and to "boost their own careers."  (Biane FAC ¶ 3.)  Of course, these asserted motivations have nothing to do with Biane, and tend to undermine any inference of retaliatory animus directed at him specifically.  The year following the Settlement, Colonies made a contribution to a PAC with which Biane was merely associated, San Bernardino County Young Republicans.[42]  (Id. ¶ 56; DSUF ¶ 13; Joint SAF ¶ 171.)  When Biane was a County Supervisor, he voted in favor of the Settlement, and also claims retaliation on this basis.  (Id. ¶¶ 35-36, 82, 91.)

Again, the Court cannot correlate Biane's vague assertions of protected conduct with retaliatory animus and investigative action, and the connection between Biane and the PAC here

---

[41] Erwin does not offer an explanation why the investigator's conduct at the Aleman interview—for example, expanding the scope of conversation to include the Settlement and Burum—could have been substantially motivated by animus stemming from his speech acts.

[42] Plaintiffs never respond to Defendants' argument that receipt of funds is not a free speech right, (Ramos MSJ at 21 (citing Receipt of funds is McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 193 (2014) (holding that statutory aggregate limits on how much money a donor may contribute in total to all political candidates or committees violates the First Amendment)), and ignore that it was the PACs, not Plaintiffs, who received the funds from Colonies.  Pac. Dawn LLC v. Pritzker, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) ("But the plaintiffs did not raise that argument to the district court in their . . . opposition to the defendants' motion for summary judgment, so the argument was waived.").  Biane appears to concede this, and in opposition only references his vote in favor of settlement and speech criticizing County actions to the press.  (Biane Opp'n at 8 (failing to specify when the speech occurred).)

---

is particularly feeble. Biane's joinder does not add any arguments that have not already been considered. (Biane Opp'n.) For the same reasons described under the Subsection on Erwin, the Court GRANTS Ramos, Cope, Randles, and Schreiber's MSJs on Biane's retaliation claim against them.[43]

### 5.    Kirk

Kirk's asserted protected activity, likewise, is far removed from the apparent concerns of the investigation, and he raises no triable question that Defendants were ever "substantially motivated" by his protected conduct. Kirk states he was the Chief of Staff for Gary Ovitt, a member of the County Board of Supervisors, and was prominent in politics. (Kirk FAC ¶ 2.) Ovitt voted in favor of the settlement after consulting with Kirk. (Id. ¶ 4; DSUSF ¶ 1.)

Kirk asserts he was investigated for being "on the wrong side of the political line," with regard to the Settlement and vaguely "with regard to [his] associations with Mr. Burum . . . and other like-minded political allies." (Id. ¶ 5.) Defendants investigated Colonies' 2007 donation to the Alliance for Ethical Government, (DSUF ¶ 171; Joint SAF ¶ 13), which Kirk states he founded and directed, (Kirk FAC ¶ 10; DSUF ¶¶ 18-20). However, it is undisputed that in his April 2009 interview with investigators, Kirk denied he founded the AEG PAC or that he directed its expenditures. (DSUF ¶ 33).

In 2010, before he was charged, Kirk worked in the County Executive Office under a Chief Administrative Officer, Greg Devereux. (Kirk FAC ¶ 13.) Hackleman wrote that Kirk was reportedly the cause of the prior CAO's firing. (Joint SAF ¶ 30.) On December 4, 2009, Hackleman exchanged emails with an individual the AG's Office who observed "[p]erhaps we upset their plans to install Devereaux." (Joint SAF ¶ 36.) To this, Hackleman responded, "I sure hope so. And we have some other potential options in that area." (Id.)

Kirk does not raise a triable issue on retaliation. As the previous paragraph demonstrates, it is not clear Kirk engaged in any protected speech in the first instance. The essence of Kirk's claim is that he was targeted on the basis of other individuals' actions, for example his former boss's vote in favor of the Settlement[44] or because he worked for Devereaux, who Hackleman and Ramos appear to have disliked. This does not show, however, that Defendants targeted Kirk primarily because of his own protected speech. (See also Ramos MSJ at 20 n.16 (to which Kirk offers no response).) Even if Ramos agreed with his campaign supervisor's sentiment that "at the end of the day, I will fuck over Mark Kirk if it's the last thing I do," (Joint SAF ¶ 62 (citing email by David Ellis to Ramos on October 4, 2010)), this would not create a triable issue on retaliation, because it is not tethered to protected First Amendment conduct around the

---

[43] Biane does not name Hackleman in his FAC.

[44] Defendants argue that the vote of a County Supervisor is not protected conduct in the first place, and is certainly not a protected action that Kirk may invoke vicariously. (Ramos MSJ at 20). Plaintiffs do not respond to this argument, and therefore waive it.

Settlement.[45]  For the same reasons described under the Subsection on Erwin and Biane, the
Court GRANTS Ramos, Cope, Randles, and Schreiber's MSJs on Kirk's retaliation claim
against them.

### 6.    DeFazio

DeFazio was the founder and leader of the Inland Empire PAC, which received a
contribution from Colonies in July 2007, after the Settlement.  (DeFazio Compl. ¶ 2; DSUF ¶
13.)  He claims that the Colonies contribution motivated Defendants to investigate and prosecute
him.  (DeFazio Compl. ¶¶ 4,6.)  DeFazio testified on October 22, 2009 before the Grand Jury.
(DSUF ¶ 38.)  He was arrested on charges of perjury in February 2009 for allegedly lying to the
Grand Jury about his control of the PAC.  (DeFazio Compl. ¶ 7.)

Neither direct nor circumstantial evidence supports the notion that Defendants were
substantially motivated to investigate DeFazio for his own protected conduct.  First, and as noted
previously, Plaintiffs do not respond to the argument that receipt of funds is not a protected First
Amendment activity.  Second, the IE PAC received funds in July 2007, and DeFazio was not
investigated for perjury until after his Grand Jury statements, more than two years later.
Accordingly, the Court GRANTS the County, Ramos, Randles, Schreiber, and Aleman's MSJs
on DeFazio's retaliation claim against them.

DeFazio's supplement, which Kirk, Biane, and Erwin join, (Dkt. No. 406), does not
change the result.  The Court will not allow Plaintiffs to rely on vague  and generic allegations in
their operative complaints and shift the asserted protected conduct without notice or
amendment.  <u>Navajo Nation v. U.S. Forest Serv.</u>, 535 F.3d 1058, 1080 (9th Cir. 2008) ("[O]ur
precedents make clear that where, as here, the complaint does not include the necessary factual
allegations to state a claim, raising such claim in a summary judgment motion is insufficient to
present the claim to the district court"); <u>Patel v. City of Long Beach</u>, 564 Fed. App'x 881, 882
(9th Cir. 2014) ("Allowing a plaintiff to proceed on a new theory [at the summary judgment
stage] would prejudice defendants").  In addition, the  Court cannot discern in the record any
support for the view that Defendants were substantially motivated to retaliate against DeFazio,
Kirk, Biane, or Erwin based on their <u>spending</u> of money, the new theory they assert.  The PACs
received the donations, not them, and the record does not contain information on how exactly the
money was spent or why that spending motivated Defendants to retaliate.

---

[45] Ramos also referenced Kirk in an email in December 30, 2010, and observed Kirk was
"getting more and more power" and "is now overseeing the redrawing of the Board's
boundaries.  A move that will help Derry and his merry men."  However, Plaintiffs do not argue
the exercise of a political function qualifies for First Amendment protection.  Second, the
insinuation is that Ramos was motivated to retaliate <u>against Derry</u>, who called for an investigation
into Ramos's alleged sexual misconduct.  (Joint SAF ¶ 27.)  Once again, Kirk finds himself
several steps removed from the relevant First Amendment activity and cannot establish the
investigation was substantially motivated to retaliate against him.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk <u>MG</u>

## C.  Qualified Immunity

### 1.  Legal Standard

In analyzing whether qualified immunity applies, a court must determine "whether, taken in the light most favorable to [the plaintiff], Defendants' conduct amounted to a constitutional violation, and . . . whether or not the right was clearly established at the time of the violation." Bull v. City and County of San Francisco, 595 F.3d 964, 971 (9th Cir. 2010) (internal quotation marks omitted; brackets in original).  "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks omitted).  The Supreme Court has emphasized that a finding that a government official's conduct violates clearly established law requires that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  A district court is not required to address these two inquiries in a particular order, but may instead "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 226; see also Bull, 595 F.3d at 971.

### 2.  The Parties' Contentions

Defendants argue that actions taken during the preliminary investigation phase by prosecutors are protected by qualified immunity.  (Ramos MSJ at 27-28; Schreiber MSJ at 30-31.)  They contend that at the time of the investigation, there was no clearly established First Amendment right to be free from an alleged retaliatory investigation, even if the investigation was otherwise objectively reasonable and supported by probable cause.  (Id. (citing Reichle v. Howards, 566 U.S. 658, 664-65, 693 (2012).)  They argue that the pursuit of an investigation supported by probable cause is not a clearly established violation, and the investigators here could reasonably believe their actions to be lawful.  (Ramos MSJ at 29; Schreiber MSJ at 30.)

The Prosecutor Defendants also contend that they have qualified immunity for alleged supervision of imperfect investigations, because there was no right violated and the right was not clearly established.  (Ramos MSJ at 29 (compiling cases regarding investigation suggesting there is no right to investigators following specific leads, asking certain questions, etc.).)  The Investigator Defendants argue that the rules of the DA's office "allow for investigation once a report has been made," (Schreiber MSJ at 31 (citing Compendium Ex. 116)), and it is objectively reasonable for officers to rely on policy when beginning an investigation.  (Id. citing Acosta v. City of Costa Mesa, 718 F.3d 800, 824 (9th Cir. 2013)); see also Ramos MSJ at 29 (making the same point).)  They argue that during the investigation, their actions are qualifiedly immune, for example, because there is no right to be interviewed in a particular manner or have the investigation carried out in a particular way.  (Schreiber MSJ at 31-32.)

Plaintiffs respond that Defendants are not entitled to qualified immunity on the retaliation claim.  (Consolidated Opp'n at 49-50.)  They argue Defendants only assert qualified immunity as

to the retaliation claim and bear the burden of "invoking" the doctrine.  (Id.)  They contend that the right at issue is the First Amendment right to be free from a retaliatory investigation for speech based on partisan, political motivations rather than objective evidence.  (Id. at 51.)  As examples of precedent clearly establishing the right, Plaintiffs offer Lozman, 138 S. Ct. at 1954, Duran v. City of Douglas, Ariz., 904 F.2d 1372, 1378 (9th Cir. 1990), and Beck v. City of Upland, 527 F.3d 853, 871 (9th Cir. 2008).  (Id. at 51.)  They also assert that it was clearly established that government actors cannot subject individuals to criminal charges on the basis of false evidence that was deliberately fabricated by the government.  (Id. (citing Abbey, 263 F.3d at 1074-77; Gantt, 717 F.3d at 707; Hall v. City of Los Angeles, 697 F.3d 1059, 1068 (9th Cir. 2012)).)

### 3.    Discussion

Plaintiffs have raised numerous genuine disputes of material fact.  "[W]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity."  Morales v. Fry, 873 F.3d 817, 824 (9th Cir. 2017) (citing commentary to Ninth Circuit Model Civil Jury Instruction 9.34 (2017)); see also Espinosa v. City & Cty. of San Francisco, 598 F. 3d 528, 532 (9th Cir. 2010).

Defendants argue that even assuming that "the investigation was less than perfect," (Schreiber MSJ at 31), it is reasonably arguable Defendants actions did not violate clearly established law, because they followed DA's Office policies and because investigative action after the existence of probable cause to arrest is protected, Baker, 443 U.S. at 145-46.  However, the First Amendment right to be free from official action in reprisal for protected speech was clearly established as a more general proposition, see Duran v. City of Douglas, Ariz., 904 F.2d 1372, 1378 (9th Cir. 1990); Lozman, 138 S. Ct. at 1954, and the Court has determined that the Hartman and Nieves no-probable-cause requirement—which is an exception to the general First Amendment retaliation standard—does not extend to investigative action.  Thus, Defendants seek qualified immunity based on a doubtful extension of an exception to a more clearly established rule.

Defendants lean heavily on Reichle v. Howards, 566 U.S. 658 (2012), for the proposition that where Hartman has cast doubt, the Court is bound to grant qualified immunity.  (Schreiber Reply at 20-21.)  In Reichle v. Howards, the Supreme Court considered whether a First Amendment retaliatory arrest claim may lie despite the presence of probable cause to support the arrest, and whether clearly established law at the time of the plaintiff's arrest so held.  566 U.S. at 663.  At the time of the arrest in Reichle, Hartman had been decided, but Nieves had not, and Tenth Circuit precedent prior to Hartman stated that retaliatory arrests violate the First Amendment regardless of probable cause.  See 566 U.S. at 666.  The Tenth Circuit held that the contours of the First Amendment right against retaliatory arrest were clearly established at the time of the arrest, and that Hartman's no-probable-cause requirement did not apply.  Id.  The Supreme Court reversed, because at the time of the arrest, "Hartman's impact on the Tenth Circuit's precedent governing retaliatory arrests was far from clear."  Id.  For example, the legal

backdrop at the time of <u>Hartman</u> treated retaliatory arrests and retaliatory prosecutions similarly.
<u>Id.</u>

Here, however, Plaintiffs point to no such legal backdrop.  <u>Hartman</u> itself reserved the issue of retaliatory investigation, 547 U.S. 250, 262 n.9.  As noted in the discussion on retaliatory investigation above, Part IV.B, it would be anomalous to apply probable cause in the context of investigative activity.  In other words, the Court cannot conclude that any uncertainty created by <u>Hartman</u> or for that matter, <u>Nieves</u>, moves the retaliatory investigation claim here from "beyond debate" to within.  563 U.S. at 741.  Defendants also do not account for the fact that the <u>Lozman</u> exception to the no-probable-cause requirement in retaliatory arrest cases was clearly established at the time.  Therefore, the Court declines to rule on qualified immunity at this stage.

## D.   <u>Monell</u>

Each of the six Plaintiffs assert a <u>Monell</u> claim for municipal liability under 42 U.S.C. §
1983 against the County.  (<u>Colonies</u> FAC; <u>Burum</u> SAC; <u>Erwin</u> FAC; <u>Kirk</u> FAC; <u>Biane</u> FAC;
<u>DeFazio</u> Compl.)

### 1.   Legal Standard

Under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690-91 (1978), a municipality cannot be sued under a theory of respondeat superior for injuries inflicted by its employees or agents. Rather, municipalities are subject to damages under 42 U.S.C. § 1983 in three situations:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.  Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy.  Whether a particular official has final policy-making authority is a question of state law.  Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

<u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996) (quoting <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1346–47 (9th Cir. 1992); <u>Price v. Sery</u>, 513 F.3d 962, 966 (9th Cir. 2008).  A municipality can be liable under Section 1983 only where its policies are the "moving force [behind] the constitutional violation."  <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 389 (1989) (citing <u>Monell</u>, 436 U.S. at 694).  Where the alleged policy or practice is a failure to act to preserve constitutional rights, the plaintiff must also establish the failure "amounts to deliberate indifference."  <u>City of Canton</u>, 489 U.S. at 389–91.

//

---

**CIVIL MINUTES—GENERAL**

## 2.      The Parties' Contentions

The County argues that Plaintiffs do not raise a triable <u>Monell</u> claim, because Plaintiffs only point to a single investigation (the one that involved them) that deprived them of their rights, and this does not support an official, widespread, or longstanding municipal custom or practice. (County MSJ at 2-5.)  A custom or practice not authorized by written law or express municipal policy must be "so persistent and widespread that it constitutes a permanent and well settled city policy." (<u>Id.</u> (citing <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996); <u>Hunter v. Cty. Of Sacramento</u>, 652 F.3d 1225, 1233 (9th Cir. 2011); <u>Talib v. Guerrero</u>, 2016 WL 1470082, at *7 (C.D. Cal. Mar. 14, 2016); <u>Hoffman v. Cty. of Los Angeles</u>, 2017 WL 3476773, at *4, 5 (C.D. Cal. Feb. 15, 2017)).)

The County also anticipates an argument that it is liable due to the actions of a county official with final policymaking authority, who ordered or ratified unconstitutional conduct and the basis for it. (County MSJ at 5 (citing <u>Christie v. Iopa</u>, 176 F.3d 1231, 1239 (9th Cir. 1999)).) The County argues that Ramos, in so far as he took actions against Plaintiffs, was acting in his state-, and not his county-policymaking capacity, and so was not a final county policymaker. (<u>Id.</u> at 6.)  The County reasons it cannot be liable for Ramos's actions taken in his capacity as a state actor, which include "investigating and proceeding with criminal prosecutions." (<u>Id.</u> at 6-7 (citing <u>Vasquez v. Rackauckas</u>, 734 F.3d 1025, 1041 (9th Cir. 2013); <u>Inman v. Anderson</u>, 294 F. Supp. 3d 907, 922 (N.D. Cal. 2018)).)  Nor can the County be accountable for certain policies of the DA's Office that relate to judicial process. (<u>Id.</u> (citing <u>Reinhardt v. Santa Clara Cty.</u>, 2006 WL 3147691, at *4 (N.D. Cal. Nov. 1, 2006)).)

Finally, the County argues that even if Ramos was deemed a county actor during the investigation, he did not direct or ratify his subordinates' conduct. (<u>Id.</u> at 8 (citing <u>Lytle v. Carl</u>, 382 F.3d 978, 987 (9th Cir. 2004); <u>Dougherty v. City of Covina</u>, 654 F.3d 892, 900 (9th Cir. 2011)).)  The County concludes by tossing in an argument that Plaintiffs do not show the county policy, custom, or practice was the "moving force" behind their injuries, and hence fail to demonstrate the requisite causal link. (<u>Id.</u> at 8.)

Plaintiffs respond that there is a triable issue, first, on whether the County retaliated against them under an "official municipal policy" by engaging in a "premeditated plan" of retaliation. (Consolidated Opp'n at 39 (citing <u>Lozman</u>, 138 S. Ct. at 1951, 1954; <u>Aydelotte v. Town of Skykomish</u>, 757 Fed. App'x 582, 585 (9th Cir. 2018)).)  Plaintiffs state that there is a "long record" of Defendants' retaliatory conduct or motives, and thus the County's contention that the <u>Monell</u> claim is based on a single decision is a mischaracterization. (<u>Id.</u> at 39-40.)

Second, Plaintiffs argue the County is liable for Ramos's actions as a final policymaker. (<u>Id.</u> 40 (citing <u>Christie v. Iopa</u>, 176 F.3d 1231, 1235 (9th Cir. 1999)).)  Plaintiffs counter Defendants' point about the prosecutor being a state authority by referencing caselaw holding that a California DA is not a state officer for all purposes, (<u>id.</u> (citing <u>Weiner v. San Diego Cty.</u>, 210 F.3d 1025, 1031 (9th Cir. 2000))), for example engaging in investigative conduct or administrative functions, as opposed to preparing to prosecute or prosecuting, (<u>id.</u> (citing <u>Bishop</u>

Paiute Tribe v. Cty. of Inyo, 291 F.3d 549, 565 (9th Cir. 2002); Ceballos v. Garcetti, 361 F.3d
1168, 1183 (9th Cir. 2004))).

Finally, Plaintiffs contend there is evidence creating a triable issue regarding Ramos's
direction of the investigation, and ratification of his subordinates' illegal conduct. (Id. at 40.)
Ramos ensured the investigation focused on Burum "from an administrative standpoint,"
Plaintiffs argue, by redistributing investigative resources, receiving updates, and directing others.
(Id.)

### 3. Discussion

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds triable
issues on one or more of Plaintiffs' Monell theories. Plaintiffs have narrowed the alleged
municipal policy in their Oppositions, and focus on the allegation that the County engaged in a
"premediated plan" of retaliation, similar to that in Lozman, 138 S. Ct. 1945. (Consol. Opp'n at
39.)

In Lozman, the Ninth Circuit discussed whether a Monell claim could stand, where the
plaintiff asserted the city council formed an official policy to retaliate against him and order his
arrest, and where the plaintiff conceded there was probable cause for the arrest. 138 S. Ct. at
1951. However, the Ninth Circuit did not consider "whether there was such a policy and what its
content may have been."[46] Id. The case is helpful to Plaintiffs in one respect: lack of probable
cause is not an element of their Monell claim for "premeditated retaliation." However, Lozman
does not provide guidance on how a plaintiff can establish the existence of a municipal policy
(either by policy, custom, decision of a policymaker, or ratification), which is the County's main
line of attack against the Monell claims.[47]

### a. Violation by Policy or Custom

First, Plaintiffs submit enough evidence to sustain a claim of a longstanding municipal
policy "so persistent and widespread that it constitute[d] a permanent and well settled [] policy."

---

[46] Lozman is limited to discussion of an element in certain retaliatory arrest cases to that
point: that the officer lack probable cause. Assuming there was such a policy or custom of
retaliation against Lozman, the court found, he would not have to establish lack of probable cause
to state a Monell claim for retaliatory arrest. 138 S. Ct. at 1953.

[47] In their Reply, Defendants argue that the Lozman exception is narrow. (Ramos Reply
at 19.) They insist Plaintiffs must provide "objective evidence of a policy motivated by
retaliation." (Id. (citing Lozman, 138 S. Ct. at 1954).) In addition, they contend that Lozman
doesn't stand for proposition that individual government actors, as opposed to a public entity,
can be liable for retaliation under this exception. (Id. at 19 n.11.) But it is unclear why the emails
or audio recordings submitted by Plaintiffs would not constitute objective evidence. Second, the
arguments would be more proper in the retaliation section of Individual Defendants' brief than
the County's.

Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (citing Monell 436 U.S. at 691).  The legal battle between Burum/Colonies and the County stretches back to 2002, and—Plaintiffs establish with email anecdotes—continued after Burum's acquittal.

The County's argument that Plaintiffs seek to impose municipal liability on the basis of a "single" investigation is hard to credit.  Plaintiffs show that members of the DA's office took interest in negotiations between Colonies and the County and in Burum's press statements even before the Settlement vote.  After the Settlement, the PIU discussed the $102 million Settlement at department meetings.  (SAF ¶ 12, 16).  And by August 2008, an investigator was inquiring about Burum, Postmus, the Settlement, and potential bribes, (id. ¶ 16), months before the November 2008 interview with Aleman that Defendants claim started the Settlement investigation in earnest.  Plaintiffs also attach evidence suggesting Defendants were focused on the criminal prosecution, because of concerns that the outcome would affect the "direction of our County . . . for years to come."  (Joint SAF ¶ 35 (emphasis added).)  After Burum's acquittal, Ramos emailed DA Office staff expressing his belief that continued investigation or monitoring of PAC donations associated with him was necessary.[48]  (Joint SAF ¶ 121.)

A reasonable juror could conclude that individual Defendants at the PIU and DA's Office acted pursuant to "a longstanding practice or custom" of retaliating against Burum or Colonies for protected speech activity.  Delia v. City of Rialto, 621 F.3d 1069, 1081–82 (9th Cir. 2010), rev'd on other grounds, 566 U.S. 377 (2012); Lozman, 138 S. Ct. 1945 (2018).  Perhaps the County could contextualize these statements to reduce their impact.  And perhaps Plaintiffs exaggerate the importance of PIU emails.  In addition, the County approved the $102 million Settlement with Colonies, which tends to negate the existence of a "permanent and well-settled" County policy of retaliation against Colonies, its managing partners, or their perceived allies. Trevino v. Gates, 99 F.3d 911, 919 (9th Cir. 1996), holding modified by Navarro v. Block, 250 F.3d 729 (9th Cir. 2001).  Nevertheless, the Court is bound to construe the evidence in the light most favorable to Plaintiffs, Barlow, 943 F.2d at 1135, and finds that Plaintiffs have amassed "more than . . . [a]  scintilla" of evidence of a widespread custom.  Anderson, 477 U.S. at 252.

Defendants bank on Trevino for the argument that ad hoc and "isolated or sporadic" municipal activities cannot support the existence of a municipal custom under Monell.  (County MSJ at 2-5.)  However, as Trevino itself acknowledges, the question of whether a policy or custom exists is normally a jury question.  Trevino, 99 F.3d at 920.  In addition, the alleged municipal custom in Trevino—indemnifying LAPD officers against punitive liability and thereby ratifying their unconstitutional excessive use of force—was not shown to have existed at the time of the alleged use of force.  99 F.3d at 919 ("The record is virtually devoid of any direct evidence of council indemnification prior to the shooting . . . If there is a pattern, it is more reflective of normal municipal claims adjusting with all its inconsistencies and imperfections than of subtle

---

[48] The Ninth Circuit has held that the behavior of policymakers after the constitutional violation is relevant to Monell liability insofar as it reveals the municipality's policies already in place at the time of the constitutional violation.  Larez v. City of Los Angeles, 946 F.2d 630, 647 (9th Cir. 1991).

conspiracy to indemnify officers outside the public eye.") Here, the Court is swayed by the long litigation history between the parties, by the fact that Burum claims to have been swept up in the PIU's retaliatory investigation, and that the relevant conduct attributable to the County was not a single City Council vote (as in <u>Trevino</u>), but spanned many years. However, the Court agrees with the County that the alleged custom is not widespread or longstanding enough with regard to Plaintiffs other than Burum and Colonies.

### b. Violation by a Final Policymaker

A jury could also conclude on this record that a "final policymaker" of the County—Ramos—took or ratified retaliatory action. Under <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986), municipal liability may be imposed for even a single action. However, in considering this alternate <u>Monell</u> theory, the Court must only consider acts Ramos took on behalf of the County. Whether a particular individual has "final policymaking authority" sufficient to impose liability under <u>Monell</u> for a decision is a question of state law. <u>Praprotnik</u>, 485 U.S. at 124. In California, a "district attorney is a state officer when deciding whether to prosecute an individual." <u>Weiner v. San Diego County</u>, 210 F.3d 1025, 1031 (9th Cir. 2000). Hence, Ramos's prosecutorial actions do not relate to County policies and do not impute liability to the County. <u>Id.</u> at 1028. However, "[d]etermining what functions are prosecutorial is an inexact science." (Dkt. No. 86 at 8 (citing <u>Lacey v. Maricopa Cty.</u>, 693 F.3d 896, 912 (9th Cir. 2012)). <u>See infra</u> Part IV.A (discussing the characteristics of prosecutorial actions intimately associated with judicial proceedings).

In the lead case cited by Plaintiffs, <u>Bishop Paiute Tribe v. Cty. of Inyo</u>, the Ninth Circuit analogized the difference between investigative conduct (imputable to the County) and prosecutorial conduct (not imputable to the County) to the difference between prosecutorial conduct entitled to qualified versus absolute immunity. 291 F.3d 549, 565 (9th Cir. 2002), overruled on other grounds in <u>Inyo Cty., Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony</u>, 538 U.S. 701 (2003). <u>Bishop Paiute Tribe</u> considered whether a district attorney obtaining and executing a search warrant engages in prosecutorial conduct or investigative conduct. (<u>Id.</u>) The Court determined the prosecutor was not "preparing to prosecute [or] prosecuting criminal violations," but was "investigating allegations," because at the time the DA served the search warrant, no criminal complaint had been filed.[49] (<u>Id.</u>) Prosecutors performing investigative functions "normally performed by a detective or police officer" are protected only by qualified immunity, <u>Buckley</u>, 509 U.S. at 273. By the <u>Bishop Paiute Tribe</u> analogy, those investigative functions would be imputable to the Country, rather

---

[49] In particular, the Court noted the "commencement of prosecution" for an offense had not yet occurred, because California law recognizes commencement of prosecution "in only four instances: (a) an indictment or information is filed; (b) a complaint is filed charging a misdemeanor or infraction; (c) a case is certified to the superior court; or (d) an arrest warrant or bench warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint." 291 F.3d at 565 (citing Cal. Penal Code § 804).

than the State.

Plaintiffs raise a triable issue whether Ramos took investigative or administrative actions to retaliate against Burum or Colonies. As discussed in Part IV.A, actions taken before the existence of probable cause to arrest would certainly be "investigation" under <u>Buckley</u>, and therefore attributable to the County, rather than the State. Even after the establishment of probable cause, if the purpose or goal of the activity is investigative or administrative, then it would also be attributable to the County. <u>Id.</u>; <u>Buckley</u>, 509 U.S. at 274 n.5.

The record supports an inference that in his capacity as a County actor, Ramos directed the PIU to investigate Burum or Colonies and to file a criminal complaint prior to the 2010 political season. (SGD ¶ 85; Joint SAF ¶ 41-42.) Ramos's post-trial emails also suggest a willingness to direct investigation based on political contributions. (Foster Decl., Ex. 59 ("The next step may be laundering campaign funds . . . It will happen.").)

In addition, Plaintiffs point to several investigative actions by the PIU that may have been ratified by Ramos or Hackleman, or to which they may have been deliberately indifferent. Ratification is generally a fact question for the jury, but "a plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred." <u>Christie v. Iopa</u>, 176 F.3d 1231, 1238-39 (9th Cir. 1999). "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.'" <u>Id.</u> at 1239 (quoting <u>City of St. Louis v. Praprotnik</u>, 485 U.S. at 127).

Here, Hackleman's "position was one that could control the investigation and prosecution," including the "criminal investigation" phase. (Joint SAF ¶ 60.) Hackleman took an active role in planning interviews. (Foster Decl., Ex. 131.) Hackleman also made several statements about being excited about targeting Plaintiffs and reducing their political influence. (Joint SAF ¶ 72, 91-92.) Ramos, in turn, received email and in-person updates from Hackleman on the Settlement investigation. (Joint SGD ¶ 85; Foster Decl., Ex. 2 at 97.) And in a March 8, 2012 email, Ramos emailed Cope and others, stating "I will not allow our team to deviate until we are done with this case. I have lived this case since day one." (Id. ¶ 107.) Hackleman's role appears to have been an admixture of prosecutorial and purely investigative, detective-like functions, and he seems to have regularly apprised Ramos of the PIU team's actions, a fact which muddies the water enough to preclude summary judgment for the County on the <u>Monell</u> claims.

However, the Court, again, does not find a triable issue on a policy ratified by Ramos or Hackleman that relates to Plaintiffs other than Burum or Colonies. Accordingly, the Court DENIES the County's MSJ on the <u>Monell</u> claims brought by Burum and Colonies and GRANTS the County's MSJ on the <u>Monell</u> claims brought by the other Plaintiffs.

//
//
//
//

---

**CIVIL MINUTES—GENERAL**

### E.    Fabrication of Evidence

Plaintiffs assert fabrication of evidence in violation of 42 U.S.C § 1983 as follows: Burum, Erwin, Kirk, and Biane against Randles and Schreiber; and DeFazio against the County, Ramos, Randles, and Schreiber.  (Burum SAC; Erwin FAC; Kirk FAC; Biane FAC; DeFazio Compl.)

### 1.    Legal Standard

There is a constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government.  Devereaux, 263 F.3d 1074-75.  A plaintiff can prove deliberate fabrication of evidence in three ways.[50]  First, a plaintiff can produce direct evidence[51] of deliberate fabrication.  See Spencer v. Peters, 857 F.3d 789, 793 (9th Cir. 2017).  In cases involving direct evidence, the investigator's knowledge or reason to know of the plaintiff's innocence need not be proved.  Id.  Next, a plaintiff can "at a minimum," point to circumstantial evidence that supports at least one of the following two propositions: "(1) [d]efendants continued their investigation . . . despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."  Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  "Failing to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result" does not rise to the level of a constitutional violation and "mere allegations that defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as the basis for a claim under [Section] 1983."  Devereaux, 263 F.3d at 1075-77.

### 2.    The Parties' Contentions

The Investigator Defendants argue that there is no direct evidence of fabrication, and both circumstantial theories of fabrication fail.  As to any claim by Plaintiffs that investigators continued to investigate or manipulated Postmus because he was a drug addict and wanted to make a deal, these characteristics are not uncommon and fall short of fabrication of evidence.  (Schreiber MSJ at 21 n. 18)  At a hearing on Plaintiffs' motion to dismiss for prosecutorial conduct, Judge Smith found no misconduct or coercion in exchange for Postmus's plea but found Plaintiffs' allegations to be "exaggerated."  (Id. at 21 n. 19 (citing SUF ¶ 79).)

---

[50] See also Costanich v. Dep't of Soc. & Health Servs., 627 F.3d 1101, 1111 (9th Cir. 2010) ("The Devereaux test envisions an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence, or one who surreptitiously fabricates evidence by using coercive investigative methods.  These are circumstantial methods of proving deliberate fabrication.").

[51] An example of direct evidence of deliberate fabrication is "when an interviewer . . . deliberately mischaracterizes witness statements in her investigative report."  Spencer, 857 F.3d at 793.

Defendants next attack any theory that the investigators used techniques so coercive and abusive that they knew or should have known they would yield false information. (Schreiber MSJ at 23.) The fact that Postmus recanted some of his earlier testimony is not enough to support a claim that interviewers coerced him. (Id. (citing Myers, 825 F. Supp. 2d at 369; Tekoh v. Cty. of Los Angeles, 270 F. Supp. 3d 1163, 1172–74, 1178 (C.D. Cal. 2017)).)

Plaintiffs oppose these arguments, first, by reviewing their separate statement of undisputed facts. In particular, they highlight what they take to be the "biggest bombshell" in the criminal proceeding: Postmus's cross examination, at which he "testified that Randles and Schreiber had taken advantage of his addiction to methamphetamines to plant false memories and to pressure and manipulate him into giving false testimony against Burum." (Consolidated Opp'n at 42-43.) Plaintiffs emphasize that Postmus testified that he informed Randles and Schreiber there was no "quid pro quo" between him and Burum in connection with his vote on the 2006 settlement, but that the investigators pressured him, by implying he would not secure a plea deal if he did not misstate the facts. (Id. at 43.)

Plaintiffs also argue that as a matter of law, Postmus's drug addiction and prior criminal charges are facts that—though not dispositive—tend to support a deliberate fabrication claim. (Id. at 45 (Trulove, 2016 WL 5930634, at *5; Gantt, 717 F.3d at 708).) Second they distinguish two cases, United States v. Ceron, 286 Fed. App'x 974, 977 (9th Cir. 2008), in which five cooperating witnesses and an officer testified consistently, and United States v. Alvarez, 358 F.3d 1194, 1201-02 (9th Cir. 2004), where the fabricated witness testimony was corroborated by physical evidence, from the instant case, in which Defendants relied on a few vulnerable witnesses. (Id. at 46.) Biane provides additional arguments to distinguish Defendants' cited authorities. (Biane Opp'n at 19-20.)

### 3.    Discussion

Plaintiffs abandon in their Oppositions the argument that Defendants fabricated evidence during the Aleman interview. (Schreiber Reply at 10.) Drawing all inferences in Plaintiffs' favor, the Court finds a triable issue of fabrication of evidence at the Postmus interviews. The deliberate fabrication claim against Ramos or the County are meritless, because Ramos did not participate in the interviews, and Randles and Schreiber are already named in their official capacities. The focus of discussion is therefore limited to the Postmus interview.[52]

Plaintiffs do not bring to light direct evidence of fabrication, which would typically consist of an intentional mischaracterization or fabrication of a witness statement in an investigative

---

[52] Biane argues that Defendants menaced a confidential informant, Matt Brown, in an "attempt to get information against Mr. Biane." (Biane Opp'n at 19; Matt Brown Deposition, Galipo Decl., Ex. A at 32:22-33:7, 54:10-25.) Biane does not raise a triable issue on fabrication of evidence arising from the Brown interview, however. At most, Brown's statement's about his interactions with investigators would suggest the investigators knew or should have known of Biane's innocence, not that the investigators fabricated any evidence in the Brown interviews.

report.  Spencer, 857 F.3d at 793; Costanich, 627 F.3d at 1111 ("Similarly, an investigator who purposefully reports that she has interviewed witnesses, when she has actually only attempted to make contact with them, deliberately fabricates evidence.")  Indeed, the Postmus interviews were recorded, and if a material fabrication in Randles or Schreiber's reports existed, Plaintiffs surely would have raised this in their Oppositions.  (DSUF ¶¶ 51-61.)

Instead, the theory here is "manipulation" of Postmus' s memory and "consequent fabrication of evidence." (Consol. Opp'n at 44.)  Plaintiffs' evidence in support of this theory is circumstantial.  As described in Part II.I, the evidence points in many directions.  In light of the numerous factual disputes surrounding the interview and the uncertain significance of each fact, summary judgment is not proper.  Reasonable jurors could disagree whether Postmus was manipulated.  Some jurors might conclude the investigators deployed typical investigative techniques, did not and could not definitively "know" of Plaintiffs' innocence, and had to ask repetitive questions only because of Postmus's garbled, evasive, or confused manner of speaking.  Others, focused more on DA's Office emails from before and after the interviews, on the tenor of the recorded interview, or on Postmus's vulnerabilities, could conclude Schreiber and Randles intentionally manipulated Postmus.

Cunningham v. City of Wenatchee does not change this result.  345 F.3d 802, 810 (9th Cir. 2003) (holding that under the Fourteenth Amendment, an interrogation is coercive only when, in light of the totality of the circumstances, an officer's tactics are so extreme as to undermine a suspect's ability to exercise free will).  Although Plaintiffs do not dispute that Postmus was an adult, had an attorney present at each interview, was offered food and water breaks, and could end the interviews when he wanted, Plaintiffs raise a triable issue whether investigators knew Postmus was so weak minded that he could be compelled to agree with any view of the case the investigators desired.

Defendants suggest Burum's defense attorneys manipulated Postmus on the stand to recant, and so the "bombshell" testimony at trial was itself, ironically, a result of witness beguilement. (Schreiber MSJ at 21 n.19; DSUF ¶ 79 (undisputed that Superior Court denied Plaintiffs' Motions to Dismiss concerning alleged prosecutorial conduct in August 2014; Schreiber Reply at 14-16.)  However, Postmus's extreme susceptibility to manipulation, including on the witness stand, could bolster the conclusion that investigators directed or controlled his initial statements.

Next, Defendants look to Postmus's motion to withdraw his plea (after his performance on the witness stand), which Judge Smith denied on November 13, 2018.  Judge Smith did not find credible the claim that investigators manipulated Postmus into pleading guilty. (Supp. Compendium, Ex. 138 (". . . [T]he Court finds the allegation[] that [Postmus] did not have an adequate memory of the events [at the time of the interviews] is not true.  The Court finds that the allegation that the District Attorney investigators fed him a narrative which he adopted is not true . . . to demonstrate that, I want to go through a couple of key points in the interviews.")

---

The Court rejects Defendants' appeal to rely on this prior hearing.  First, Defendants raise the hearing on Postmus's motion to withdraw for the first time in Reply and the hearing transcript is attached as a supplement.[53]  Second, the absence of clear and convincing evidence of good cause to withdraw Postmus's plea based on his asserted frailties or investigator manipulation, Cal. Penal Code § 1018 (permitting withdrawal "for a good cause shown"); People v. Ravaux, 142 Cal. App. 4th 914, 917 (holding good cause must be shown by clear and convincing evidence), does not establish the absence of a triable issue on fabrication of evidence, which is a lower standard.

Plaintiffs must also establish the fabrication was the proximate cause of the deprivation of liberty.  Caldwell, 889 F.3d 1105, 1115 (9th Cir. 2018); Brittain v. Hansen, 451 F.3d 982, 991 (9th Cir. 2006)).  For example, in McSherry, an officer allegedly fabricated some of the evidence after the prosecutor's initial decision to charge, and so the allegedly fabricated evidence could not have affected the prosecutor's decision.  See McSherry, 584 F.3d at 1133, 1136, 1142.

The Court also finds a triable issue on causation, because it is disputed when the decision to prosecute Burum, Kirk, and Biane took place.  On February 9, 2010, the DA's Office filed criminal complaints against Erwin, Postmus, and DeFazio for their conduct related to the Settlement, but did not name Burum, Kirk, or Biane in the complaint, except indirectly as Doe defendants.  (DSUF ¶ 44.)  Postmus's testimony was more than a "trivial matter" to Hackleman, Spencer, 857 F.3d at 798, and so was arguably the proximate cause of the prosecutor's decision to pursue an indictment against Burum, Kirk, and Biane.  (Foster Decl., Ex. 82 (attaching email from Hackleman stating, "I am not yet convinced we have enough to file [on Biane] . . . we come up short on a viable case against Paul [Biane] or Jeff [Burum], as of this date[, February 8, 2011].")

As a result, the Court finds Burum, Kirk, and Biane raise a genuine dispute whether the potentially fabricated evidence caused their deprivation of liberty, but Erwin and DeFazio[54] do not.  The Court DENIES Randles and Schreiber's MSJs on Burum, Kirk, and Biane's fabrication of evidence claims, and GRANTS Randles, Schreiber, Ramos, and the County's MSJs on all other fabrication of evidence claims.

//

---

[53] Reply papers should be limited to matters raised in the opposition papers, and the opposition papers did not raise the motion to withdraw plea hearing.  It is improper for the moving party to "shift gears" and introduce new facts or different legal arguments in the reply brief than presented in the moving papers.  See Lujan v. National Wildlife Federation, 497 U.S. 871, 894–895 (1990) (court has discretion to disregard late-filed factual matters); Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) ("district court need not consider arguments raised for the first time in a reply brief").

[54] DeFazio simply joins in Burum's Consolidated Opposition with respect to fabrication of evidence, and therefore only premises his response to the MSJs on fabrication of evidence at the Postmus interviews.  (DeFazio Opp'n at 21.)

## F.     Malicious Prosecution

Plaintiffs assert malicious prosecution claims as follows: Burum against Ramos, Cope, and Hackleman; Erwin against Cope, Randles, and Schreiber; Kirk against Ramos, Cope, Randles, and Schreiber; Biane against Ramos, Cope, Randles, and Schreiber.  (Burum SAC; Erwin FAC; Kirk FAC; Biane FAC.)

### 1.     Legal Standard

The relevant elements of the common law tort of malicious prosecution are incorporated into the analysis of a malicious prosecution claim under Section 1983.  Awabdy v. City of Adelanto, 368 F.3d 1062, 1066 (9th Cir. 2004) (citing Usher v. City of Los Angeles, 828 F.2d 556, 562 (9th Cir. 1987).)  California law requires a plaintiff claiming malicious prosecution to establish "that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice."  Sheldon Appel Co. v. Albert & Oliker, 47 Cal. 3d 863, 871 (1989) (internal quotation marks omitted).  Additionally, to maintain a Section 1983 action for malicious prosecution, "a plaintiff 'must show that the defendants prosecuted [him] ... for the purpose of denying [him] equal protection or another specific constitutional right.'"  Awabdy, 368 F.3d at 1066 (quoting Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995)).  Malicious prosecution actions are not limited to suits against prosecutors but may be brought against other persons who have wrongfully caused the charges to be filed.  Galbraith v. County of Santa Clara, 307 F.3d 1119, 1126–27 (9th Cir. 2002).

Collateral estoppel[55] may bar a plaintiff from relitigating the no-probable-cause requirement in a subsequent Section 1983 claim.  Haupt v. Dillard, 17 F.3d 285, 289 (9th Cir. 1994).  In California, a decision by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes prima facie—but not conclusive—evidence of probable cause.  Awabdy, 368 F.3d at 1067 (9th Cir. 2004) (citations omitted).  A plaintiff can rebut a prima facie finding of probable cause, among other ways, by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken

---

[55] Under California law, collateral estoppel bars the relitigation of an issue in a subsequent proceeding when certain threshold requirements are fulfilled: (1) the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding; (2) this issue must have been actually litigated in the former proceeding; (3) it must have been necessarily decided in the former proceeding; (4) the decision in the former proceeding must be final and on the merits; and (5) the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.  Mills v. City of Covina, 921 F.3d 1161, 1169 (9th Cir. 2019) (citing Gikas v. Zolin, 6 Cal. 4th 841, 849 (1993)), cert. denied sub nom. Mills v. City of Covina, California, 140 S. Ct. 388 (2019), .

in bad faith.  Id. (citations omitted).  Similarly, collateral estoppel does not bar the Section 1983 claim when the decision to hold the defendant to answer was made on the basis of false or fabricated evidence presented at that hearing or as the result of other wrongful conduct by state or local officials.  Id.

### 2.    The Parties' Contentions

Defendants argue that the malicious prosecution claim fails for the same reason Plaintiffs' retaliation claims fail: there was probable cause for the prosecution, and the absence of probable cause is an element of malicious prosecution.  (Ramos MSJ at 22; Schreiber MSJ at 27.)  The Prosecutor Defendants also argue they are absolutely immune from malicious prosecution claims. (Ramos MSJ at 22 (citing Imbler v. Pachtman, 424 U.S. 409, 428 (1976)).)  As to Biane's and Kirk's claims against Ramos (that he steered the investigation towards Biane and supervised the investigators), Ramos responds that he cannot be liable for malicious prosecution just for supervising investigators.  (Ramos MSJ at 22 (citing Lacey v. Maricopa Cty., 693 F.3d 896, 919 (9th Cir. 2012)).)  Moreover, Ramos contends he did not participate in or direct the investigations.  (Id. (citing Compendium Ex. 100).)

Plaintiffs respond that there is a triable issue on malicious prosecution for the same reason there is a triable issue on retaliation: because of the false-or-fabricated-evidence exception to "any requirement" that they show a lack of probable cause.  (Consol. Opp'n at 41 (citing Awabdy, 368 F.3d at 1067).)  They also argue that where there is a conspiracy, there is malicious prosecution.  (Id. (citing Bretz v. Kelman, 773 F.2d 1026, 1031 (9th Cir. 1985)).)  Thus, to the extent the conspiracy or fabrication of evidence claims survive summary judgment, the malicious prosecution claim must also remain.[56]

### 3.    Discussion

To maintain a Section 1983 action for malicious prosecution, "a plaintiff 'must show that the defendants prosecuted [him] ... for the purpose of denying [him] equal protection or another specific constitutional right.'"  Awabdy, 368 F.3d at 1066 (noting, however, that no substantive due process right exists to be free from prosecution without probable cause).  As discussed in the previous Section, Part IV.B, the "specific" right in play is the First Amendment right to be free from official reprisal for protected speech.

Plaintiffs and Defendants agree that the malicious prosecution claims rise and fall with the underlying First Amendment claims.  (Ramos MSJ at 22 (Since Plaintiffs' retaliation claims fail . . . so too do their malicious prosecution claims); Consol. Opp'n at 41 ("Because there is a triable

---

[56] Biane and DeFazio provide additional argument on the subject of malice.  (Biane Opp'n at 14 (citing Sierra Club Found. v. Graham, 72 Cal. App. 4th 1135, 1157 (1999)); DeFazio Opp'n at 19.)  They focus on evidence that Randles initiated the investigation based only on the dollar amount of the settlement and his suspicions.  (DeFazio Opp'n at 19 (citing DeFazio SAF ¶¶ 104-109).)

issue on retaliation . . . the same is true for malicious prosecution.").)  False or fabricated evidence may rebut probable cause, and thus helps a plaintiff, but under <u>Awabdy</u>, the plaintiff must invoke a "specific" constitutional right other than substantive due process.  368 F.3d at 1069–70.  If any Plaintiff is attempting to rely on procedural due process or a constitutional right other than the First Amendment, he has not so pleaded.  (Erwin FAC ¶¶ 94-111; Biane FAC ¶¶ 80-88; Kirk FAC ¶ 85.)  Kirk mentions in passing his right to equal protection under the Fourteenth Amendment only in the context of his conspiracy claim, (<u>Kirk</u> FAC ¶ 116), but never elaborates how this right was violated, (<u>see</u> Ramos MSJ at 20 n.16; Kirk Opp'n (failing to mention Equal Protection in any context).)

The Court is mindful that Kirk and Biane's false and fabricated evidence claims survive for now.  But it is far from evident the two can state a malicious prosecution claim on that basis alone, or that such a novel formulation of their claim would be within the scope of their operative complaints: for example, malicious prosecution with the purpose of violating Fourteenth Amendment due process rights.  <u>Costanich</u>, 627 F.3d at 1113-12; <u>Spengler v. Pomona Police Dep't</u>, 2018 WL 10498558, at *3 (C.D. Cal. June 19, 2018) ("To the extent plaintiff intends to allege a procedural due process violation, he must allege a specific liberty or property interest and which process defendants intended to deprive him.").  Assuming a procedural due process violation occurred due to false and fabricated evidence, this could negate probable cause, but would not necessarily lead to an inference Randles or Schreiber fabricated evidence "for the purpose" of violating Biane or Kirk's rights.  <u>Awabdy</u>, 368 F.3d at 1066.[57]  Nor would it resolve the problem that Kirk and Biane's fabricated evidence claims are only against Randles and Schreiber, but those Defendants did not "commenc[e]" or "direct[]" the prosecution or "initiate[]" it "with malice."  <u>Sheldon Appel Co.</u>, 47 Cal. 3d at 871.

Returning to the original point, the Court finds Plaintiffs must plead a specific constitutional violation—which in this case can only be the First Amendment—to proceed on their malicious prosecution claims.  The Court granted Defendants' MSJs on the First Amendment retaliation claims asserted by Erwin, Kirk, and Biane.  As a result, the Court also GRANTS Defendants' MSJs on malicious prosecution claims asserted by Erwin, Kirk, and Biane.  The only pending malicious prosecution claim is therefore by Burum, against Ramos and Hackleman.  The Court DENIES Ramos and Hackleman's MSJs on Burum's malicious prosecution claim.

The Court finds a triable issue on malicious prosecution, because the parties genuinely dispute when the decision to prosecute took place, who made it, and whether it was made independently.  The record suggests some prosecutors were determined to pursue an indictment against Burum prior to the Postmus interview, but others did not resolve to pursue the

---

[57] <u>See also</u>  <u>Mishak v. Serazin</u>, 2018 WL 5620091, at *14 (N.D. Ohio Oct. 30, 2018) ("Based on the Court's own research, it appears the Circuit Courts of Appeals are divided on the issue of whether a federal malicious prosecution claim may be premised on an alleged due process violation under the Fourteenth Amendment.") (collecting cases).

indictment until later.[58]  Second, the Court finds a triable issue on whether false or fabricated evidence from the February and March 2011 Postmus interviews influenced the decision to pursue an indictment against Burum.  See Part IV.E.  As a result, the false and fabricated evidence exception to absolute immunity to malicious prosecution may apply.  Buckley, 509 U.S. at 275.

## G.  Conspiracy

Each Plaintiff alleges conspiracy under 42 U.S.C. § 1983 against each Defendant named by that Plaintiff, including the County.  (Colonies FAC; Burum SAC; Erwin FAC; Kirk FAC; Biane FAC; DeFazio Compl.)

### 1.  Legal Standard

A civil conspiracy is "a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage."  Lacey, 693 F.3d at 935 (quoting Gilbrook v. City of Westminster, 177 F.3d 839, 856 (9th Cir. 1999)).  A plaintiff must show the conspiring parties "reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement."  Id. (quoting Gilbrook, 177 F.3d at 856).  Conspiracy is not a constitutional tort under Section 1983.  Id.  "It does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation.  [It] may, however, enlarge the pool of responsible defendants. . . ."  Id.

### 2.  The Parties' Contentions

The County argues that the conspiracy to retaliate must fulfill additional requirements: Plaintiffs must show an agreement by a County policymaker with someone acting independently of the County.  (County MSJ at 8-9 (citing Avalos v. Baca, 517 F. Supp. 2d 1156, 1170 (C.D. Cal. 2007) ("[S]ince a municipal entity cannot conspire with itself, plaintiff's claim against defendants in their official capacity fails.")).)  The County also contends Plaintiffs fail to show a deprivation of constitutional rights.  (Id. at 9.)  To the County arguments, individual Defendants add that Plaintiffs do not point to concrete evidence of an agreement to violate their constitutional rights, or acts unlikely to be undertaken absent an agreement, and also fail to show the conspiracy caused any harm.  (Ramos MSJ at 25 (citing Radcliffe v. Rainbow Const. Co., 254 F.3d 772, 782 (9th Cir. 2001); Mendocino Envtl. Ctr. v. Mendocino Cty., 192 F.3d 1283, 1301 (9th Cir. 1999)); Schreiber MSJ at 28 (same).)

---

[58] In January 2011, Hackleman wrote that he "hope[ed] to present the bottom-line recommendation" to Ramos, regarding whether to broaden charges to include the Doe Defendants.  (Joint SAF ¶ 68.)  On February 7, 2011, Hackleman wrote to Schreiber and Cope regarding the "Big Decision" and their "commitment to take a position" to join or oppose the recommendation from the California AG's Office, in the form of a memo.  (Id. ¶ 69; Foster Decl. Ex. 93.)

Plaintiffs counter that "[w]hether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury." (Consolidated Opp'n at 48 (citing Mendocino, 192 F.3d 1283, 1301 (9th Cir. 1999)). They point to the Joint SAF, in particular evidence of meetings, updates, and emails regarding the investigation. (Id.) Biane adds that conspiracies are highly context-specific and best left to juries, where facts could lead to an inference of conspiracy, and plaintiffs are not required to provide direct evidence of the agreement. (Biane Opp'n at 20 (citing Williams v. County of Santa Barbara, 272 F. Supp. 2d 995 (C.D. Cal. 2003))). Demonstrating the interconnected nature of Plaintiffs' claims, Biane argues that the malicious prosecution and fabrication of evidence show Defendants "worked together closely" and a jury must determine whether there was an express or tacit agreement to deprive Plaintiffs of their rights. (Id. at 22.)

### 3.    Discussion

An actual constitutional deprivation is required for a conspiracy claim to succeed. Hart, 450 F.3d at 1071. The conspiracy claim may expand the pool of responsible defendants, but not the pool of plaintiffs. Lacey, 693 F.3d at 935. Here, the conspiracy alleged was to "retaliate" using "false and fabricated evidence, (Consol. Opp'n at 291), so the Court eliminates conspiracy claims arising out of asserted claims of retaliation that have also been denied on summary judgment. Thus, the only remaining conspiracy claims for consideration are by Burum and Colonies.[59]

For the same reasons described in the Sections on First Amendment retaliation and on fabrication of evidence, the Court finds a triable issue on conspiracy. "[C]oncerted action" to accomplish an "unlawful objective" can be inferred on the basis of the same circumstantial evidence of Defendants' actions previously discussed. See Mendocino Cty., 192 F.3d 1283, 1301 (9th Cir. 1999.) Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, "so long as there is a possibility that the jury can infer from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached a[n] understanding to achieve the conspiracy's objectives." Id. To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1541 (9th Cir. 1989). The asserted common objective of the conspiracy here was to retaliate against Plaintiffs. Evidence that "each Defendant participated directly in several aspects of unlawful investigative conduct," would be enough to infer that Defendants reached an understanding to achieve that common objective. Alcox v. City of Lompoc, 2019 WL 8013875, at *13 (C.D. Cal. Nov. 27, 2019.)

---

[59] Burum and Colonies have a claim of retaliation and Burum, Kirk, and Biane have a claim of fabrication of evidence. However, because the Court concluded Kirk and Biane do not provide more than a scintilla of evidence Defendants were substantially motivated by animus against them, the Court also concludes they fail to state a claim that Defendants conspired to retaliate against them.

Defendants assert there must be "concrete evidence" of an agreement to violate constitutional rights. (Ramos MSJ at 25.) That language, excerpted from Radcliffe, 254 F.3d at 782, can be traced to a discussion of the burden of proof on summary judgment in a libel case, Liberty Lobby, 477 U.S. 242, 256 (1986) (holding that on summary judgment, the court must consider the heightened "clear and convincing" standard of proof for actual malice in determining the quantum and quality of proof needed to support a claim of libel). Although Mendocino does not adopt a clear and convincing standard of proof, the reference to "concrete evidence" suggests a heightened standard. At least one court has required pleading "specific facts" to support the existence of the claimed conspiracy. Avalos v. Baca, 517 F. Supp. 2d 1156, 1169 (C.D. Cal. 2007) (quoting Burns v. County of King, 883 F.2d 819, 821 (9th Cir. 1989)), aff'd, 596 F.3d 583 (9th Cir. 2010). Without deciding the question, the Court is satisfied that the quantum and quality of evidence provided by Burum and Colonies in response to the MSJs would be adequate to satisfy that standard.

A question remains whether to "enlarge" the pool of Defendants to include Cope, Randles, or Schreiber.[60] For the reasons discussed in Part IV.B on retaliatory investigation, the Court finds the evidence of a substantial motivation to retaliate so lacking that a reasonable juror could not possibly conclude they participated in a conspiracy to retaliate.

Accordingly, the Court: (1) GRANTS Defendants' MSJs on Kirk, Biane, Erwin, and DeFazio's conspiracy claims, because these Plaintiffs have not demonstrated the investigation was substantially motivated by retaliatory animus against them and thus, no conspiracy to retaliate could have existed; (2) GRANTS the County's MSJs on the remaining conspiracy claims against it, because the County cannot conspire with itself; (3) GRANTS Cope's, Randles, and Schreiber's MSJs on remaining conspiracy claims against them; and (4) DENIES Ramos and Hackleman's MSJs on Burum and Colonies' conspiracy claims.

## H. Supervisory Liability

### 1. Legal Standard

An official may be liable as a supervisor "only if either (1) he or she was personally involved in the constitutional deprivation, or (2) a sufficient causal connection exists between the supervisor's wrongful conduct and the constitutional violation." Felarca v. Birgeneau, 891 F.3d 809, 819-20 (9th Cir. 2018) (internal quotations omitted). The requisite causal connection can be established by "setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." Id.

//

---

[60] Notably, the asserted conspiracy was not to fabricate evidence, but to do so "for the purpose of retaliating." (See Burum SAC ¶ 158.)

## 2.      The Parties' Contentions

The prosecutor Defendants (Ramos, Hackleman, and Cope) contend that there is no triable issue on supervisory liability, to the extent Plaintiffs assert they are liable as supervisors under 42 U.S.C. § 1983 for the alleged acts of the investigators, including fabrication of evidence or retaliation. (Ramos MSJ at 24.) Ramos also notes separately that supervisory liability with regard to his supervision of prosecutors cannot be established, because the relevant conduct occurred during the prosecution stage, when prosecutors are absolutely immune. (Ramos MSJ at 23-24 n.17 (citing Van de Kamp v. Goldstein, 555 U.S. 335, 345-46 (2009)).)

Plaintiffs respond that there is a triable issue on the extent of Ramos, Hackleman, and Cope's supervision, again, by recapping their separate statement of facts. (Consolidated Opp'n at 47.) For example, Plaintiffs argue the supervisors: (1) participated in weekly investigative updates; (2) admitted to having supervisory roles; (3) played a role in coercing Postmus by being present at the interview (Cope); (3) emailed before the second interview (Hackleman), or consulted with Ramos on the plans. (Id. at 47.)

## 3.      Discussion

Supervisors may be held liable in their individual capacities for constitutional violations under Section 1983 if the supervisor: (1) personally participated in the constitutional violation; (2) directed the violation; or (3) there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (citation omitted); see also Gravelet–Blondin v. Shelton, 728 F.3d 1086, 1096 (9th Cir. 2013) ("To meet this requirement, the plaintiff must show both causation-in-fact and proximate causation.").

Plaintiffs offer insufficient evidence to create a triable issue on Cope's supervisory liability, but more than enough for Ramos or Hackleman to be held accountable as supervisors. The Court discusses Cope first. Plaintiffs' Joint SAF and Joint SGD say little about Cope's role in the PIU. The record reflects that Cope appeared at the beginning of several interviews, and was "involved in scheduling them." (Joint SGD ¶ 88.) Although Cope may have helped to "jump start" the PIU in the early days of its operation, the record is devoid of evidence suggesting Cope played a significant supervisory role or was the proximate cause of the rights violations. (Joint SAF ¶ 19.)

Later emails and other evidence suggest a much more active supervisory role for Hackleman, and by extension Ramos. (Joint SAF ¶ 59.) Ramos received email and in-person updates from Hackleman on PIU activity generally, and on the Settlement investigation in particular. (Joint SGD ¶ 85; Foster Decl., Ex. 2 at 97.) He also testified that Hackleman was "right next door to my office and would give me updates in my office as well." (Joint SAF ¶ 58.) Ramos contends the updates were of a general nature and would not have notified him of misconduct by his subordinates. (Ramos Reply at 29.) The Court finds a genuine dispute on the extent of his awareness and ratification of the purported violations, however. This evidence, and

the evidence supporting retaliatory motive, supports an inference that Hackleman and Ramos either directed the violations or that there is a causal connection between their action or inaction and the violations. Accordingly, the Court DENIES Ramos and Hackleman's MSJs on supervisory liability claims and GRANTS Cope's MSJs on the same.

## I.  Negligence and IIED

Burum and Erwin assert claims of negligence and intentional infliction of emotional distress ("IIED") against all Defendants. (Burum SAC; Erwin FAC.) The claims are time barred.

The statute of limitations for IIED begins to run when "the effects of a defendant's conduct result in plaintiff's severe emotional distress." Kiseskey v. Carpenters' Trust for So. California, 144 Cal. App. 3d 222, 232 (1983). California courts have roughly equated this with when plaintiffs learned or should have learned of the "outrageous" conduct—essentially, when they were on notice of the conduct. See Unruh-Haxton v. Regents of University of California, 162 Cal. App. 4th 343, 356-358 (Cal. Ct. App. 2008) (noting that "the discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action," and holding that IIED statute of limitations was triggered "on the date the patients received letters from an attorney stating their names were on" the list of victimized patients).

The County argues that the state law negligence and IIED claims are barred by the statute of limitations. In particular, a claim must be presented within six months of the accrual of the cause of action. (County MSJ (citing Cal. Gov. Code §§ 905, 945.4.); Ramos MSJ at 32 (same).) The County claims the six-month period is not tolled by a criminal trial. (Id. at 10 nn.7-8 (citing DeLeon v. City of Vista, 2019 WL 969544, at *5 (S.D. Cal. Feb. 28, 2019), and Nguyen v. Western Digital Corp., 229 Cal. App. 4th 1522, 1552 (2014) (holding accrual starts at the earlier of objective or subjective knowledge that the injury was caused by wrongdoing)).) Hence, the Defendants argue, Burum and Erwin's claims accrued in February 2010 and after Erwin's arrest. (Id. (citing SUF ¶¶ 90-91).)

Burum and Erwin respond that the outrageous nature of Defendants' conduct was not fully evident until after the criminal trial, so the equitable principles of delayed discovery apply. (Consol. Opp'n at 55.) They do not contest that six months is the appropriate period, and observe they were precluded from bringing a civil lawsuit so long as criminal charges against them were pending. (Id. (citing Cal. Gov. Code § 945.3).) As Cal. Gov. Code § 945.3 acknowledges, however, bringing a civil lawsuit for damages is not the same thing as "filing a claim with the board of a public entity," and there is no bar to filing such a claim while criminal charges are pending.

Consequently, the state law claims are barred. On May 19, 2014, long after the indictment and the commencement of criminal proceedings, Burum filed a motion to dismiss the indictment based on alleged prosecutorial misconduct and alleged coercion of Postmus and Aleman by investigators, which Erwin joined. (DSUF ¶¶ 77-78.) Thus, the IIED and negligence

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

claims accrued as of May 19, 2014 at the latest.  By that date, Burum and Erwin had begun
experiencing the asserted harms or distress, (id. ¶¶ 90, 91), and were on inquiry notice of the
asserted misconduct.  Erwin and Burum did not file their state law claims until several months
after the trial, however  (Reply at 22-24 (implying Burum filed in January 2018); Joint SAF ¶ 116
(a jury acquitted Burum of all charges on August 28, 2017); Consol. Opp'n (not bothering to state
when exactly Burum filed his claim); Erwin Opp'n at (same).)  Accordingly, the Court GRANTS
Defendants' MSJs on the IIED and negligence claims.

## J.    Contract Claims

Colonies alleges that the County and the District breached the 2006 Agreement and
breached the implied covenant of good faith and fair dealing.  (Colonies FAC.)  On November 14,
2019, the Court ruled on the Flood Control District ("District") and Colonies' cross motions for
summary judgment on the contract claims, but did not directly address the question of County
liability. (MSJ Order.)  Now, the County asks for summary judgment on Colonies' claims of
breach of ¶ 3.3 and ¶ 6.3 of the Agreement, as well as the implied covenant claim.  (Colonies MSJ
at 11-13.)

Colonies did not oppose the MSJ on contractual claims under ¶ 3.3 and ¶ 6.3 or for breach
of the implied covenant of good faith and fair dealing.  "A complete failure of proof concerning
an essential element of the nonmoving party's case necessarily renders all other facts
immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  As a result the Court deems the
claims abandoned, and GRANTS the County's MSJ on the claims for breach of ¶¶ 3.3 and 6.3 of
the Settlement and for breach of the implied covenant of good faith and fair dealing.

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART
Defendants' motions for summary judgment, except Cope's motion for summary judgment,
which is GRANTED, as detailed above.  The Court DENIES Erwin's motion for summary
judgment.

**IT IS SO ORDERED.**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 1. Notice of Appeal from a Judgment or Order of a United States District Court

Name of U.S. District Court: Central District of California

U.S. District Court case number: 5:18-cv-02202-JGB-SHK

Date case was first filed in U.S. District Court: 10/15/2018

Date of judgment or order you are appealing: 07/28/2020

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

◉ Yes   ○ No   ○ IFP was granted by U.S. District Court

**List all Appellants** *(List each party filing the appeal. Do not use "et al." or other abbreviations.)*

Hollis "Bud" Randles
Robert Schreiber
Michael A. Ramos

Is this a cross-appeal?   ○ Yes   ◉ No

If Yes, what is the first appeal case number?

Was there a previous appeal in this case?   ○ Yes   ◉ No

If Yes, what is the prior appeal case number?

Your mailing address:

444 South Flower Street

Suite 2400

City: Los Angeles   State: CA   Zip Code: 90071

Prisoner Inmate or A Number (if applicable):

**Signature**  /s/ Charles E. Slyngstad   **Date** Aug 26, 2020

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 1**                                                    *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

Hollis "Bud" Randles
Robert Schreiber

Name(s) of counsel (if any):

Charles E. Slyngstad
Brian S. Ginter

Address: 444 South Flower Street, Suite 2400, Los Angeles, CA 90071

Telephone number(s): (213) 236-0600

Email(s): cslyngstad@bwslaw.com; bginter@bwslaw.com

Is counsel registered for Electronic Filing in the 9th Circuit?  ⊙ Yes   ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*
Name(s) of party/parties:

Paul Biane

Name(s) of counsel (if any):

Dale K. Galipo
Renee V. Masongsong

Address: 21800 Burbank Boulevard, Suite 310, Woodland Hills, CA 91367

Telephone number(s): (818) 347-3333

Email(s): dgalipo@galipolaw.com; rvalentine@galipolaw.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**<u>Appellants</u>**

Name(s) of party/parties:

Michael A. Ramos

Name(s) of counsel (if any):

Charles E. Slyngstad
Brian S. Ginter

Address: 444 South Flower Street, Suite 2400, Los Angeles, CA 90071

Telephone number(s): (213) 236-0600

Email(s): cslyngstad@bwslaw.com; bginter@bwslaw.com

Is counsel registered for Electronic Filing in the 9th Circuit?   ◉ Yes   ○ No

**<u>Appellees</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 6**                                        *2*                                   *New 12/01/2018*